# UNITED STATES DISTRICT COURT
## FLORIDA MIDDLE DISTRICT

JEFF DAVIES

     Plaintiff

                                     Civil Case Number:

v.

INTERNET CORPORATION FOR
ASSIGNED NAMES AND NUMBERS
     a California Nonprofit Public
     Benefit Corporation
And

AFILIAS LIMITED
     A Delaware corporation

     Defendants



## COMPLAINT

### Nature of Case

Jeff Davies seeks:

- A declaration that the 'Sunrise Policy' of the Defendants is contrary to the free speech provisions of the First Amendment of the United States Constitution.

- A declaration that the agreement of the defendants to implement and enforce a 'Sunrise Policy' constitutes an unlawful contract and conspiracy in restraint of trade contrary to the Sherman Act, 15 U.S.C. §1.

- A declaration that Afilias is in breach of its own policies by restricting the free use of the Plaintiff's domain name registrations as a result of locking the Plaintiff's domain registrations beyond the period specifically allowed.

- A declaration that Afilias' Sunrise Challenge Policy denies due process by denying the right to a party to represent himself or be represented by legal counsel and is, thereby, contrary to the contractual terms which govern its provisions.

- Statutory and other damages in an amount to be proven at trial.

- Injunctive relief.

- Costs and fees.

- Such other remedies and relief as the Court deems just.

## Parties

1. Plaintiff, Jeff Davies, is a natural person residing at 5452 Coral Way, Orlando, Florida.

2. The first defendant, Internet Corporation for Assigned Names and Numbers ("ICANN"), has its principal place of business at 4676 Admiralty Way, Suite 330, Marina Del Rey, CA 90292.

3. The second defendant, Afilias Limited ("Afilias"), has its principal place of business at Building 3, Suite 105, 300 Welsh Road, Horsham, PA 19044.

## Jurisdiction

4. This Court has jurisdiction under 28 U.S.C. § 1331 as a civil action arising under the First Amendment of the Constitution and the laws of the United States.

## Venue

5. Venue is proper in the Middle District of Florida because:

    a    The plaintiff is resident within this District

b     A substantial portion of the events giving rise to this action occurred within this District

c     Certain material contracts that form the basis of this action were entered into in this District

d     The Plaintiff has been damaged by actions taken by the Defendants specifically aimed at the Plaintiff in Florida such that they should have reasonably expected to be held accountable in the Florida Courts.

e     This Complaint concerns trademark-based domain name disputes. The Uniform Domain Name Dispute Resolution Policy (the "UDRP") is the policy developed by ICANN to regulate the resolution of domain name disputes "by agreement, court action or arbitration"[1]. The provisions of ICANN's policy are binding upon the Plaintiff as a domain name registrant; upon Defendant Afilias as a domain registry and upon ICANN as the entity responsible for the Policy's development and application. The Plaintiff is the holder of various domain names that are the subject of dispute. The UDRP policy defines a 'court of mutual jurisdiction'[2] – one in which venue is proper to hear cases involving trademark-based domain name disputes - to be within the District encompassing the domain-name holders address. The Plaintiff resides in Orlando, Florida. All parties to this matter - as parties to ICANN's UDRP - therefore consent to the Venue of this Court being proper in the Middle District of Florida.

---

[1]    http://www.icann.org/udrp/

[2]    http://www.icann.org/dndr/udrp/uniform-rules.htm Section 1 - Definitions - Mutual Jurisdiction

**Facts**

**Internet, Domain Name and Dispute Resolution
Background Information**

6.      The Internet is a world-wide collection of computers connected together to form a

network that facilitates the exchange of information between the computers so

connected.

7.      Each computer is referenced by a unique internet protocol (IP) number that

consists of a set of 4 numbers separated by dots (as in 192.168.0.1). Because of

the difficulty of remembering such numeric identifiers a system known as the

domain name system (DNS) was developed. This system is designed to

associate a familiar name with a specific IP number and provides access to the

computer having a specific IP address by use of the familiar name.

8.      In the formative years of the Internet, it was decided to divide the DNS into

multiple domains to enable the same name to be used by more than one user.

Several 'top-level domains' (TLDs) were established and were named so as to

identify the category of users of the assigned names. These included com, net,

org, edu, mil and gov. The TLD is identified as an extension to the name (as in

usa.com) with the dot separating the name – usa - from the domain – com.

9.      The use of this system allows harvard.edu to be currently used by the

educational entity of that name and be distinct from the current use of

harvard.net by a company offering website hosting and harvard.com by a

commercial bookstore.

10.   Entitlement to register a name (a "domain name") within one of the public

domains of .com, .net and .org was available to anyone who prepaid an annual

fee and who chose a domain name not currently registered.

11.   In August 1999, a Uniform Domain Name Dispute Resolution Policy ("UDRP")

was adopted and made a condition of all domain name registrations. It provided

that a trademark holder could bring proceedings before an administrative tribunal

to resolve allegations that the registration and use of a domain name infringed

upon the trademark rights of the complainant. If the complaint was upheld, the

tribunal was empowered to order the transfer of the domain name to the

complainant.

### The Creation of ICANN and Statements of US Policy

12.   Registrations of names under the DNS system were originally controlled by a

single commercial entity, Network Solutions. In 1997 the President of the United

States directed the Secretary of Commerce to privatize the management of

Internet names and addresses to increase competition and facilitate international

participation.

13.   On June 5, 1998, the United States Department of Commerce issued a White

Paper[3] that envisaged the creation of ICANN as a private entity to manage the

DNS and, as a statement of policy, said[4]:

> **The U.S. Government policy applies only to management of Internet names and addresses and does not set out a system of Internet "governance." Existing human rights and free speech protections will not be disturbed and, therefore, need not be specifically included in the core principles for DNS management. In addition, this policy is not intended to displace other legal regimes (international law,**

---

[3]   Management of Internet Names and Addresses. Docket number 980212036-8146-02
http://www.ntia.doc.gov/ntiahome/domainname/6_5_98dns.htm

[4]   Management of Internet Names and Addresses – Comments and Response §1.

competition law, tax law and principles of international taxation, intellectual property law, etc.) that may already apply. The continued applicability of these systems as well as the principle of representation should ensure that DNS management proceeds in the interest of the Internet community as a whole.

The White Paper also referred to the "Trademark Dilemma" where a trademark could be reflected in a domain name and result in confusion as to the source of goods or services. The Government proposed:

The U.S. Government will seek international support to call upon the World Intellectual Property Organization (WIPO) to initiate a balanced and transparent process, which includes the participation of trademark holders and members of the Internet community who are not trademark holders, to (1) develop recommendations for a uniform approach to resolving trademark/domain name disputes involving cyberpiracy (as opposed to conflicts between trademark holders with legitimate competing rights), (2) recommend a process for protecting famous trademarks in the generic top level domains, and (3) evaluate the effects, based on studies conducted by independent organizations, such as the National Research Council of the National Academy of Sciences, of adding new gTLDs and related dispute resolution procedures on trademark and intellectual property holders. These findings and recommendations could be submitted to the board of the new corporation for its consideration in conjunction with its development of registry and registrar policy and the creation and introduction of new gTLDs.

The White Paper also provided for the new corporation (ICANN) to adopt policies whereby:

Nothing in the domain name registration agreement or in the operation of the new corporation should limit the rights that can be asserted by a domain name registrant or trademark owner under national laws.

14.    The Government subsequently ended Network Solution's monopoly and issued a charter to ICANN to establish that organization as a public-benefit, non-profit corporation to oversee and regulate the Internet DNS in accordance with the principles set out in the White Paper referred to above..

15.    ICANN's Articles of Incorporation (Appendix 1), section 4 states:

The Corporation shall operate for the benefit of the Internet community as a whole, carrying out its activities in conformity with relevant principles of international law and applicable international conventions and local law and, to the extent appropriate and consistent with these Articles and its Bylaws, through open and transparent processes that enable competition and open entry in Internet-related markets.

16.    On August 24, 1999, ICANN's Government Advisory Committee ("GAC") issued

a communiqué (Appendix 2) which included the statement:

> **The GAC reaffirmed its May resolution that the Internet naming system is a public resource and that the management of a TLD Registry must be in the public interest.**

This statement of policy was affirmed in a letter written by Louis Touton –

ICANN's Vice President and General Counsel - on October 23, 2000[5].

17.    ICANN describes itself on its main web page as:

> **a technical coordination body for the Internet…assuming responsibility for a set of technical functions previously performed under U.S. government[6]**

It's policies are described as being developed:

> **through private-sector, bottom-up, consensus-based means.**

### The WIPO Report and
### The issue of new Top-Level Domains (TLDs)

18.    In furtherance of the US Government's White Paper referred to above, the World

Intellectual Property Organization ("WIPO") - an international organization

founded by 171 treaty states and dedicated to the protection of intellectual

property rights – carried out an extensive international process of consultation[7].

Chapter 4 of its report considered whether additional protection should be

provided to 'famous' trademarks by such names being excluded from registration

as domain names in newly authorized TLDs. The report took account of

"frequently voiced" criticisms and concerns that such a policy of exclusion should

---

[5]    http://www.icann.org/tlds/correspondence/biz.com-response-23oct00.htm
[6]    http://www.icann.org
[7]    The Management of Internet Names and Addresses: Intellectual Property Issues
Executive Summary – Background
http://wipo2.wipo.int/process1/report/doc/report.doc

be strictly limited in terms of applicability and also that such an extension of

protection should not create new law. The report recommended[8]:

> **"that a mechanism be established before the introduction of any new open gTLDs whereby exclusions can be obtained and enforced for marks that are famous or well-known across a widespread geographical area and across different classes of goods and services".**

The report also recommended that the designation of well-known trademarks

should be by a panel of experts acting within a central authority (WIPO

suggested that it would be consistent with its mandate to provide such a

service)[9]: The report further recommended that[10]:

> **ICANN adopt a policy providing for a mechanism for obtaining and enforcing exclusions in open gTLDs for famous and well-known marks**

19.    ICANN subsequently established Working Group B charged with addressing

"Chapter 4 of the World Intellectual Property Organization ("WIPO") report"

referred to above. The majority of the participants of the Working Group were

described as "trademark attorneys and brand managers"[11] - hardly representative

of the broad range of Internet stakeholders that ICANN is supposed to support

and protect.

20.    As input to the Working Group, ICANN's Intellectual Property constituency

essentially proposed adoption of the WIPO recommendations for famous names

to be granted exclusionary status. Under this proposal, registrar's would be

required to 'filter' domain name applications to ensure that famous marks would

be protected. The Registrar's Constituency strongly opposed any such

---

[8]  The Management of Internet Names and Addresses: Intellectual Property Issues § 275
[9]  The Management of Internet Names and Addresses: Intellectual Property Issues § 276 & 279
[10]  The Management of Internet Names and Addresses: Intellectual Property Issues § 278
[11]  Working Group B Report - Background
http://www.icann.org/dnso/wgb-report-17apr00.htm

responsibility and proposed an alternative 'Sunrise program' in which all

trademark owners could participate.

21.    A position paper by the non-commercial constituency within ICANN was also

submitted to Working Group B[12]:

> This position paper argues that the creation of a list of famous marks which are
> then excluded from all new gTLDs would greatly expand the existing rights of
> famous mark holders. It would allow those who hold marks that are famous in one
> context, to block future domain name holders in the new gTLDs from using words
> in noncommercial and generic ways that are specifically protected under domestic
> laws of sovereign countries. It would eliminate the ability of individuals,
> noncommercial groups and small businesses to register domain names in new
> gTLDs for protected noncommercial uses (such as "bell" by a school group or
> "apple" for a children's noncommercial program) and also for protected generic
> uses (such as "bell" by a bell manufacturer or "apple" by an small apple farmer).
> Instead of the WIPO/IPC proposal, the Non-Commercial Paper proposes creation of
> a .TMK top level domain (others have called it .FAME) for famous marks in which
> WIPO could create a list of famous marks owners, these famous names would be
> registered in this new gTLD, and the gTLD would be branded as "the place to be in
> e-commerce."

22.    One day before the deadline for the production of the Group's report (Appendix

3), the Intellectual Property Constituency submitted a revised proposal which

adopted the registrar's proposal  - but went even further:

> a Sunrise Proposal to be incorporated into the rollout of new top-level domains.
> During the Sunrise Period, owners of trademarks and service marks (marks) would
> be able to register their marks as domain names on a first-come-first-served basis
> in a new top-level domain before that new domain is opened to the general public.
> In order, to protect their sub-string variations without the need for filters, the
> trademark owner would be able to register up to 20 variations of the mark.

No discussion of this proposal took place within the Group and no vote was taken

to adopt or modify its contents.

23.    Working Group B's report states:

> There remains strong opposition among many members of the Working Group
> against any additional protections for trademarks beyond the Uniform Dispute
> Resolution Policy and national laws such as the U.S. Anticybersquatting Act and
> the new trademark monitoring services now coming into existence.

and

---

[12]    http://www.icann.org/dnso/wgb-report-17apr00.htm   non-commercial constituency position paper

> **In response to the recent IPC and Registrar proposals advocating a Sunrise Proposal, several participants in the Working Group have criticized this proposal as being technically unfeasible, unfounded in law, and greatly expanding the scope of Working Group B's original charter**

24. Notwithstanding the submission of the proposal just one day before the production of the report and the warnings relating to its technical feasibility and even its legality (see above), it was, nevertheless, accepted and recommended for approval by the Chairman of the Group and author of the report, Michael Palage – an intellectual property attorney and also the 'Secretariat' of the Registrar Constituency – who, while admitting that:

> **on its face appears to greatly expand the scope of protection afforded to trademark owners from just famous trademarks to all registered trademarks.**

refers to it as:

> **an immediate solution to the protection of trademark interests during the test period for new top-level domains.**

This proposal exceeded the authority of the Working Group to restrict its consideration to the need for protection of famous marks.

25. The Report includes 8 attachments. The first recites the proposals of the Intellectual Property Constituency which demanded that:

> **The Sunrise Proposal Plus Twenty shall be incorporated into the rollout of new top-level domains .... Any owner of a valid national trademark or service mark registration is eligible to seek to register as a domain name during the Sunrise Period that mark and up to an additional twenty (20) variations of such mark**

This Constituency, therefore, demanded adoption of a policy that would dramatically broaden the scope of 'famous' name' protection to incorporate a right for **every** trademark holder to exclude others from registration of 'their' name - plus up to 20 variations of 'their' name – as a domain name.

26. The remaining seven attachments – from some 24 organizations, including: a Government Department, Professors of Law, Registrars, attorneys and authors

of Internet textbooks - are universally critical of both the proposal and the

processes of the Working Group. Typical comments (at least one has been taken

from each attachment) are:

- **An early registration is granting trademark holders rights that are above and beyond the law.**
- **trademarks are already adequately protected by the Uniform Dispute Resolution Policy ("UDRP") and the Anticybersquatting Consumer Protection Act ("ACPA").**
- **there is a question whether this registration preference violates the First Amendment of the U.S. Constitution as a restriction of free speech. In addition, it is conceivable that a sunrise period would constitute a restraint in trade or an attempt to combine with other persons to monopolize the name space, which is a violation of Sections 1 and 2 of the Sherman Act.**
- **The Exclusionary Proposals Have No Basis In Technology Or Law**
- **These proposals are for prospective, pre-emptive restraints of the kind that we do not permit our own government to exert**
- **The IPC does not have the technical background to dictate how to run the Internet, and WG-B does not have the legal sophistication to re-write fundamental principles of trademark law, or law generally, in [a] single weekend.**
- **This is not how to run a computer network.**
- **this exceeds the scope of ICANN's authority. ICANN's purpose is not to safeguard the Internet for a specific class of users--the holders of famous marks.**
- **TUCOWS [a large Registrar] must protest the inadequate consultation that has taken place in regard to these proposals, and must on grounds of substance reject them in their entirety. We find it increasingly anomalous that the secretary of the registrars association is acting to compromise the interests of IP holders with the interests of the vast mass of Internet users in this way**
- **… devastates the position of the IPC that they are entitled to extra-legal privileges in the matter of establishing domain names for famous names, and lately, for all trade mark holders in all countries.**
- **What we are actually observing in the saga of domain name expansion is a power-grab of major proportions over the architecture of the Internet, using ICANN not so much as a representative forum for IP interests as the embodiment of IP lawyers' interests. This tendency is not good for the Net, for Internet users, for small businesses…**
- **this was presented very late in the game, and without any warning.**
- **The latest proposals are utterly unfair and unnecessary. It is so hard to take them seriously that one is almost forced to assume they are proposed for tactical reasons**
- **a dispute settlement mechanism will have to be found at some later stage is a recipe for either gridlock or chaos**
- **The proposals are completely outside the mandate of your working group**
- **Thank you for allowing persons whose access to the debate is limited to the mailing list to have as much as 48 hours to comment.**
- **First, the "sunrise" proposal. This was not been discussed on-list, and if any consensus-building has occurred around it, it's occurred behind closed doors.**

27.   Of particular relevance is attachment 2 (see Appendix 3, page 11) written to the Chairman of the Working Group by the Office of Advocacy of the US Government's Small Business Administration. The SBA's Assistant Chief Counsel, Eric E. Menge, advises Mr. Palage that his proposals for a 'Sunrise Period' are both "flawed" and "not grounded in law". The letter continues that the implementation of such a Policy and the granting of early registration would be granting trademark holders rights that are above and beyond the law. The letter also advises that the proposed policy would provide preferential treatment to one class of commercial entity over another. Even more telling, the legal advocate of the Government's department committed to developing the interest of small business feels the need to also state that it is the SBA's view that commercial interests should not be given superior rights to individuals and non-commercial interests in furtherance of a presumption that commercial use of the Internet is somehow superior to personal use.

Trademark holders are, by definition, almost exclusively business entities. Small Businesses account for over 99% of employers in the United States and the SBA can, therefore, safely be regarded as being representative of the interests of the business community (and trademark holders) - interests that the Sunrise Policy is alleged by the Defendants to protect.

The SBA's counsel also stated his opinion that the Policy would not be effective in meeting its alleged objective of curbing trademark violations.

28.    On May 2, 2000, Ellen Rony, co-author of the authoritative 'Domain Name

Handbook" submitted a response to ICANN regarding the proposals of Working

Group B (see Appendix 4). It states, in part[13]

> **The report also insinuates support for a Trademark Sunrise+20 Proposal submitted on deadline by the Intellectual Property Constituency. Regrettably, too much attention is devoted to this strawman proposal, which was not vetted at all by members of Working Group B. Recommending a sunrise exclusion for ALL trademarks exceeds both the scope of WGB and ICANN's charter as the technical coordinator of Internet administration. The sunrise proposal is inherently inequitable, operationally impractical, internally inconsistent, and nonconforming with the tenets of trademark law.**

And

> **One of the tenets of the Department of Commerce Statement of Policy, a.k.a. the White Paper, is, "the new corporation should operate as a private entity for the benefit of the Internet community as a whole." A sunrise proposal for trademarks or famous marks provides an unsupportable pre-emptory bias to the commercial sector of the Internet over all other legitimate uses of the same or similar character strings.**

And

> **In summary:**
> *  **There are sufficient existing protections for trademarks, including federal law and statutes, the UDRP and monitoring mechanisms. Preemptive exclusions or a sunrise proposal are unnecessary.**
> *  **A famous marks list used for exclusionary registrations creates new preemptive rights that do not exist in law.**
> *  **A sunrise period is not likely to reduce the number of cybersquatters nor diminish the trademark owners concerns over policing the use of their marks**
> *  **Introduction of a top level domain solely for registered owners of trademarks is the most efficient way to assure that users find the sites associated with those marks and limit the value of cybersquatting.**

29.    On May 15, 2000 (posted on June 12, 2000), Working Group B produced its final

report (Appendix 5). This document is remarkable for its brevity and total lack of

recommendation with respect to its original charter to consider protection for

famous marks in line with the WIPO recommendations. It did however again seek

to promote the minority views of its Chairman and Report author – Michael

Palage – and those of the IP Constituency (see paragraph 22 et. seq. above):

---

[13]    http://www.domainhandbook.com/wgbreport.html

> **I regret to inform the Names Counsel [sic] that there does not appear to be consensus among the Working Group B participants as to the type of mechanism that should be incorporated into the rollout of new top-level domains. However, I encourage the Names Counsel Representatives to review the proposals contained in my April 17, 2000 formal report.**

The proposals recommended to the Names Council were those submitted one day before the report was published and that were neither discussed nor voted on – or even seen - by members of the Working Group (see paragraph 22 above).

30.   On May 19, 2000, the ICANN Names Counsel passed a resolution[14] (Appendix 6) that referred to the report of Working Group B and that consensus had been reached that:

> **some type of mechanism, yet to be determined, is necessary in connection with famous trademarks and the operation of the Domain Name System**

This conclusion appears to be based upon a preliminary vote taken within Working Group B some six months before – and before the Group even called for position papers from participants. At this vote, some 30 of the 120 members of the Group voted in favor. There was a subsequent controversy regarding the tabulation of votes and allegations that less than 30 had voted in favor. The result was redefined as a "rough consensus". The Plaintiff has been unable to locate any record of the result of any vote that may have been taken during the following six months of debate. The Names Council resolution appears, therefore, to be solely based upon an outdated, disputed and isolated event that even occurred prior to consideration of the various position papers that were subsequently provided. It was clearly not based upon any consensus reached by

---

[14]   DNSO Names Council Resolution on Famous Trade-Marks
http://www.dnso.org/dnso/notes/20000519.NCftm-resolution.html

the members of the Working Group at the conclusion of its deliberations when the various proposals were known. This assessment is supported by the following public comment[15]:

> Working Group B specifically rejected a proposal for a sunrise period in which Famous Marks would be allowed first crack at names in a new TLD.
> For that reason I was somewhat surprised in May to see the Names Council's summary of the WG-B report, in which they gave a convoluted nod to the idea of start-up protection. As quoted in the Yokohama agenda --on which the ICANN staff did an impressive job -- "...the Names Council ... recommended that there be varying degrees of protection for intellectual property during the startup phase of new top-level domains."
> This statement seriously distorts what WG-B said. The NC basically grafted its own wishes onto that of the Working Group, having failed to obtain the result it wanted from the group.
> I served on -- or tried to -- Working Group B until the dominant forces of big business and intellectual property law all but made individual participation impossible. This was not a bottom-up enterprise at all, but a solidly top-down affair that mimicked the functioning of the best-oiled trade associations.
> ICANN is supposed to be representative and inclusive. The Board should take action to investigate whether and why the Names Council's recommendation in this matter ignored the recommendations of the members.

The Plaintiff can find no record of any investigation or action in respect of this serious allegation that the report of 'consensus' having been reached did not, in fact, reflect the views of the Working Group and, worse, was deliberately false so as to promote the interests of a small minority who were unable to achieve consensus for their views. Such a view is supported by the fact that at least 2 of the 3 reports of the Working Group were the views of only its Chairman – and not seen or considered, let alone approved, by members of the Group.

ICANN thereby failed to comply with its charter and bylaws which require it to adhere to[16]:

> a sound and transparent decision-making process, which protects against capture by a self-interested faction

31.   Another member of Working Group B wrote that:

---

[15]   http://forum.icann.org/newtlds/3962577E00000343.html
[16]   http://www.domainhandbook.com/archives/comp-policy.html  Process – White Paper

> The group could come to no consensus that *any* trademark protections, famous or otherwise, were either warranted or legal.

Most disturbingly, it was also reported by another member of Working Group B that Registrars (a number of whom, as shareholders of Afilias, were later to be the successful applicants for the .info TLD) were called to an ICANN Registrars' Constituency meeting which, in contravention of the Constituency's byelaws, was held in secret and at which no minutes were taken. At this meeting – at which Michael Palage officiated as 'Constituency Secretariat' – attendees were told that[17]:

> IP [intellectual property] protections were going to be instilled in the new registry contracts; that congress was "in their pockets" or something to that effect so don't bother complaining; and that if they wanted approval of any new TLDs at all, to lay down and shut up.

32. Michael Palage is also reported to have stated at a SBA Office of Advocacy Roundtable on Internet Domain Names that[18 and 19]:

> The trademark lobby must be placated because of its potential ability and inclination to bankrupt new registrars and wreck havoc on their registrant databases.

This statement provides a clear explanation for the apparent corruption of ICANN's policy-making processes by powerful groups representing minority interests within its structure.

33. On June 13, 2000, ICANN posted a document relating to the forthcoming consideration of the introduction of new TLDs by its Board[20] (Appendix 7). Section F referred to the protection of Intellectual Property and invited public comment.  From the 1,307 comments received, the Plaintiff has been able to find

---

[17] http://icbtollfree.com/pressetc/adentive.html
[18] http://www.domainhandbook.com/wgbreport.html
[19] http://icbtollfree.com/pressetc/adentive.html
[20] ICANN Yokohama Meeting Topic: Introduction of New Top-Level Domains
http://www.icann.org/yokohama/new-tld-topic.htm#IIF

only one (by a group representing multi-national corporations[21]) that supports

either the exclusion of trademarked names or the grant of a right to non-famous

trademark holders to pre-register a domain name in preference to other

registrants. Even large corporations who provided comments (for example,

British Telecom[22] and AT&T[23]) failed to support such a proposal. Many supported

the protection of famous names – a proposal rejected by Working Group B and

the Names Council as not supported by a consensus. Typical public comments

were:

- Before there are any further TLD's created I would strongly suggest some firm interpretations and guidelines as to the relationship of domain name and trademarks.[24]
- The Sunrise Period idea is a totally idiotic idea supported by one group .. trademark lawyers.[25]
- I am a trademark holder myself, but still I have enough common sense NO TO MAKE LAWS OUT OF MY OWN DESIRE.[26]
- The legal and UDRP precedents are clear and eliminate the economic basis for cybersquatting. Cybersquatters stand to gain nothing by registering trademarked names in new TLDs. Of course there will be good-faith disputes and borderline cases, as there are now. Currently, trademark-disputed registrations are filed at a rate approximately 0.000269 of monthly domain name registrations. The rate of bad faith registrations is likely to be lower in a new TLD than in an old, established one such as dot com, because the value of names in those spaces is likely to be less certain. If anything, over the long term as new TLDs are added they will gradually reduce the risk to intellectual property by undercutting the artificial economic value of specific SLDs. The UDRP has proven to be quick and inexpensive; if anything it is biased toward trademark holders because it gives complainants a choice of dispute resolution service provider. No other protections are needed.[27]
- ...prevent this by declaring the Internet to be a "trademark-free-worldwide-virtual country". But give the trademarkholder (As e.g. myself) the "r"-domains, please. ...no sunrise system is requested, because it heads to the wrong direction. The first-come-first-serve system selects be quicker minded people and the "r"-gtls give trademarkholders their space.[28]

---

[21] http://forum.icann.org/newtlds/396A628300000523.html
[22] http://forum.icann.org/newtlds/396A04F3000004F3.html    Q41 through Q46
[23] http://forum.icann.org/newtlds/396A6D160000052E.html    Q41 through Q46
[24] http://forum.icann.org/newtlds/39487DAC00000019.html
[25] http://forum.icann.org/newtlds/394919AC00000042.html
[26] http://forum.icann.org/newtlds/3954C5B3000001CE.html
[27] http://forum.icann.org/newtlds/395D801600000270.html
[28] http://forum.icann.org/newtlds/3960CCA0000002DD.html

- New TLD's should be opened to the free market. It is the responsibility of the Trademark owner to protect their Trademark.[29]
- I have registered names for my customers. ICANN...stick with the basic trademark issues, the ones that were handed down at registration time. Trademarks and Domain Names are two different animals, if a company wishes to retain a domain name, let them pay for it..period. A series of numbers and or letters in a url is NOT a trademark and never will be. Because you own a trademark does not give the right to own any and all domain names with your trademarked name in them.[30]
- The more salient question is "Should ICANN be doing more to protect individual free speech and due process?"[31]
- I would also like to add that I do not understand how and why we moved from the initially envisaged (see White Paper) protection of "famous marks" to the current debate where solutions for "all trademarks worldwide" are proposed. This attitude is absolutely to be rejected UDRP (and ultimately court proceedings) constitute sufficient protection of intellectual-property rights in the TLDs where such protection is appropriate.[32]
- The TM lobby (WIPO influenced) would love to disallow any trademark from being included in any name, thus preventing the use of just about any word in the English language from being used in a domain name.[33]

34.     There was also support expressed for a TLD (such as .tm or .reg) that would be reserved for trademark holders.

- I think there would be merit to reserving a TLD (like .tm) for the exclusive use of parties with registered trademarks. If domains under that (and only that) TLD are exclusively issued to registered trademark holders, then it can free up domain names under all other TLDs to be used by "first come - first served" parties without fear that the use of just the domain name itself constitutes a trademark violation. [34]
- Only one TLD is needed for all trademarks. Using .reg, for example: A trademark *name* is for a specific *class* in a specific *country*. Therefore with a domain name in the format - name.class.reg.country it would be a unique identifier - no trademark conflict. Fully explained at www.WIPO.org.uk[35]
- Trademark conflicts are the major issue. They can only be solved, if trademark holders (and I am holding trademarks myself) have to register their trademarked domain names in clearly identifiable gtlds as .tm, .reg or .1 (one - worldwide known trademarks like CocaCola). No one else should be admitted there.
- Here is a hypothetical situation at this point that I think can become very real with the inclusion of new TLD's The scenario: Using the competitive TLD .web as an example and the generic dictionary word Delta, which  is used by more than one large corporation. There are currently 104 records that relate to the word delta on www.marksonline and 3062 records shown at www.uspto.gov. My first question is who should get it Delta Airlines or Delta faucets or perhaps

---

[29]     http://forum.icann.org/newtlds/3961EA2D00000320.html
[30]     http://forum.icann.org/newtlds/3961F44300000324.html
[31]     http://forum.icann.org/newtlds/3962349B0000033A.html
[32]     http://forum.icann.org/newtlds/3968980400000483.html
[33]     http://forum.icann.org/newtlds/396976CA000004C0.html
[34]     http://forum.icann.org/newtlds/394915F400000041.html
[35]     http://forum.icann.org/newtlds/394C61AD000000EC.html

> **one of the many others who may lay claim to it? This is where I can see the unfair implications of current TM policy and the proposed inclusion of its even more sinister sunrise+20. In my opinion this would stifle any hope for people to start a new business. If this continues it seems possible that whole dictionary will be off limits to the next generation**

A particularly relevant post because of his position and involvement with the ICANN process was by Jon Weinberg, Professor of Law at Wayne State University and co-chair of ICANN's DNSO Working Group C on new generic top-level domains[36]:

> **The start-up of a new TLD presents certain opportunities for cybersquatting and trademark infringement; those risks are appropriately addressed via the UDRP. There is no need for protections beyond the UDRP (and judicial proceedings under relevant national law).**
> **As deliberations and discussion over the past year have made clear, the creation of such a list [of famous names] would be monumentally difficult. Nor does it make sense, in the absence of such a list, to create special "sunrise" protections for *all* trademark holders. Under the latter approach, the exclusive right to register "grass" during the sunrise period would go to trademark owners including Grass Products, Inc. (who make aftershave), Grass Instrument Company (who make scientific instruments) and Alfred Grass Ges. m.b.H. Metallwarenfabrik (who make metal fittings for furniture). The exclusive right to register "computer" during the sunrise period would go to trademark owners including Dunlop Olympic (Australia), which uses "computer" as a trademark for socks. A DNS in which a socks manufacturer has a priority right to register the SLD "computers" across the range of domains is a DNS governed by silly and arbitrary rules.**

35.   On July 10, 2000, The Office of Advocacy, US Small Business Administration, wrote to the Chairman of ICANN in support of the introduction of new TLDs but included the following warning regarding trademark protection[37]:

> **ICANN should not act as a conduit, either through its actions or through sanctioning private action, for the expansion of trademark rights beyond those currently existing at law**

36.   On July 16, 2000, ICANN's board adopted a policy for the introduction of new Internet TLDs "in a measured and responsible manner"[38] and invited proposals to sponsor or operate the new TLDs. Applicants were advised that they should

---

[36]   http://forum.icann.org/newtlds/396AB4BE0000059C.html
[37]   http://www.icann.org/yokohama/eoi24.htm
[38]   http://www.icann.org/minutes/minutes-16jul00.htm#00.50   and
New TLD Application Overview
http://www.icann.org/tlds/application-process-03aug00.htm

include a response in respect of topics included by the ICANN Board at its

meeting in Yokohama on July 15, 2000[39], one of which referred to:

> **The importance of appropriate protections of rights of others, including intellectual property rights, in connection with the operation of the TLD, especially during the start-up phases**

37.  Seven new TLDs were ultimately approved by ICANN

| .aero | Sponsored | Air-transport industry |
|---|---|---|
| .biz | Unsponsored | Businesses |
| .coop | Sponsored | Cooperatives |
| .info | Unsponsored | Unrestricted use |
| .museum | Sponsored | Museums |
| .name | Unsponsored | Individuals' names |
| .pro | Unsponsored | Accountants, lawyers, physicians etc. |

.info was the only unrestricted TLD to be approved. Its use was not, therefore,

associated with specific goods or services or even with commercial use.

38.  Although applicants for unsponsored TLDs were invited to submit additions or

variants as part of the submission and negotiation process[40] the application

documentation made clear that policy decisions in respect of an unsponsored

TLD were to be established and modified only through the ICANN process.

Policies for the new TLDs were stated to be those currently in force in relation to

existing .com, .net and .org TLDs (the ICANN-NSI Registry Agreement[41]).

Section 3 (A) (ii) provides that:

> **NSI shall comply, in its operation of the registry, with all Consensus Policies insofar as they:**
>
> > **(a) are adopted by ICANN in compliance with Section 4 below,**

---

[39]  Meeting of the ICANN Board in Yokohama
http://www.icann.org/minutes/prelim-report-16jul00.htm#00.50

[40]  New TLD Application Process Overview
http://www.icann.org/tlds/application-process-03aug00.htm#1b

[41]  ICANN-NSI Registry Agreement November 4, 1999
http://www.icann.org/nsi/nsi-registry-agreement-04nov99.htm

**(b)** relate to one or more of the following: **(1)** issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, technical reliability and/or stable operation of the Internet or domain-name system, **(2)** registry policies reasonably necessary to implement Consensus Policies relating to registrars, or **(3)** resolution of disputes regarding the registration of domain names (as opposed to the use of such domain names), and

**(c)** do not unreasonably restrain competition.

Section 4 of the agreement referred to above states:

**General Obligations of ICANN.** With respect to all matters that impact the rights, obligations, or role of NSI, ICANN shall during the Term of this Agreement:

**(A)** exercise its responsibilities in an open and transparent manner;

**(B)** not unreasonably restrain competition and, to the extent feasible, promote and encourage robust competition;

**(C)** not apply standards, policies, procedures or practices arbitrarily, unjustifiably, or inequitably and not single out NSI for disparate treatment unless justified by substantial and reasonable cause; and

**(D)** ensure, through its reconsideration and independent review policies, adequate appeal procedures for NSI, to the extent it is adversely affected by ICANN standards, policies, procedures or practices.

39. On August 15, 2000, ICANN published amended proposals that included criteria for assessing TLD proposals[42]. This included:

**8. Appropriate protections of rights of others in connection with the operation of the TLD.** In introducing new TLDs, care should be taken to ensure that the rights of third parties are appropriately protected. Examples of matters to be examined in this regard include:

a. Does the proposal have a well-thought-out plan for allocation of names during the start-up phase of the TLD in a way that protects the legitimate interests of significant stakeholders, including existing domain-name holders, businesses with legally protected names, and others with which conflict is likely?

b. Does the proposal provide for a reasonably accessible and efficient mechanism for resolving domain-name disputes?

c. Has the proponent considered intellectual property interests or otherwise designed protections for third-party interests?

d. Does the proposal make adequate provision for Whois service that strikes an appropriate balance between providing information to the public regarding domain-name registrations in a convenient manner and offering mechanisms to preserve personal privacy?

e. Does the proposal incorporate policies that are likely to discourage abusive registration practices?

---

[42]    ICANN's Criteria for Assessing TLD Proposals
       http://www.icann.org/tlds/tld-criteria-15aug00.htm

Section 13(6) refers applicants to a Frequently Asked Questions section[43]. FAQ #30 asks:

> Item (c) under factor 8 of the Criteria for Assessing TLD Proposals states that when evaluating proposals ICANN will examine: "c. Has the proponent considered intellectual property interests or otherwise designed protections for third-party interests?" What types of intellectual-property protections should be included?

ICANN responded that

> Applicants should propose measures they believe are appropriate to protect intellectual property and other third-party interests. The types of protections that are appropriate will depend, to some extent, on the nature of the TLD and other circumstances. Applicants should anticipate that one of the topics of public comments on their proposals will be the appropriateness of the protections they propose.
> In preparing their proposals, applicants may wish to consult the materials prepared by the ICANN DNSO Intellectual Property Constituency (IPC) and posted on the IPC website. These are the views of the IPC only.

The IPC website referred to (also an ICANN website)[44] states, under §2:

> In addition to the general mechanisms for intellectual property protection that must be addressed by each TLD applicant, each application also must include a proposal for providing adequate intellectual property protection during the start-up phase of the new TLD. In this regard, it is critical to have a procedure whereby owners of trademarks and service marks having been registered in a national trademark office for at least one year prior to the creation of the new TLD can pre-register on a first-come, first-served basis, the material textual element(s) (i.e., the word portion of their marks) as a domain name in a fully open TLD. Such domain name pre-registrations would be confined to a single registration corresponding to a trademark.

40. These 'critical' requirements for trademark holders to be given preference were stated to apply to a "fully open TLD" – one that is specifically designated to be open to all Internet users and not restricted to specific types of commercial enterprise – or commercial entities at all.

41. Applicants were, therefore, specifically warned by ICANN that they should take notice of these "materials" posted on the official ICANN website that referred to

---

[43]   TDL Application Process FAQs
       http://www.icann.org/tlds/tld-faqs.htm
[44]   Intellectual Property Protection New TLDs
       http://www.ipc.dnso.icann.org/New_TLD_Safeguards.htm

"critical" requirements even though they did not reflect any ICANN Policy or result from any discernable process of obtaining Consensus.

42.     This issuance of directions to applicants by the DNSO is in direct contravention of the decision of the ICANN Board that[45]:

> **The Domain Name Supporting Organization ("DNSO") should be a consensus-based policy advisory body within ICANN**

And that its Names Council should:

> **..act as a steering committee for the DNSO and should be responsible for managing consensus and making recommendations to the ICANN Board regarding TLDs...**

The DNSO clearly exceeded its authority by determining and issuing directions on matters of fundamental policy to applicants that were neither the result of consensus nor approved by the ICANN Board of Directors (see paragraph 46 below).

43.     It would appear that the IP Constituency of the DNSO was advised of developments within Working Group B as a result of formal reports. However, it would appear that the reports were not representative of the opinions of its some 120 members. An example would be the Report of March 21, 2000[46] (Appendix 8) which states:

> **Unlike the Paper presented to the Names Council from WG-C [Working Group C], the following "State of Affairs in Working Group B" is not a collaborative effort by WG-B, and has not been seen, discussed or reviewed by WG-B. It is a good faith effort by elected WG-B chair Michael Palage, with some edits from Kathryn Kleiman, to respond in a timely effort to the request of the Names Council for a status report. The report will now be circulated for review and discussion by the WG-B, and for additional work on consensus.**

---

[45]   Domain Name Supporting Organization Formation Concepts March 4, 1999
       http://www.icann.org/dnso-formation.html
[46]   Report of Working Group B (Famous Names) Presented to the Names Council
       http://www.icann.org/dnso/wgb-report-21mar00.htm

It is hard to see how a report by its chairman (Michael Palage) that has not been "seen, discussed or reviewed" by his 120 colleagues can constitute a report from the Group and be in furtherance of the development of consensus. The practice of the issue of 'Group reports' that were representative of the views of only one of its 120 members - the Group's chairman, Michael Palage - was continued by issue, one month later, of the 'report' of April 18 (see paragraph 22 above) which was similarly not discussed, approved or even seen by other members of the Group and was similarly widely condemned by many of its members.

**Afilias' TLD Registry Application and Registry Operators Agreement**

44. While it has not been – and is not - the Plaintiff's intent to investigate or make a case for conflict of interest in the process of selecting a new TLD operator, it is hard to ignore the numerous examples of potential conflicts of interest that have continually emerged. In this context, the close involvement of Michael Palage with the successful bidder – Afilias – as its Policy Consultant (and his shareholding in and officer/director status with a number of other applicants - such as iDomain and ICM) while holding senior positions and wielding significant power within the ICANN process to shape policies for new TLDs appears, at best, undesirable. The additional fact that Hal Lubsen – President of Afilias - was also a member of ICANN Working Group C formulating policy on new TLDs and that Kenyon Stubbs - a Director of Afilias - was the Chairman of ICANN's influential Names Council should also be regarded as a matter of considerable concern in the context of potential conflict of interest.

45.   On October 2, 2000, the final day for the acceptance of applications, and one week after its formation, Afilias LLC submitted a proposal to operate an unsponsored, unrestricted TLD to be selected from .info, .site and .web. The company was (and still is) owned by a number of leading domain name registrars. It was formed specifically to run an unsponsored, unrestricted TLD. It had no officers, employees, commercial premises, revenue, operating history or experience[47]. The corporation was formed[48] on September 25, 2000 – just one week prior to the deadline for the receipt of applications by ICANN.

46.   Although some insight into the early stages of the evaluation of applications is provided on the ICANN website, it is unclear what criteria were ultimately applied in selecting successful applicants. What is, however, clear, is that the ICANN Board of Directors did not include - as a factor to be considered by its staff - the extent to which applicants proposed to provide trademark holders with preferential treatment in the establishment of a new TLD. The list of approved factors is included in the Minutes of a Special Meeting of the Board on October 31, 2000[49]. They limit consideration by the ICANN staff to provisions made by applicants to protect the rights of "users" rather than a special segment of user – for example, trademark holders.

47.   Notwithstanding the guidance of its Board of Directors, on November 9, 2000, ICANN published its Report on TLD Applications[50]. The inclusion of the heading of 'Protection of Rights of Others' – 'Sunrise Period' (while it is unclear whether

---

[47] Registry Operators Proposal, Part 1, sections D2 – D8
[48] http://www.icann.org/tlds/info1/App_E_Item_1-Page1.htm
[49] http://www.icann.org/minutes/minutes-31oct00.htm   New TLDS, item 8.
[50] Report on TLD Applications: Application of August 15 Criteria to each Category or Group
http://www.icann.org/tlds/report/report-iiib1a-09nov00.htm

its inclusion was approved by its Board of Directors) clearly identifies the interest of the ICANN evaluators in the inclusion of a Sunrise Policy into applicants' proposals. This would be of no relevance if there was no desire for such a policy to be implemented by the successful applicant.

48.     The report identifies Afilias and iDomains as the only 2 applicants (in a group of 14 applying for an unrestricted TLD) that proposed to implement a 'sunrise' period that reflected the "critical" proposals of the Intellectual Property Constituency of ICANN's DNSO (one further applicant was identified as providing a sunrise policy but this application was withdrawn following an inability to resolve confidentiality concerns with ICANN). The report further states that:

    **For various reasons, the remaining applicants do not propose a sunrise period.**

The ICANN staff evaluation is, however, untrue and misleading. In addition to Afilias and IDomains, 5 other applicants also proposed implementing sunrise policies: Abacus America[51] Affinity[52] Commercial Connect[53] Dubai Technology[54] and Namespace[55].

Commercial Connect's proposed policy is particularly relevant as it specifically states that its policy is in accordance with the "Policy" of the DNSO IPC. Its applications states:

    **CCL will adhere to the policy mentioned in the sunrise period discussion paper that initial domain-names will go to those registrants who certify they have done business under that copyright or trademark before October 2, 2000. CCL proposes to start operation with a sixty (60) day sunrise period. During this period, CCL will accept only accredited copyright or trademark owners for registration. After this initial period, CCL will delay further activity for an additional thirty (30) days, to allow for changes or improvements in CCL's software or systems.**

---

[51]   http://www.icann.org/tlds/biz1/Policy.html   under E15 – Sunrise Period
[52]   http://www.icann.org/tlds/biz2/startup.html   under E15 and E11.3
[53]   http://www.icann.org/tlds/mall1/_5_I6.3_TLDPolicies.htm   under E15
[54]   http://www.icann.org/tlds/dubai1/40POLICIES_v1.htm   under E15
[55]   http://www.icann.org/tlds/ads1/tld-pol.htm   under E15

It is clear, therefore, that at least one applicant regarded and interpreted the

DNSO IPC 'statement' as ICANN policy (see paragraphs 39-40).

Commercial Connect's application was classified by ICANN staff as not

proposing a sunrise period whereas its proposal is stated to – and does –

conform to the 'requirements' of the DNSO IPC statement. The application was

rejected. It is clear, therefore, that the evaluation of the applications was flawed

and inaccurate and also appears to have favored certain applicants – iDomains

and Afilias – over others as a result of such inaccuracies.

49.  The involvement of key personnel in the two companies singled out for favorable

comment – iDomains and Afilias - are worthy of comment:

The controlling director of iDomains is Henry (Hal) Lubsen.

Michael Palage is a director

The President of Afilias is Henry (Hal) Lubsen.

Michael Palage is its Policy Consultant.

Henry (Hal) Lubsen was a member of ICANN's Working Group C

Michael Palage was chairman of ICANN's Working Group B

50.  The heading of ICANN's Report on TLD Applications (see paragraph 47 above)

above is the "Application of August 15 Criteria". The 'August 15 criteria' makes

no reference to a 'Sunrise Period' yet the evaluation conducted in this document

is under a heading "Sunrise Period" and makes a distinction between those

proposing to operate a 'Sunrise Policy' in accordance with the DNSO IPS

'requirements' and those not.

The report does not address or evaluate the "various reasons" that other applicants provide for not providing a 'Sunrise Policy'. Two applicants did, in fact, provide extremely well-argued reasons for a 'Sunrise Policy' not being adopted. Online Design's [56] application included the statement

> The inherent difficulty in giving priority to owners of trademarks is that it is a fundamental premise of trademark law throughout the world that different entities are allowed to use the identical mark so long as there is not likelihood of consumer confusion between the two uses. For example, there are scores of entities that use the mark UNITED, or variations thereon, on a variety of different goods and services without confusion to consumers. This includes United Van Lines and United Airlines whose UNITED mark is arguably one of the more famous marks in the world. Thus, just because an entity owns a registered trademark does not mean that they have exclusive rights to use that mark as a domain name. In fact, even an entity that has a famous mark often does not have exclusive rights to any use of that mark. Additionally, in many jurisdictions, owners of unregistered trademarks ("common law trademark rights") may have rights that are superior to registered trademark rights and even the rights in famous marks.
> Thus, there is no simple formula or criteria that would identify one class of entities or individuals that should always have priority over another class of entities or individuals. Rather, every mark owner's particular rights in a particular mark would have to be evaluated individually in order to properly protect every trademark owner's rights. This evaluation is something that only a judicial or quasi-judicial body has the authority and qualifications to make.

JVTeam also provided a cogent and detailed historical and legal analysis of the 'sunrise proposals' and specifically addressed the absence of consensus in such a policy[57]:

> Since well before the formation of ICANN, intellectual property owners have debated whether new TLDs should be introduced into the DNS and how to protect their trademarks and globally famous marks on the Internet.  On April 30, 1999, the World Intellectual Property Organization recommended to ICANN a proposal for providing a mechanism to protect globally famous trademarks in any new TLDs. ICANN's Domain Name Support Organization (DNSO) thereafter created Working Group B to address the issue of whether protection should be given to famous names in the DNS.  However, there has never been within the Internet community a true consensus on the appropriate mechanism.
> The most current proposal, set forth by the Intellectual Property Constituency (IPC) of the DNSO and supported by the International Trademark Association and the American Intellectual Property Organization and which has gained some support among the Internet community, advocates a "Daybreak Proposal" to be incorporated into the rollout of new TLDs.  During the "Daybreak Period" owners of trademarks and service marks would be able to register their marks as domain names on a first-come-first-served basis in a new TLD before that new domain is

---

[56]   http://www.icann.org/tlds/web1/application/e1-e32.htm#e15
[57]   http://www.icann.org/tlds/dot1/TLDPolicyPropWeb.htm   under I.5

made available to the general public. The trademark owner would only be permitted, however, to register their exact trademark as a domain name during this period.

Under the IPC proposal, any owner of a valid national trademark registration is eligible to seek registration of a domain name during the Daybreak period, provided that the national registration for that mark was issued at least one (1) year prior to the date on which the mark owner applies to register the mark. The registry (or registrar), would not be required to validate the fact that the person/entity has a valid national registration prior to the registration of the domain name. The proposal, however, does contemplate a "take down" procedure if it is brought to a registrar's attention by an entity that has intellectual property rights in a domain name, that an entity registered a domain name during the Daybreak period which was not eligible to take advantage of the Daybreak period at the time the domain name was requested.

Critics of the Daybreak proposal, including the United States Small Business Administration and the Non-commercial Constituency of the DNSO, argue that

·     The Daybreak proposal is not grounded in law.

·     The Daybreak provision will not be effective in curbing trademark violations since only the exact corresponding mark will be allowed to be registered early.

·     The Uniform Dispute Resolution Procedures established by ICANN coupled with the new anti-cybersquatting Consumer Protection Act adequately protect the interests of trademark owners without the need for Daybreak provisions.

·     The Daybreak proposal arbitrarily sets a one-year requirement on having a trademark registration, thereby ignoring the legitimate trademark rights of companies with common law trademark rights and even those with national trademark registrations that are less than one year old.

·     There is a possibility that such provisions could subject ICANN to liability for restraint of trade in violation of Sections 1 and 2 of the Sherman Act.

In addition, critics argue that under the IPC's Daybreak Proposal, there would be nothing to stop an individual or entity from fraudulently registering generic domain names during the Daybreak period even with a "take down" procedure. This would not only be an abuse of the Daybreak provisions, but would also deny all other users of the Internet from registering those marks on a first-come first-served basis when the TLDs are introduced to the public at large. Critics claim that this is primarily because no one has a legitimate intellectual property right to use the generic mark as a domain name and therefore, no one has standing to challenge such a fraudulent registration.

Given the lack of consensus within the industry regarding an effective and fair mechanism for protecting intellectual property rights during start-up of a new TLD, and recognizing that it is not within the purview of a registry to preside over intellectual property disputes, JVTeam does not intend to adopt the Daybreak Proposal. Rather, JVTeam seeks to operate in a neutral manner that does not favor one right holder over another. Adequate mechanisms exist for the protection of intellectual property rights, including the Uniform Dispute Resolution Program established by ICANN and the courts. Therefore, while JVTeam is cognizant of the needs of intellectual property rights holders and intends to implement mechanisms for assisting such holders, JVTeam will not establish preferential registration mechanisms unless such mechanisms are mandated by ICANN.

It is hard to understand why these reasoned and detailed submissions were

totally ignored by ICANN in evaluating applications unless it had a fixed agenda

to enforce a sunrise period – in spite of their being no consensus under its policy-making procedures and, therefore, no corresponding authority to do so.

The pressure felt by applicants to include a Sunrise Policy is reflected by 3 applicants – JVTeam, KDD and Neustar – stating in their applications that they would include a Sunrise provision "if required by ICANN"[58]. This comment by JVTeam is particularly relevant in view of its extremely strong opposition to the Sunrise concept as detailed above.

51.   Not surprisingly - in view of its Policy Consultant being Michael Palage, Chairman of ICANN's Working Group B - Afilias proposed the implementation of a 'Sunrise Period' in accordance with the 'Policy' of ICANN's DNSO IPC (see Appendix 9).

52.   The evaluation of the Afilias proposal is also of note as it identifies a greater proportion of negative public comment against its application than against any other applicant - two in support and twenty against – a 10:1 ratio against their application[59].

53.   On November 16, 2000, ICANN's Board of Directors selected Afilias as the only candidate for an unrestricted TLD (.info) and authorized ICANN officers to negotiate an appropriate agreement with Afilias[60].

54.   On May 11, 2001, ICANN entered into a Registry Agreement with Afilias under which Afilias was given the right to operate the .info top-level domain.

55.   ICANN, however, itself raises some doubt as to its authority to grant such a right. In a submission to the U.S. District Court for the Eastern District of Missouri[61]

---

[58]   http://www.icann.org/tlds/report/report-iiib1a-09nov00.htm  Sunrise Period, paragraph 2
[59]   http://www.icann.org/tlds/report/info1.html
[60]   http://www.icann.org/minutes/prelim-report-16nov00.htm
[61]   Economic Solutions, Inc v ICANN – case number 4:00CV1785-DJS

ICANN stated that it had no authority to implement new TLDs and that it merely

makes recommendations to the U.S. Commerce Department who, in fact, makes

such decisions.

56.     Section 3 of Appendix J (see Appendix 10) of the ICANN/Afilias contract details

an extensive Sunrise Policy including a Dispute Resolution Policy. Under this

policy, trademark holders were to be provided with an exclusive 'Sunrise Period'

of 30 days in which to register "their" names prior to applications being accepted

from the general public. Sunrise registrations could be challenged during a

subsequent 120-day challenge period. A challenger was required to pay a $295

fee but could request the transfer of the domain name in the event of a

successful challenge.

57.     On June 26, 2001, ICANN announced[62] the operational status of Afilias and other

new TLDs. It stated (in part):

> **Over the coming months, ICANN will evaluate the performance of these seven new
> top-level domains as a "proof of concept". This evaluation will inform the ICANN
> Board of Directors to guide future steps. Besides technical performance, these
> evaluations will also address practical and administrative issues such as methods
> for providing adequate protection for trademark interests to inhibit cybersquatting.**

ICANN thereby clearly identifies its interest in providing such 'protection' for

'trademark interests'.

### Plaintiff's application for .info domain names

58.     Around this time, the Plaintiff became aware that the Afilias .info domain was to

be released and applied to pre-register a number of names. The plaintiff did not

apply for the registration of any names during the Sunrise Period (July 27 –

---

[62]   http://www.icann.org/tlds/correspondence/esi-v-icann-13nov00.htm
       ICANN Announcement
       http://www.icann.org/announcements/icann-pr26jun01.htm

August 27, 2001) as he did not own any trademark rights. All names applied for

by the plaintiff were generic names in common use and, to the best of his

knowledge, did not infringe on any trademark rights of others.

59.    The Plaintiff was later disappointed to discover that he was not able to register

any of the names that he had applied for. All of the names had, in fact, been

registered to applicants during the Sunrise Period as a result of a claim to a

trademark.

60.    The Plaintiff knew little of trademarks or trademark law but initiated some

research and discovered that the trademark relied upon to register most of the

domain names that he had applied for appeared to be invalid.

61.    The Plaintiff also learned of a challenge process for invalid Sunrise registrations

that was administered by WIPO (see Appendices 11 and 12 for details of the

Policy and associated Rules). He accessed the challenge form and materials

and, on September 23, 2001, submitted challenges in respect of domain names

that he had been unsuccessful in registering as a result of apparently improper

registrations. Challenges were instituted by the completion of an online form as

mandated by WIPO. There was no reference on this form to the possession of a

trademark by the challenger and no request for any trademark information to be

provided.

62.    Over a period of some 4½ months – between November 5, 2001 and March 26,

2002 – WIPO adjudicated the Plaintiff's challenges. In no case was a challenge

of the Plaintiff found to be deficient, invalid or denied. The Plaintiff was

consequently provided with transfer authorizations and registered the domain

names with his Registrar – DirectNIC. All registrations were accepted by DirectNIC and by Afilias. Afilias was provided with copies of the transfer authorizations by WIPO and had to take deliberate steps to unlock the domain registrations in order for the transfer to occur. The Plaintiff was not asked to supply details of any trademarks that he held in order to effect the registrations and, in fact, at Afilias' instigation, the data fields in Afilias' WHOIS records that contained trademark information were deleted when Afilias was advised that no trademarks were held by the Plaintiff.

63.     On November 22, 2001 (effective December 5, 2001) Afilias announced amendments to its Sunrise Challenge Policy that would require all successful challengers to provide evidence of trademark ownership in order to qualify for transfer of a challenged domain name[63]. These amendments were specifically stated not to apply to challenges already initiated under the existing policy. All of the Plaintiff's challenges had been commenced some 2 months prior to the announcement of the new policy.

64.     Afilias' new policy also purported to provide for Afilias to itself challenge invalid registrations that remained unchallenged at the end of the Sunrise Challenge Period[64]:

> **However, the Registry reserves the right to bring, after the conclusion of the Sunrise Challenge Period, a Challenge of Last Resort in connection with Sunrise registrations appearing to be made in violation of the sunrise registration conditions.**

However, the same section also provided that:

> [The policy] **sets forth the terms and conditions in connection with a dispute between you (as the registrant) and any party other than us (as the registrar) or the**

---

[63]     http://www.afilias.info/register/dispute_resolution/sunrise_challenge_policy_revised
[64]     http://www.afilias.info/register/dispute_resolution/sunrise_challenge_policy_revised §1

registry operator for the <.info> top-level domain (the "Registry") regarding the compliance of your registration of a second-level domain name (the "Domain Name") with the sunrise registration conditions set forth in the Registration Agreement.

The Policy is, therefore, specifically stated not to apply to a dispute between the registrant and the registry (Afilias).The Plaintiff believes that its Policy, therefore, precludes Afilias from challenging a Registrant.

65.   The Plaintiff was concerned to see news reports regarding the new policy which suggested that registrations based on successful challenges where the challenger did not own a relevant trademark could be regarded as 'invalid registrations' and subject to challenge by Afilias. The Plaintiff therefore sought clarification from Afilias. On December 12, 2001, due to continuing uncertainty and the refusal of both WIPO and Afilias to directly address the Plaintiff's concerns, the plaintiff wrote an 18-page letter to Afilias seeking to clarify a range of issues raised by his experiences with the Sunrise Policy. Afilias promised to carefully review the Plaintiff's letter and respond "as soon as possible".

66.   The Plainitiff received no substantive response prior to February 5, 2002 when he received an email from Michael Palage on behalf of Afilias. Mr Palage stated that he was meeting with Afilias' management and its outside counsel later that week to consider the Plaintiff's correspondence and invited the Plaintiff to submit any further material that he wished to be considered. In spite of the Plaintiff's positive response and extensive further requests for the Plaintiff's concerns to be addressed, Afilias has refused to correspond with the Plaintiff regarding this and further issues.

67.   In January 2002 - after the Sunrise Challenge Period had ended - Afilias began a

process of challenging Sunrise registrations. Both WIPO and Afilias have refused

to provide the Plaintiff with details of the process. WIPO also refused to publish

details of challenges and their status on its website (as they had previously

committed to do with respect to all challenges). It is not known, therefore, how

many domain names were actually challenged but, after the end of the process in

May, 2002, some 17,023 domain names were offered for registration to public

applicants. Afilias charged registration fees to all successful applicants and

therefore "sold" these registrations for a second time.

68.   Afilias did not challenge any of the Plaintiff's registrations or otherwise allege that

the Plaintiff's registrations were in any way invalid.

69.   Afilias has not, however, removed the 'lock' from any of the Plaintiff's

registrations as it was bound to do by its own statement of policy[65]

> **Afilias will lock domain names registered during the Sunrise Period at the registry
> level for a period of approximately 180 days following the end of the Sunrise
> Period. The only exceptions are for transfers required as a result of: a successful
> challenge, a decision in a UDRP administrative proceeding, or an order from any
> court of competent jurisdiction. In addition, names subject to one or more pending
> challenges may not be transferred.**

180 days from the end of the Sunrise Period equates to February 23, 2002. As of

the date of filing this complaint (November 4, 2002) Afilias' deadline to unlock

domains under its own policy has been exceed by 252 days. In spite of

numerous requests by the Plaintiff, Afilias continues to refuse to unlock the

Plaintiff's domain registrations; refuses to discuss its action; provide any

---

[65]   The Sunrise Period -Can I transfer a domain registered during the Sunrise Period?
http://www.afilias.info/register/schedule/sunrise_period

explanation or justification; or provide a date on which it will unlock these
registrations.

70.     Afilias has, as a result of unjustifiable action in contravention of its own policies,
prevented the free use by the Plaintiff of his domain name registrations and
subsequently caused loss to the Plaintiff.

## Operation of the Sunrise Policy

71.     Under its agreement with ICANN[66], Afilias stated

> **In order for trademark and service mark owners to qualify to receive a registration
> during the Sunrise Period, the following information must be provided to the
> Registry Operator [Afilias]**
> - **The ASCII characters name of the trademark or service mark**
> - **The date the registration issued**
> - **The country of registration**
> - **The registration number**

This requirement is repeated in – and made a requirement of – agreements
between Afilias and its registrars[67].

In spite of its use of the word "qualify" – which suggests a process of evaluation
to determine eligibility - Afilias did not validate any trademark information
submitted to it by applicants via registrars. Even though required under its own
policy, it did not even check that any information at all had been submitted.

72.     It was determined very early in the Sunrise Period that numerous Sunrise
registrations were invalid. Many contained trademark dates in the year 2040 or
1899 (a default value if no entry has been made). In fact, one single individual
submitted 4,981 applications that contained an invalid trademark registration date
in the year 1899. All of these applications were registered without objection by

---

[66]     Appendix 10, Section 3 – Processing
also http://www.icann.org/tlds/agreements/info/registry-agmt-appj-11may01.htm
[67]     Afilias/Registrar agreement, Exhibit E, 3. Sunrise Period, Processing

Afilias. Numerous other registrations were accepted by Afilias from applicants specifying trademarks or trademark numbers of 0 or n/a or none. In addition, many registrants used the same trademark number in support of multiple registrations of different domain names.

73.   It would have been very easy for Afilias to apply basic validation procedures to the submitted trademark data. Any competent programmer could have written the necessary code in less than an hour. Afilias, however, stated (via its Policy Consultant – Michael Palage)[68] that it was:

> not equipped to screen or verify trademark claims

He was also quoted by name4ever[69]:

> Afilias policy consultant Michael Palage said the company was not set up to check out trademark claims.
> ``It's not our intention to be a policeman and verify the integrity of the underlying data,'' Palage said.

74.   Afilias also posted a "clarification" of its policies on the ICANN Public Comment Forum that stated in part[70]: (see Appendix 14):

> While Afilias has committed to providing the most comprehensive protection for trademark holders it can, given the number of trademark jurisdictions around the world it is simply not possible to validate all of the information in each of these restrictive fields and maintain a competitive pricing structure.

Roland LaPlante, Afilias' Vice President and Marketing Director stated[71]:

> If we did it again... We would also have taken steps to make it more difficult to put the wrong information into the [domain registration] form. For example, we didn't specify how to put dates in. We just had a date field. This has made it harder to do an effective search. There may have been ways in which we could have screened applications better.

75.   Afilias received a great deal of criticism from a very wide range of public media sources including the New York Times[72] and the BBC[73] as well as well-known

---

[68]   http://www.infowar.com/iwftp/edupage/00/Edupage,_August_8,_2001.shtml
[69]   http://www.names4ever.com/services/domain-news-8-7-01.html
[70]   http://forum.icann.org/cgi-bin/rpgmessage.cgi?newtldagmts;3B6F7E5700000343
[71]   http://www.theregister.co.uk/content/archive/22151.html

'internet' news companies such as ZDNet[74] and Newsbytes. Afilias even received

harsh criticism from its own Registrars (see Appendix 16 for an example)[75] which

confirmed that prevention of most of the abusive registrations could have been:

> **Easily achieved in less than 5 minutes of programming**

and also offered an explanation why Afilias should have deliberately chosen not

to adopt such easily and quickly applied preventative measures.

76.    Afilias had, at this stage, only just started to process Sunrise applications and it

could easily have applied such basic detection techniques to applications already

processed and continue to apply them for the remainder of the Sunrise Period. It

was, therefore, open to Afilias to take simple and easily-applied action to redress

the situation. Michael Palage  announced that it would[76]:

> **decide whether to change or scrap the process by the week ending August 12".**

Instead, Afilias chose to do neither. It continued to accept tens of thousands of

invalid applications that it knew to be invalid. This decision led to the resignation

of one of its founders and a major shareholder – Robert Connelly[77] – who

referred to Afilias' Sunrise process as an "abomination"[78] as well as charging that

the company lacked basic organizational skills. Other legal experts called the

process a "fiasco".

77.    In a situation reminiscent of a recent case in which defendant ICANN had to be

forced by the California State Superior Court to provide operating information to

---

[72]    http://query.nytimes.com/search/abstract?
        res=F00D12FA3D5A0C768DDDA10894D9404482
[73]    http://news.bbc.co.uk/hi/english/sci/tech/newsid_1593000/1593396.stm
[74]    http://news.zdnet.co.uk/story/0,,t269-s2092829,00.html
[75]    Post to the ICANN DNSO Registrars constituency mailing list
        http://www.dnso.org/clubpublic/registrars/Arc01/msg00956.html
[76]    http://www.zdnet.com.au/newstech/news/story/0,2000025345,20253207,00.htm
[77]    http://news.zdnet.co.uk/story/0,,t269-s2094819,00.html
[78]    http://www.dnso.org/clubpublic/registrars/Arc01/msg01103.html

one of its Directors[79] Afilias similarly refused to provide information about the

scope of sunrise registrations to one of its Directors - Robert Connelly – who later

stated (see Appendix 15)[80]:

> **Management of Afilias is out of control**

His post also provides some insight into other aspects of Afilias actions.

78.    Even when the mass abuse of the sunrise registration period was well known to

Afilias in early August, (a study of over 11,000 sunrise registrations had, by this

time, been conducted by University of Minnesota Professor Robert Connor[81]

which suggested that some 15 - 25% of the total were improperly registered

using invalid trademark information), Roland LaPlante, Afilias' vice-president and

Chief Marketing Officer made a statement[82], referring to the challenge process,

that said:

> **We have to allow the process to take its course.**

79.    Afilias specifically built into its operating proposal[83] a 30 day 'evaluation period'

during which:

> **Afilias will not accept registrations for 30 days after the Sunrise Period to ensure**
> **that all properly submitted Sunrise Period registration requests are properly**
> **processed.**

If Afilias did, in fact, use this period to ensure that Sunrise registrations were

'properly submitted' and 'properly processed', they decided to ignore the

---

[79]    http://www.eff.org/Infra/DNS_control/ICANN_IANA_IAHC/
        Auerbach_v_ICANN/20020807_auerbach_judgment.pdf
[80]    Post of Robert Connelly to ICANN DNSO Registrars mailing list
        http://www.dnso.org/clubpublic/registrars/Arc01/msg01112.html
[81]    http://www.domebase.com/study.htm
[82]    http://www.nbnn.com/news/01/168842.html
[83]    Afilias Registry Operators Proposal D13.2.5 footnote to table 1
        http://www.icann.org/tlds/info1/Registry_Operator_s_Proposal_Pt1.htm

significant evidence of widespread invalid registrations that had, by that time, been assembled by numerous independent evaluators.

80.    A number of registrants subsequently advised Afilias that they had either mistakenly registered during the Sunrise period or that their applications had been submitted by Registrars during the Sunrise Period without their authorization or even against their specific wishes (one registrar admitted to submitting all 'pre-registrations' as Sunrise registrations even though it was clear that they did not 'qualify' for such registration under Sunrise conditions and that this was not intended by the registrant). Even where Afilias was specifically advised by the applicant that applications were invalid, Afilias refused to cancel them. One applicant, William Lorenz, registered over 100 names as a result of following the public advice of a Registrar who advised him that he could register generic, 'non-trademarkable' names during the Sunrise Period. Once he realized that this information was possibly misleading, he asked Afilias to cancel his registrations. Afilias refused and, instead, suggested that he should challenge his own registrations through WIPO (and pay a fee of $295 per domain to do so...)[84]. This case is particularly relevant as the applications were made through Domainbank – an Afilias authorized registrar – which is owned by Afilias' President, Hal Lubsen. Four days earlier, Mr Lubsen - speaking as President of Afilias - had criticized the submission of ineligible applications by registrants and regsitrars – and thereby "abusing the process". Hal Lubsen – as owner of Domainbank - was, however, prepared to accept some $13,000 from Mr. Lorenz to "abuse the process" by submitting ineligible applications. The agreement

---

[84]    Steven Nelson reported at http://www.dnso.org/clubpublic/registrars/Arc01/msg01107.html

between Afilias and Domainbank[85] specifically provides that, in respect of the submission of an application for a domain name registration by a Registrar, the:

> **willful provision of inaccurate or unreliable information ... shall constitute a breach of this Agreement.**

Both Afilias and Domainbank were aware that inaccurate and unreliable information had been provided on numerous occasions. Not surprisingly, however, Domainbank remains an Afilias accredited registrar.

81. Referring to the evaluation of Sunrise applications, one legal expert[86] stated:

> **Afilias deserves nothing but criticism for the way it has handled the sunrise process. It is very clear that they did not do their job. Afilias needs to go back through the generic registrations and country registrations and check every single trademark. It is an incredibly incompetent sunrise process. Even the very basic anti-fraud steps, in common use, were not implemented.**

Afilias responded:

> **We never intended to verify the individual data components. We checked to make sure there was data in the field, and relied on the testimony of the registrant that the information was correct. But it has quickly become evident that some people are not providing accurate information. This is the proof of concept and we are learning the strengths and weaknesses of our system.**

It is clear, however, that Afilias did not check that any relevant or realistic data was provided and thereby allowed thousands of invalid registrations to be effected. Although it initially denied the extent of the problem as described by external evaluations, Afilias has subsequently admitted that, of some 50,000 Sunrise registrations, over 17,000 were invalid – with a further 14,000 estimated to be also invalid and unchallenged (Appendix 13)[87] – some 62% of total Sunrise registrations. It is, therefore, hard to give credence to any claim that the Sunrise Policy has been successful in achieving the prevention of abuse - and a

---

[85] Afilias' Registrar Agreement – Policy and Disclaimer – section 4.
[86] http://news.bbc.co.uk/hi/english/sci/tech/newsid_1593000/1593396.stm
[87] Study of Sunrise Registrations and Challenges by Afilias Registrar Directi
http://dotinfo.directi.com

significant amount of frustration and loss to the Internet public. Many applicants paid non-refundable, pre-registration 'fees' to registrars. Many of the requested domain names were registered as a result of abusive Sunrise registrations. No preference was given by Afilias to pre-registrants who had been defrauded by the process when these domain names were later cancelled and offered to new registrants.

82.   Afilias decided to charge a 5-year minimum registration fee in respect of Sunrise applications and therefore had a very significant financial incentive to encourage a maximum number of Sunrise registrations as opposed to public registrations where this minimum did not apply. Afilias therefore directly received some $100,000 in respect of the 17,000 invalid applications that were subsequently cancelled without reimbursement of registration fees and offered for re-registration to new registrants who had to pay new registration fees. As a company newly created to act solely as a registry operator, this may be particularly relevant as Afilias had no other source of income and had incurred extensive start-up costs (including a $50,000 non-refundable application fee paid to ICANN). Afilias had, in fact, predicted[88] that, at a 50% confidence level, it would receive some 700,000 applications during the Sunrise Period. In fact, it received just over 50,000 – a disturbing reflection of its inability to accurately forecast demand in its area of alleged expertise. Even if its predicted level of success had been achieved, Afilias projected that it would make a significant loss in the first 2 years of operation. There would, therefore, be even more incentive

---

[88]   Afilias Registry Operator Proposal D13.2.5 Table 1
http://www.icann.org/tlds/info1/Registry_Operator_s_Proposal_Pt1.htm

for Afilias to ignore a situation that would result in the depletion of what little

revenue had been received from Sunrise registrations by it choosing to deem a

significant proportion of them ineligible.

83.    Afilias, instead, relied upon others to identify invalid registrations and then pay a

$295 fee to challenge them under its challenge policy. Afilias directly benefited

from this policy financially as, under its agreement with WIPO, Afilias received

$25 from both the challenger's and respondent's fees and this is stated "not to be

reimbursed to the parties" as part of the reimbursement provisions for successful

challengers[89].

84.    In its proposed Sunrise Policy contained in its application to ICANN[90], Afilias

stated that a successful challenger would have to:

>    provide Afilias with a certified copy of its trademark registration to enable Afilias to
>    verify its entitlement to the registration.

This requirement was deliberately deleted from the Challenge Policy that was

subsequently implemented. Such a deletion could be explained by the financial

incentive to Afilias of maximizing the number of Sunrise challenges – which

resulted in $50 of revenue per challenge being provided to the company. Some

2,000 challenges were initiated – providing a further $100,000 of potential

revenue to the company.

85.    When considering the wholesale abuse of the Sunrise Policy, the Plaintiff feels it

necessary to also make reference to the disturbing fact that several of Afilias'

own directors appear to have personally registered domain names during the

Sunrise Period using invalid trademark claims. Several subsequently lost

---

[89]    Afilias Rules for Sunrise Registration Challenge Policy for <.info> 13 (g)
[90]    Policy Deliverables – E15

challenges to their registrations in WIPO administrative proceedings. There are also numerous cases of Afilias-authorized registrars registering domain names for themselves during the Sunrise period using invalid trademark information. One Registrar lost 230 challenges under WIPO proceedings. This is, by no means, an isolated example. Another registrar's senior officer registered such names as sextoys.info, marijuana.info, shit.info and spanking.info using false trademark information. ICANN, although having received literally hundreds of complaints and requests to take action against the, at best, wholly inappropriate actions of registrars have, to date, taken no publicly reported action against Afilias or its directors or against any registrar in respect of this deplorable conduct. There is extensive evidence[91] that ICANN has consistently refused to respond to such complaints either publicly or even individually to the complainant. ICANN thereby demonstrates a complete disregard for the interests of the Internet user while instituting a flawed and, in the Plaintiff's view, illegal system of preferences benefiting a small but powerful group within its policy-making structure.

### Sunrise Challenge Policy

86.   Afilias' contract with ICANN to operate the .info registry contains a provision that[92]:

> **The domain name registrant and challenger may represent themselves in these proceeding or may be represented by legal counsel or other representatives.**

---

[91]   http://forum.icann.org/newtldevaluationprocess/
[92]   Afilias ICANN agreement, section 3 Sunrise Period, Dispute Resolution policy, para 3
http://www.icann.org/tlds/agreements/info/registry-agmt-appj-11may01.htm

87.    This provision was deleted from the Sunrise Challenge Policy (appendix 11 and

12) that was subsequently adopted by Afilias – in contravention of a section of

the Agreement which states, in part[93]:

> **Registry Operator reserves the right to develop, in consultation with such third party dispute resolution provider, supplemental rules to facilitate the dispute resolution procedure, provided that they are consistent with the policy set forth in this document.**

The deletion of a provision as important as the right of a party to represent

himself or be represented can not be regarded as providing a 'supplemental rule'.

Neither can it be regarded as maintaining the consistency of the policy as set

forth in the Agreement.

88.    The Plaintiff sought to make representations to WIPO – as the third party dispute

resolution provider envisaged under the Agreement - in connection with the

challenge process and to make submissions that would challenge the jurisdiction

of WIPO to adjudicate challenges other than as permitted under the terms of the

registration agreement that applied to domain names registered by the Plaintiff.

WIPO stated that, under the terms of Afilias' Policy, it was unable to consider any

challenge to its jurisdiction. WIPO advised the Plaintiff that:

> **The WIPO Arbitration and Mediation Center administers disputes pursuant to the sunrise challenge policy, and therefore does not get involved in disputes regarding the terms and conditions of a domain name registration agreement.**

It is, however, the domain name registration agreement that provides the

applicability of the Sunrise Challenge Policy. WIPO could not, therefore, properly

consider the representations of the Plaintiff – or its own jurisdiction - without

considering the conditions of the domain name registration agreement. It refused

---

[93]    Afilias ICANN agreement, section 3 Sunrise Period, Outsourcing
        http://www.icann.org/tlds/agreements/info/registry-agmt-appj-11may01.htm

to do so. To justify this action, WIPO referred the Plaintiff to provisions of Afilias' Sunrise Policy that restrict its ability to consider any issue other than whether the challenged party holds or does not hold a relevant trademark[94]:

> **The Center's determination of whether your response meets the conditions set forth in Paragraph 4(b) will be based solely on a prima facie examination of any trademark or service mark certificates submitted by you. The Center's decision is of an administrative nature and shall be final. The Center shall not be required to state reasons for its decision.**

89.   The Plaintiff was, as a result, precluded from making representations or be represented by legal counsel as specifically permitted by the ICANN-Afilias Agreement and was, therefore, denied due process.

90.   Afilias' Challenge Process has also been acknowledged to be "flawed" by WIPO - its administrator – who described how they were:

> **struggling with the problems associated with the current procedure and are attempting to resolve them with Afilias to create a fair procedure**

and were:

> **actively reviewing the challenge procedure to ensure a fair outcome.**

### Legal and Factual Arguments

### General Considerations of 'Sunrise' Policies

91.   Under trademark law of the United States – and, to the best of the Plaintiff's knowledge and belief, every other country - more than one person or entity can own a trademark relating to the same word or name. Confusion is avoided by a trademark being granted only in association with specific goods or services in a specific country. An internationally agreed classification of such goods and services has been established  - 37 C.F.R. §6.1.

---

[94] Sunrise Challenge Policy 4(c)
http://www.afilias.info/register/dispute_resolution/sunrise_challenge_policy

92.     There is no foundation in United States or foreign law for any equivalence of a
        right to ownership of a trademark and a consequential right to a domain name
        registration reflecting the trademark[95] (see also paragraph 108 below). It would
        be impossible for such a right to exist due to the lawful right of multiple entities to
        a trademark name when compared to the technically unavoidable uniqueness of
        a name within an Internet domain. Any attempt to provide such a right could,
        therefore, only be achieved by one trademark holder being given preference over
        another and by all trademark holders being given precedence over non-
        trademark holders.

93.     It is impermissible for a national trademark authority to grant a trademark for a
        generic word, name or phrase in respect of its use in connection with its generic
        meaning. The registration of a domain name that comprises a generic word can
        not, therefore, be considered *per se* to be infringing upon the trademark rights of
        another. All relevant registrations of the Plaintiff are wholly generic within the
        English language and this fact has not been disputed by Afilias or otherwise.

94.     A mechanism has been suggested to ICANN by a number of parties that
        associates a domain name with a specific class of goods or services and also
        with a specific country. The creation of a domain for such a purpose - for
        example, .tm - could provide, for example, a domain name of
        apple.computerhardware.us.tm that would identify the registrant – in this case,
        Apple Computer - as the holder of a trademark related to computer hardware in
        the United States. Providing that there was sufficient detail in the second level of

---

[95]    Washington Speakers Bureau, Inc. v. Leading Authorities Inc., 51 USPQ2d 1478, (E.D. Va. 1999)

the domain name to avoid confusion between similar goods or services, such a scheme would provide a workable environment for properly granting the right to a domain name to the owner of a trademark as it would properly reflect the rights of the trademark holder. Even though it was proposed to them by numerous parties, such a scheme was not implemented by ICANN who had the opportunity of approving a .tm or .reg TLD when approving the .info and other TLDs.

95.   Although not founded upon any legal right, the Afilias Sunrise policy was, nevertheless, stated by Afilias to provide means whereby trademark holders could secure *"their"* domains prior to any other person having any right to compete for them[96]. No trademark law of the United States; the laws of any other country or any principle of International Law provides for any advantage to be provided to any trademark holder over any other trademark holder or any public citizen in the registration of an internet domain name.

96.   The Plaintiff supports the right of any business to seek protection against anyone 'passing off' a look-alike or competing product and believes this to be the intention of trademark legislation – to provide rights in marks that represent specific products or services. Again, he believes that, for there to exist a *prima facie* case of infringement, there needs to be some element of the offending party attempting to cause confusion in the mind of a potential consumer or the public generally. ICANN's UDRP reflects these principles by requiring claimants to show elements of infringement and bad faith by the registrant. ICANN's UDRP was, at the time of the approval of the .info domain (and is currently) an existing dispute resolution mechanism. It applies to all domain registrations and provides

---

[96]   http://www.afilias.info/register/schedule/

– with the ACPA – a practical, relatively inexpensive and fast means for a trademark holder to seek relief from an abusive domain name registration. With this in mind, the plaintiff does not believe that there should additionally be an automatic right to an Internet address solely because of the ownership of a trademark relating to part of that address (see paragraph 108 below for a precedent decision that supports this view). Should there be actual use of a domain name to mislead internet users into thinking that they are viewing information provided by the trademark holder, then the plaintiff would agree that such a use would be infringing and therefore should be subject to constraints and restriction. On the other hand, he does not believe that a person should, for example, be debarred from registering cat.info and producing a web site dedicated to the enjoyment of a cat as a popular domestic animal on the grounds that registration of this name is reserved as the sole right of Caterpillar Corporation in every new TLD that is released. As practically all words in the English language appear to be trademarked by someone, somewhere for some goods or services, the logical extension of such policies will have the effect of permanently depriving the general population of ever being able to register any name and will make the release of new TLDs totally pointless. Many corporations appear to have a policy of obtaining all domain names in all TLDs that contain their trademark (or variations of it) either through early registration; cease and desist demands; legal action and administrative tribunals. This is so even where their trademark is also a generic word like 'cat' and 'sun' and where others have perfectly legitimate interests in using such domain names to reflect the generic

nature of the word. Caterpillar Corporation and Sun Microsystems have both taken action to obtain 'their' names from other registrants and have expressed an intention to obtain "their" name in every new TLD that is released in the future. Sun Microsystems even wrote to all registrars warning them against registering domain names that could be similar to – even though they were, of course, aware that others had quite lawful and legitimate rights to register such names. The letter, from their attorneys, states[97]:

> On behalf of Sun we demand that you respect its trademark, trade name, common law and domain name rights by refusing domain name registration to other parties of domain names that are identical or similar to Sun's trademarks, trade name, common law and domain name.

Sunrise Policies support such heavy-handed and abusive practices which have no basis in law or ethical business practice. Caterpillar Corporation has stated that they merely intend to point cat.info to their existing site at www.cat.com rather than create new Internet content. However, since obtaining the name as a result of the advantage provided to it as a trademark holder under Afilias' Sunrise policy, Caterpillar Corporation has made no use whatsoever of the domain name which, over a year later, does not link to any Internet web site or content. Some cat lover or breeder has, thereby, been unreasonably deprived of the opportunity of making uninfringing and wholly lawful use of the domain name. Sunrise policies thereby succeed only in restricting the ability of new and legitimate users to create new content for their own benefit and the benefit of the Internet public generally.

---

[97]    http://www.nytimes.com/2001/08/29/technology/29DOMA.html

97.    Trademark law recognizes – and is, in fact, founded on - the coexistence of users

of words reflected in trademarks for a diverse range of goods or services. The

plaintiff believes that this situation should also persist in the domain name space

and that the creation of an artificial situation where commercial entities are able

to monopolize the domain name space in order to extend the 'protection of their

intellectual property' beyond what is allowed by law is an intolerable abuse of the

rights of the ordinary internet user. ICANN also has the right to implement a .tm

or .reg domain (as discussed earlier) that would provide a practical means of

trademark holders to reflect their rights in a domain name. (Unbelievably, the

process to implement such a domain would take less than 10 minutes). The

plaintiff does not believe that businesses automatically have to "own" rights to

domain names in every top level domain that is issued in order to protect 'their'

intellectual property rights. The .info domain – as an unrestricted, unsponsored

domain - particularly cries out to be a domain where generic words remain

generic words and wherein people are free to provide new content that provides

general and generic information rather than provide one more pointer to an

existing site that is focused on the products of a single company.

98.    There is also considerable evidence that Sunrise policies are directly resulting in

the abuse of the trademark process by trademarks being obtained for generic

terms – particularly in foreign countries - expressly for the purpose of qualifying

for Sunrise registrations. Domain names obtained by such deceptive practices

are then invariably used in connection with the generic meaning of the word. It

appears to the plaintiff to be totally unfair and abusive for such trademarks – that

were obtained for products or services totally unrelated to the generic meaning of the word – to be used in this manner.

99.   In this context, for example, one individual has obtained a large number of .info domain name registrations as a result of Sunrise Policies and challenges by alleging that he owns or controls trademarks that were issued to provide protection in respect of (by way of further example):

(a)   Beer and mineral water (broadway)

(b)   Soaps and perfumes (comic)

(c)   Ready-mixed cocktails (last-minute)

(d)   Trade shows and advertising (wellness)

(e)   Services for gardens, forestry and seeds (power)

(f)   Jewelry, leather goods and umbrellas (hotel)

(g)   Lightweight automobile bodies (tennis).

(The trademark appears in parentheses in the list above)

A review of the .info web sites that have been created as a result of these acquisitions displays content that, in no case, relates to the purpose for which any of the trademarks were issued and invariably relates to the English generic meaning of the word. The web site for broadway.info, for example, offers Broadway show tickets for sale. The registrant of these domains also contacted the Plaintiff with an offer to join a fraudulent and illegal scheme whereby .info domain names would be improperly obtained using the Afilias Sunrise Challenge Policy by falsely claiming an assignment of trademark rights. The Plaintiff refused to join such a scheme.

As a further example, the Plaintiff has been provided with a "trademark" (see Appendix 17) issued by the Republic of Anodyne (which appears to be located in a suburb of Miami, Florida) in order to provide justification for the registration of an .info domain. The duly authorized officer signing this 'trademark certificate' is the same person listed as the Ambassador to the United States and also the President of the 'Republic'. The Plaintiff has refused to use such a document but is aware that similar documents have been extensively used to justify Sunrise registrations.

Such abusive practices would not occur were it not for the granting of extra-judicial 'exclusionary rights' by the Defendants to entities not entitled to such consideration by the operation of relevant legal principles.

Under Appendix U of the ICANN/Afilias agreement[98], Afilias has been required to submit detailed information, by specified deadlines, regarding the .info rollout to assist with the 'Proof of Concept' evaluative process. Such reports include such topics as fairness to customers and an evaluation of the effectiveness of dispute resolution policies. In spite of ICANN providing publication terms under Section 10 of Appendix U that defined the majority of such reports to be non-confidential and publishable by ICANN either immediately or after a 3-month delay and in spite of being asked repeatedly[99] to provide public access to these documents, ICANN has refused to disclose their details; explain their non-availability or even acknowledge requests for their disclosure thus ensuring the continuing invisibility of its 'transparent' processes.

---

[98]   http://www.icann.org/tlds/agreements/info/registry-agmt-appu-11may01.htm
[99]   Richard Henderson has repeatedly asked for this information. For an example, see
http://forum.icann.org/cgi-bin/rpgmessage.cgi?newtldevaluationprocess;3D6A50A7000011D1

100.   There has been extensive criticism of ICANN's decision making processes - even supported by one of its Directors, Karl Auerbach, in Testimony before a Senate subcommittee[100]

> **ICANN, despite its claims to the contrary, is extremely secretive.  We know more about how the College of Cardinals in Rome elects a Pope than we do about how ICANN makes its decisions.  As a member of the ICANN board I have been surprised at how often I learn of ICANN actions from outside third parties. And I have perceived a very strong resistance on the part of ICANN's staff to opening its activities, even to members of ICANN's Board of Directors.**
> **ICANN has several internal committees and organizations that have no distinct legal existence apart from ICANN.  As a Director I am responsible for the assets, liabilities, and actions of these bodies.  Yet some of these bodies act as completely autonomous, independent, and often very secretive entities.  At least one of these entities maintains distinct financial records that seem not to be incorporated into ICANN's overall financial statements.  Another refuses to allow Directors to inspect its activities or meetings.**
> **I have a hard time reconciling ICANN's opaque processes and structures with the obligation in its bylaws that "[t]he Corporation and its subordinate entities shall operate to the maximum extent feasible in an open and transparent manner and consistent with procedures designed to ensure fairness." (ICANN By-Laws Article III, Section 1.)**

Of particular relevance in the context of this case are his comments regarding ICANN's DNSO:

> **ICANN should take steps to remedy the apparent capture by certain industry segments of ICANN's Domain Name Supporting Organization (DNSO).**

The DNSO appears to have played a pivotal role in the adoption of the Sunrise Policy by ICANN (see paragraphs 39 and 42 above):

### The Sunrise Challenge Policy and Process
### and the Good Faith of the Plaintiff

101.   As a result of the implementation of a Sunrise Policy that unlawfully provided trademark holders with a prior and superior right to register domain names in the new .info domain, the Plaintiff was deprived of the right to legitimately register a

---

[100]   Testimony of Karl Auerbach before the
Senate Commerce, Science and Transportation Committee
Communications Subcommittee
February 14, 2001
http://www.cavebear.com/cavebear/growl/issue_6.htm

number of domains during the public registration period. The plaintiff was then forced to utilize the Defendants' Dispute Resolution Process and pay fees in excess of $8,000 in order to challenge improperly registered domain names that Afilias, in full knowledge that they were invalid, first accepted for registration and then refused to take proper action under its own policies to cancel.

102. The Plaintiff properly acquired domain names as a result of Afilias' challenge process. His right to domain names was granted by WIPO acting as arbiter under the challenge process who found that previous registrants had improperly and abusively registered the domain names by claiming fictitious trademark rights. Afilias supported the right of members of the public to challenge invalid Sunrise registrations in its submission to the ICANN TLD forum of August 7, 2001 (see Appendix 14) in which it confirmed that the challenge process:

**opens the battle against cybersquatting to every interested Internet user.**

103. The plaintiff properly registered awarded domain names with an Afilias-authorized registrar – DirectNIC. The registrations were accepted and processed by Afilias and the plaintiff was reflected as the registrant in Afilias' WHOIS database. The domain name registrations were made using wholly correct information and no invalid, false or misleading information was provided as part of the registration process.

104. The roots (second level) of all domain names registered by the Plaintiff are wholly generic in the United States. They are incapable of trademark registration in the United States in respect of their generic meaning.

105. The plaintiff has not used, and does not intend to use, any domain name in any way other than in relation to the generic, English, meaning of the root word and

would not, therefore, make any infringing use of the domain names in respect of any trademark rights of any other entity.

106.    The plaintiff does not have a business that deals in domain names and has never registered a domain name except with an intent to use it to create new content by way of a web site and to provide email services. The plaintiff has also never registered a domain name with intent to sell it and, to the best of his knowledge, has never registered a domain name the use of which would infringe another's intellectual property rights.

107.    The plaintiff has made no improper use of any domain name and has not diluted, disparaged or otherwise interfered with the trademark rights or business interests of any other entity. No suggestion has ever been made that he has done so either by the Defendants or any other entity.

108.    The Defendants have at no time alleged that the registration and use of any domain name by the Plaintiff is in any way infringing or dilutive of any trademark. The mere registration of another's trademark as a domain name is not, of itself, unlawful. As stated by the E D Virginia US District Court[101]:

> **Nothing in trademark law requires that title to domain names that incorporate trademarks or portions of trademarks be provided to trademark holders. Instead, the law simply prevents others from making use of a company's trademarks in a manner likely to confuse the consuming public.**

109.    The UDRP[102] provides authoritative guidance as to whether a registrant can be regarded as having acted in bad faith. Circumstances that are regarded as evidence of bad faith are:

---

[101]    Washington Speakers Bureau, Inc. v. Leading Authorities Inc., 51 USPQ2d 1478, (E.D. Va. 1999)
[102]    Uniform Domain Name Dispute Resolution Policy 4 (b)
          http://www.ica.nn.org/udrp/udrp-policy-24oct99.htm

(a)  circumstances indicating that you have registered or you have acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant who is the owner of the trademark or service mark or to a competitor of that complainant, for valuable consideration in excess of your documented out-of-pocket costs directly related to the domain name; or

(b)  you have registered the domain name in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that you have engaged in a pattern of such conduct; or

(c)  you have registered the domain name primarily for the purpose of disrupting the business of a competitor; or

(d)  by using the domain name, you have intentionally attempted to attract, for commercial gain, Internet users to your web site or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of your web site or location or of a product or service on your web site or location.

None of these circumstances apply to the actions of the plaintiff in this case.

110. There are many examples of cases[103] decided by WIPO under the UDRP that illustrate the general principle that the registration of a domain name that is identical to a generic, non-famous trademark with an intent to use it for a non-competing or non-infringing web site, establishes a domain name holder's right to a legitimate interest in the name and will not result in his loss of the name under a UDRP proceeding.

111. WIPO also has provided a definition of 'cybersquatting' as[104]:

predatory and parasitical practices by a minority of domain name registrants acting in bad faith to register famous or well-known marks of others which can lead to consumer confusion or downright fraud.

This definition does not fit the actions and intentions of the plaintiff.

112. Neither of the Defendants nor any other entity has provided any evidence – or even suggested – that any action by the Plaintiff in his registration or use of the domain names resulting from Sunrise challenges has infringed upon; diluted;

---

[103]   For example, Asphalt Research Technology, Inc v Anything.com - http://www.esqwire.com/ezstreet.shtml

[104]   reported at 125 Congressional Record S15023 1999 http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=S15023&dbname=1999_record

disparaged or otherwise impinged in any way upon the rights of any trademark holder.

113.    It has never been alleged under the UDRP or in any Court or through any administrative proceeding that the use or registration of any domain name registration of the Plaintiff infringes upon another's trademark rights.

## Sunrise Challenge Policy as Denying Due Process

114.    A domain name registration is the product of a contract for services between the registrant (Plaintiff) and Registrar (DirectNIC)[105] No registration of a domain name has been made by the Plaintiff that has been made subject to any conditions relating to any dispute resolution other than to the ICANN UDRP – acknowledged by the Plaintiff to apply to all domain name registration.

115.    However, in contravention of the provisions of the Plaintiff's registration agreement, WIPO proceeded to adjudicate challenges without considering its jurisdiction to do so (see paragraph 88 above). The inability of the Plaintiff - under Afilias' Policy - to challenge WIPO's jurisdiction and represent his interests or be represented by legal counsel is a denial of due process. These provisions are also in direct breach of Afilias' contract with ICANN to operate the registry[106]:

> **The domain name registrant and challenger may represent themselves in these proceeding or may be represented by legal counsel or other representatives.**

116.    The Plaintiff believes that it is fundamentally wrong to have a dispute of such importance as ownership of a domain name registration be decided using a

---

[105]    Michael Zurakov v Register.com,  NY Sup Ct No 600703/01 7/25/01; Network Solutions v Umbro International 529 SE 2d 80 (2000); Dorer v Arel. 60 F Supp 2d 558, 561 (ED Va 1999)

[106]    Afilias ICANN agreement, section 3 Sunrise Period, Dispute Resolution policy, para 3
http://www.icann.org/tlds/agreements/info/registry-agmt-appj-11may01.htm

policy and process that is generally regarded as fundamentally flawed (even by

WIPO, its administrator); is clerical in nature; does not provide for the judgment

of a qualified, competent and experienced arbitrator to be applied; does not

provide for the reasons for a decision to be stated (even to the parties); and does

not provide for basic rights of stating a case and representation to be afforded to

the parties – even where this is required by the contract under which it operates.

The policies and rules administered by WIPO under the Sunrise challenge

procedure are contrary to its own recommendations[107] to ensure:

- **due process and fairness so that each party has an equal and adequate opportunity to present its case**
- **that the procedure should be "uniform and consistent" across all TLDs**
- **the proceeding be conducted by an appointed panelist experienced in domain names, intellectual property rights, litigation and alternative dispute resolution**
- **the provision of publicly available and reasoned decisions.**

The plaintiff believes that the UDRP and the Anticybersquatting Consumer

Protection Act provide more consistent, 'thought-out' and logical approaches to

the issue of domain name trademark infringement that are in conformity with

relevant law and WIPO's stated principles. Congressional intent is also

specifically stated to support the superiority of the UDRP as a uniform and global

mechanism[108]:

> **The adoption of a uniform trademark domain name dispute resolution policy should be of enormous benefit to American trademark owners**

and that:

---

[107]   The Management of Internet Names and Addresses: Intellectual Property Issues – Final Report, April 30, 1999 – Procedural Rules, section 180 at http://wipo2.wipo.int/process1/report/finalreport.html

[108]   Congressional Record 145 S15024 (1999) reported at http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=S15024&dbname=1999_record

> **We should encourage the sensible development of... the ongoing efforts within WIPO and ICANN to build a concensus global mechanism for resolving online trademark disputes.**

Afilias' policy is not part of a global mechanism; is contrary to WIPO's

recommendations and is not the result of consensus policies.

### The Jurisdiction of Courts to Review
### WIPO's Administrative Decisions

117. WIPO has acknowledged the appropriateness of national courts reviewing its

administrative decisions[109]:

> **The determinations flowing from the administrative procedure would not, as such, have weight of binding precedent under national judicial systems**

and

> **the parties to a dispute should have the ability to go to the national courts to initiate litigation even after the completion of the administrative procedure**

and

> **a decision by a court of competent jurisdiction that is contrary to a determination resulting from the administrative procedure should, subject to the application of principles for the enforcement of judgments, override the administrative determination.**

The ability of Federal Courts to review arbitration awards has also been

considered in the context of a domain name registration proceeding under the

ACPA[110] where the court held that Federal Courts were not limited by the Federal

Arbitration Act to review WIPO determinations[111].

---

[109]   The Management of Internet Names and Addresses: Intellectual Property Issues – Final Report, April 30, 1999 – Relationship with National Courts, section 196 and Guiding Principles, sections 150 (iv) and (ix) at http://wipo2.wipo.int/process1/report/finalreport.html

[110]   Parisi v Netlearning in the US District Court, Eastern District of Virginia, Alexandria Division No CIV A 00-1823-A

[111]   139 F.Supp 2d 745   2001 WL 503004

**Sunrise Policies as being unlawful under the
First Amendment**

118.    The expression of United States policy relating to the establishment of ICANN

(see paragraph 13 above) is very specific in that:

- ... [it] **does not set out a system of Internet "governance."**
- ... **existing human rights and free speech protections will not be disturbed**
- ... **this policy is not intended to displace ... principles of ... intellectual property law ... that may already apply.**
- ... **should ensure that DNS management proceeds in the interest of the Internet community as a whole.**
- **Nothing in the domain name registration agreement or in the operation of the new corporation should limit the rights that can be asserted by a domain name registrant or trademark owner under national laws.**

ICANN is thereby expressly precluded from taking any action or implementing

any policy that conflicts with the rights of domain name registrants under existing

law. There is no provision of U.S. law that provides a preferential right to a

domain name as a result of ownership of a trademark (see paragraph 108

above).

The imposition of a Policy that has, as its primary and stated objective, the

granting of a preference to a trademark holder over other trademark holders or

members of the public that is not supported by trademark law or existing legal

principles results is beyond ICANN's authority and an infringement of the free

speech rights of both groups of disenfranchised parties.

119.    ICANN was encouraged to consider the findings of WIPO to develop a method to

protect famous marks and to apply the results to the implementation of new

TLDs. WIPO subsequently recommended the framework of a system to protect

famous marks. Even though it is a body dedicated to the rights of intellectual

property interests, it did not propose any process that would give preferential

rights to 'non-famous' trademark holders over other 'non-famous' trademark

holders or over members of the public. (In fact WIPO envisaged that some 1,000 trademarks could be regarded as famous worldwide. Afilias, however, anticipated registering 700,000 domain names to trademark holders during the Sunrise Period.) ICANN referred the WIPO report to a Working Group who finally reported a lack of consensus on the protection of famous marks. The working group had done its job and that should have been the end of the matter. However, in a remarkable and disturbing series of events that bring into question the authenticity of ICANN's decision-making process, a 'Sunrise Policy' emerged on the day before the report of Working Group B was issued (see paragraph 22). This proposal – without being reviewed, discussed or voted on; being beyond the scope and authority of the group; and in spite of there being almost universal opposition to such proposals - somehow became translated into ICANN 'policy' that applicants for new TLDs were officially exhorted by ICANN to 'review' (see paragraphs 39 and 41). It is clear that applicants took serious notice of this statement of ICANN 'policy'. It is also clear that ICANN excluded those applicants that failed to incorporate such a policy into their applications.

120.  It is particularly relevant that the Office of Advocacy of the United States Government's Small Business Administration (see paragraph 27 above) strongly cautioned ICANN against implementing such policies and warned of the potential legal consequences of doing so. The Government unequivocally disapproved of Afilias' Sunrise Proposals on not only legal and moral grounds but also on the grounds that it unfairly discriminated against non-commercial use of the Internet

as a Public Resource. The ICANN/Afilias policy therefore represents neither ICANN consensus; US Government Policy or the public interest.

121.    The ICANN and Afilias Sunrise policy was wholly unnecessary. ICANN's own UDRP provided, and continues to provide, an inexpensive, accessible and expedited administrative process that fully conformed to WIPO's recommendations whereby trademark holders could take effective action against infringing domain name registrants – including the transfer of an infringing domain name to the complainant. The Government's Small Business Administration stated that the Sunrise Policy would be ineffective in curbing cyberpiracy and this has been clearly borne out by actual experience.

122.    The predominant result of the Sunrise Policy was to allow the fraudulent registration of some 31,000 domain names (some 62% of the total) during the Sunrise period that resulted in the inability of the general internet public to register these names during the subsequent public registration period. Many ordinary people appear to have lost significant amounts of money charged by Registrars as pre-registration fees that were non-refundable even if the domain name requested was subsequently not available. This abuse has been inadequately addressed by Afilias reclaiming some 17,000 names and reselling them due to further public criticism that has resulting from the 'manipulation' of the new distribution process by some Registrars which enabled them to obtain advantages and increased chances of obtaining desirable domain names for certain 'preferred' clients; to charge further non-refundable 'pre-registration fees' (hundreds of dollars in some cases); to obtain valuable domain names for

themselves; and to sell names to the highest bidders rather than at their 'normal' registration rates.

123.    Even if the purpose of the Sunrise Policy could be shown to have been to avoid "cyberpiracy" – an allegation that is specifically rejected by the Plaintiff (see preceding paragraph) – the 'remedy' that was applied was wholly disproportionate to the damage done to the rights of ordinary internet users and even other trademark holders who have been denied the right to register a domain name for wholly legitimate and non-infringing use. It is akin to granting a single and exclusive business license to sell fruit to the first entity that registers a fruit shop containing the word 'fruit' as an effective means of preventing confusion to consumers by other businesses subsequently registering 'fruit shops'. The avoidance of confusion or 'infringement' would be effective - but at what cost to the interests of existing (or prospective) legitimate fruit sellers or the consuming public who want access to a wide range of fruit from multiple and selectable sources.

124.    ICANN has itself asserted[112] that:

> **ICANN has no statutory or regulatory "authority" of any kind. It has only the power of the consensus that it represents, and the willingness of members of the Internet community to participate in and abide by the consensus development process that is at the heart of ICANN.**

The evidence, however, is that ICANN imposed its policy on an Internet community that almost universally condemned it prior to it being adopted (see paragraph 33 above). It is clear that the Policy was not founded on any process of consensus in which the Internet community participated.

---

[112]    ICANN's Response to Questions from Tom Bliley to Esther Dyson F. 1(b) – 8 July 1999
http://www.icann.org/correspondence/bliley-response-08july99.htm

ICANN has specifically agreed with the U.S. Government:[113]:

> **not to "act unjustifiably or arbitrarily to injure particular persons or entities or particular categories of persons or entities."**

125.   In creating a Sunrise Policy, ICANN took action arbitrarily (without consensus or public support) that injured the Plaintiff and the general Internet public.

126.   In creating a Sunrise policy, ICANN took upon itself a 'governing' role that was specifically forbidden to it under the express provisions of the Government's White Paper that led to its creation (see paragraph 13 above).

127.   In making policy that extended trademark law beyond the statutory limits enacted by Congress, ICANN took upon itself a legislative role that contravened a prohibition clearly stated by the U.S. Government not to:

> **displace intellectual property law that already applies.**

128.   In making exclusionary policy that prevented potential registrants from obtaining domain names within new TLDs for the purpose of fair, lawful and non-infringing use, ICANN operated in contravention of the terms of its charter from the U.S. Government that specifically prohibit it from:

> **limiting the rights that can be asserted by a domain registrant or trademark owner under national laws.**

### Sunrise Policies as being unlawful under the Sherman Act

129.   Notwithstanding the legal advice proffered to it from various sources – including a number of professors of law as well as U.S. Government Counsel – ICANN proceeded to negotiate an agreement with Afilias – as the successful applicant for the .info TLD - that incorporated a 'Sunrise Policy'. This contract included

---

[113]   Paragraph 9

provisions that excluded individuals, businesses and even other trademark

holders from the opportunity of registering domain names in the new TLD by

granting a preference to certain trademark holders that was not permitted under

either United States or International Law. Such an agreement violates Sections 1

and 2 of the Sherman Act as a combination in restraint of trade and a conspiracy

to monopolize the namespace of the new .info TLD for the benefit of minority

interests not entitled to such preference by any legal principle or statutory

provision and against the interests of general internet users.

### ICANN's Capacity to Implement New TLDs

130.   ICANN itself has cast doubt as to its capacity to enter into such a contract

through its evidence (see paragraph 55 above) that it has no power to implement

a new TLD beyond an advisory role to the U.S. Government and the Plaintiff

therefore addresses this issue below.

131.   If ICANN's assertion is correct that it has no power to implement a new TLD and

that this right is reserved by the U.S. Government acting upon the advice of

ICANN, then the inevitable conclusion would be that it is the U.S. Government

(through its Department of Commerce) rather than ICANN that is acting in

contravention of trademark law; the Administrative Procedures Act; and the

whole range of legal norms and procedures that are applied to the rule making

process of a Government Agency.

132.   The Memorandum of Understanding[114] that established ICANN contains a

provision[115] that:

> **ICANN will carry out the following DNS management functions:**
> **c. Oversight of the policy for determining the circumstances under which**
> **new top level domains would be added to the root system;**

It would appear that, contrary to its own assertions, ICANN did, in fact, possess

oversight authority to determine 'policy' regarding the implementation of new

TLDs and should be held accountable for its oversight process and the

lawfulness of its policy decisions.

133.   Also, in a letter of May 15, 2000 to the Office of Advocacy of the US

Government's SBA, Michael Roberts, ICANN's President and CEO stated that[116]:

> **it would not be appropriate, in our opinion, for ICANN to adopt or observe federal**
> **agency rules of procedure.**

The letter also refers to the US Government's intent to:

> **continue to participate in policy oversight until such time as the new corporation**
> **was established and stable, phasing out as soon as possible, but in no event later**
> **than September 30, 2000.**

ICANN granted approval of the implementation of new TLDs on November 16,

2000 – after the "in any event" date referred to above.

134.   ICANN also describes its structure and policy making role as follows:

> **The structure of ICANN, the entity subsequently recognized by the Department of**
> **Commerce as fulfilling the requirements of the White Paper, embodies the concept**
> **of "private-sector leadership" and attains this goal through the organizational**
> **means of a tax-exempt, non-profit California public benefit corporation that**
> **encourages extensive bottom-up participation by its stakeholders in the crafting of**
> **new or revised coordination policies.**

The Plaintiff believes that, in spite of some puzzling ambiguities in its own public

statements, the comments detailed above demonstrate that ICANN clearly

---

[114]   Memorandum of Understanding between the U.S. Department of Commerce and ICANN
        http://www.ntia.doc.gov/ntiahome/domainname/icann-memorandum.htm
[115]   Section II B (c)
[116]   http://www.icann.org/correspondence/sba-15may00.htm

regards itself as a corporation that has the authority of the U.S. Government to make and implement policy. It reached this conclusion (see paragraph 133 above) after specifically considering if any procedures that would apply to federal agency rules of procedure should apply to its own decision-making processes.

135.   Michael Froomkin – Professor of Law at Miami University - provides a detailed and persuasive analysis of the legality of ICANN's relationship with the U.S. Government. His analysis arrives at a contrary conclusion that, in fact, supports the unconstitutionality of its processes[117].

136.   Karl Auerbach, an elected Director of ICANN and an attorney, however, describes ICANN[118] as:

> Internet governance

And (as a California Company)

> responsible to no one other than the Attorney General of the State of California. ICANN is very much a regulatory body. But unlike regulatory bodies that are part of the government, ICANN is a private corporation [3] and is not obligated to undertake any of those troublesome constitutional Due Process burdens imposed on governmental administrative bodies. ICANN is not subject to the burden of judicial review or the Federal Administrative Procedures Act. ICANN is not required to make it possible for those affected by its decisions to participate in the making of those decisions.

The Plaintiff has restricted his analysis to the publicly chronicled events that led to ICANN's implementation of a Sunrise Policy. While some of the exact mechanisms that led to the final decision remain shrouded in some secrecy (contrary to ICANN's rules), the Plaintiff believes that the available evidence supports the view that ICANN acted independently of the United States Government – and even of its own consensus-building processes - and that the

---

[117]   Wrong Turn in Cyberspace: Using ICANN to Route around the APA and the Constitution
http://www.law.duke.edu/journals/dlj/articles/dlj50p17.htm

[118]   Senate Testimony on February 14, 2001
http://www.cavebear.com/cavebear/growl/issue_6.htm

corporation made Internet law that is beyond its authority; contrary to the

recommendations of WIPO; contrary to its consensus-based decision-making

policies; contrary to relevant principles of national and international law and

contrary to the public interest.

**The plaintiff therefore requests this court to enter judgment to provide the following remedies**

1    A declaration that the 'Sunrise Policy' of the Defendants is contrary to the free speech provisions of the First Amendment of the United States Constitution.

2    A declaration that the agreement of the defendants to implement and enforce a 'Sunrise Policy' constitutes an unlawful contract and conspiracy in restraint of trade contrary to the Sherman Act, 15 U.S.C. §1.

3    An order that Afilias restore full and unrestricted rights to all domain names registered by the Plaintiff as a result of transfer decisions of WIPO.

4    An order that decisions of WIPO under Afilias' Sunrise Challenge Policy that denied due process to the Plaintiff by denying his specific request and right to represent himself or be represented by legal counsel and to challenge the jurisdiction of WIPO are null and void.

5    An award of damages.

6    An award of plaintiff's costs and fees.

7    Such other relief and remedies as the court deems to be just.

Submitted by Jeff Davies

Jeff Davies
5452 Coral Way
Orlando, FL 32839, USA
Telephone: (407) 855 0758
Fax: (407) 855 0673
Email: j@jduk.com

# Appendix 1

# ICANN Articles of Incorporation

# November 21, 1998

# ICANN

---

## Articles of Incorporation (As Revised)

---

### ARTICLES OF INCORPORATION

### OF INTERNET CORPORATION FOR

### ASSIGNED NAMES AND NUMBERS

### As Revised November 21, 1998

1. The name of this corporation is Internet Corporation for Assigned Names and Numbers (the "Corporation").

2. The name of the Corporation's initial agent for service of process in the State of California, United States of America is C T Corporation System.

3. This Corporation is a nonprofit public benefit corporation and is not organized for the private gain of any person. It is organized under the California Nonprofit Public Benefit Corporation Law for charitable and public purposes. The Corporation is organized, and will be operated, exclusively for charitable, educational, and scientific purposes within the meaning of § 501 (c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), or the corresponding provision of any future United States tax code. Any reference in these Articles to the Code shall include the corresponding provisions of any further United States tax code. In furtherance of the foregoing purposes, and in recognition of the fact that the Internet is an international network of networks, owned by no single nation, individual or organization, the Corporation shall, except as limited by Article 5 hereof, pursue the charitable and public purposes of lessening the burdens of government and promoting the global public interest in the operational stability of the Internet by (i) coordinating the assignment of Internet technical parameters as needed to maintain universal connectivity on the Internet; (ii) performing and overseeing functions related to the coordination of the Internet Protocol ("IP") address space; (iii) performing and overseeing functions related to the coordination of the Internet domain name system ("DNS"), including the development of policies for determining the circumstances under which new top-level domains are added to the DNS root system; (iv) overseeing operation of the authoritative Internet DNS root server system; and (v) engaging in any other related lawful activity in furtherance of items (i) through (iv).

4. The Corporation shall operate for the benefit of the Internet community as a whole, carrying out its activities in conformity with relevant principles of international law and applicable international conventions and local law and, to the extent appropriate and consistent with these Articles and its Bylaws, through open and transparent processes that enable competition and open entry in Internet-related markets. To this effect, the Corporation shall cooperate as appropriate with relevant international organizations.

5. Notwithstanding any other provision (other than Article 8) of these Articles:

   a. The Corporation shall not carry on any other activities not permitted to be carried on (i) by a corporation exempt from United States income tax under § 501 (c)(3) of the Code or (ii) by a corporation, contributions to

which are deductible under § 170 (c)(2) of the Code.

b. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall be empowered to make the election under § 501 (h) of the Code.

c. The Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

d. No part of the net earnings of the Corporation shall inure to the benefit of or be distributable to its members, directors, trustees, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article 3 hereof.

e. In no event shall the Corporation be controlled directly or indirectly by one or more "disqualified persons" (as defined in § 4946 of the Code) other than foundation managers and other than one or more organizations described in paragraph (1) or (2) of § 509 (a) of the Code.

6. To the full extent permitted by the California Nonprofit Public Benefit Corporation Law or any other applicable laws presently or hereafter in effect, no director of the Corporation shall be personally liable to the Corporation or its members, should the Corporation elect to have members in the future, for or with respect to any acts or omissions in the performance of his or her duties as a director of the Corporation. Any repeal or modification of this Article 6 shall not adversely affect any right or protection of a director of the Corporation existing immediately prior to such repeal or modification.

7. Upon the dissolution of the Corporation, the Corporation's assets shall be distributed for one or more of the exempt purposes set forth in Article 3 hereof and, if possible, to a § 501 (c)(3) organization organized and operated exclusively to lessen the burdens of government and promote the global public interest in the operational stability of the Internet, or shall be distributed to a governmental entity for such purposes, or for such other charitable and public purposes that lessen the burdens of government by providing for the operational stability of the Internet. Any assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as such court shall determine, that are organized and operated exclusively for such purposes, unless no such corporation exists, and in such case any assets not disposed of shall be distributed to a § 501(c)(3) corporation chosen by such court.

8. Notwithstanding anything to the contrary in these Articles, if the Corporation determines that it will not be treated as a corporation exempt from federal income tax under § 501(c)(3) of the Code, all references herein to § 501(c)(3) of the Code shall be deemed to refer to § 501(c)(6) of the Code and Article 5(a)(ii), (b), (c) and (e) shall be deemed not to be a part of these Articles.

9. These Articles may be amended by the affirmative vote of at least two-thirds of the directors of the Corporation. When the Corporation has members, any such amendment must be ratified by a two-thirds (2/3) majority of the members voting on any proposed amendment.

(c) 1998 The Internet Corporation for Assigned Names and Numbers

# Appendix 2

# Communiqué of the Government Advisory Committee

# August 24, 1999

# Communique of the Government Advisory Committee
## August 24, 1999
## Santiago, Chile

TUESDAY, 24 AUGUST 1999 - The Governmental Advisory Committee of the Internet Corporation for Assigned Names and Numbers held its third meeting today. The attending Committee members, representing 28 national governments, distinct economies as recognised in international fora, and multinational governmental and treaty organisations, issued the following statement:

The Governmental Advisory Committee (GAC) has had fruitful discussions around substantive issues relating to the usage of the Internet across the worldwide community and the administration of the country code top level domains. The GAC initiated a positive and constructive process for addressing these and other significant Internet policy issues, and as a consequence makes the following recommendations to the ICANN Board:

a.  With regard to ICANN's Proposed Interim Policy for Geographic Diversity on the ICANN Board of Directors:

The GAC supports the underlying principles of geographic diversity and international representation in the context of ICANN. The GAC believes that these principles are best implemented using the criterion of citizenship, as specified in the By-laws of ICANN, to determine the eligibility of directors of the board of ICANN and of participants in the Councils of the Supporting Organizations. In addition, taking into consideration the practicality of determining the electorate, the GAC supports the use of residency as the criterion for determining the eligibility of the electorate.

2.  With regard to principles for the delegation of management for country code top level domains:

1. The GAC reaffirmed its May resolution that the Internet naming system is a public resource and that the management of a TLD Registry must be in the public interest.

2. Accordingly, the GAC considers that no private intellectual or other property rights inhere to the TLD itself nor accrue to the delegated manager of the TLD as the result of such delegation.

3. The GAC also reaffirmed that the delegation of a ccTLD Registry is subject to the ultimate authority of the relevant public authority or government. The GAC discussed the development of best practices for the administration of ccTLDs and agreed to continue this discussion.

The next face-to-face meeting of the GAC will be held on 2 November 1999 in Los Angeles, to coincide with ICANN's next round of meetings.

**Appendix 3**

**Report of ICANN Working Group B**

**April 18, 2000**


**ICANN**

# Report of Working Group B

(posted 18 April 2000)

---

**This report of Working Group B was delivered to the DNSO Names Council on 17 April 2000. Click below to read public comments received through 12 May 2000.**

**Click here to enter the public comment forum on Working Group B's formal report**

**Click here to read e-mail comments on Working Group B's formal report**

---

**Working Group B (WG-B) Report**

**Written by Michael Palage, Chair of WG-B**

**Presented to DNSO Names Council**

**On April 17, 2000**

**Executive Summary:**

Over the past twelve months there has been an in-depth discussion of Chapter Four of the World Intellectual Property Organization (WIPO) report. There appears to be a growing consensus on several key issues; while there remains significant differences on others. In this report, I will attempt to outline the points of agreement and dissension that have emerged since the inception of the Working Group.

**Background:**

Working Group B was created in Berlin last year and tasked with addressing Chapter Four of the WIPO report. Since that time the group has met at each of the last three ICANN regional meetings. There are currently over 120 participants on the Working Group B mailing list. Although the majority of the participants are trademark attorneys and/or brand managers, the remaining participants are scattered among a diverse cross section of the other six DNSO constituencies.

When Working Group B was formed last May, Jonathan Cohen was the designated Names Council Co-Chair and I was the elected Co-Chair. However, after Jonathan's decision to run for an ICANN Board seat, I functioned as the sole Chair of the Working Group for several months. Last December, the Names Council designated two Names Council representatives, Kathy Kleiman and Philip Sheppard as Co-Names Council Liaison Representatives.

In October 1999, there was a vote among the participants of the Working Group at that time and a consensus was reached (30 out of 42 voters - 71%) that a mechanism was needed to protect famous trademark interests in connection with the domain name system.

After the results of this vote, there was a call for position papers among the participants of the Working Group. A total of ten position papers were submitted. A complete list of the submitted papers with an HTML link to each can be found at http://www.dnso.org/wgroups/wg-b/Archives/msg00505.html. In addition, the American Intellectual Property Law Association (AIPLA) submitted a paper summarizing the various papers and offering their own recommendations. This paper can be found at: http://www.dnso.org/wgroups/wg-b/Archives/msg00604.html.

Of the ten position papers received, only five offered substantive solutions to the problems confronting the Working Group. A summary of each of these five papers are outlined below:

*Non-commercial Constituency Position Paper:* This position paper argues that the creation of a list of famous marks which are then excluded from all new gTLDs would greatly expand the existing rights of famous mark holders. It would allow those who hold marks that are famous in one context, to block future domain name holders in the new gTLDs from using words in noncommercial and generic ways that are specifically protected under domestic laws of sovereign countries. It would eliminate the ability of individuals, noncommercial groups and small businesses to register domain names in new gTLDs for protected noncommercial uses(such as "bell" by a school group or "apple" for a children's noncommercial program) and also for protected generic uses(such as "bell" by a bell manufacturer or "apple" by an small apple farmer). Instead of the WIPO/IPC proposal, the Non-Commercial Paper proposes creation of a .TMK top level domain (others have called it .FAME) for famous marks in which WIPO could create a list of famous marks owners, these famous names would be registered in this new gTLD, and the gTLD would be branded as "the place to be in e-commerce."

*Michael Palage Position Paper:* This position paper advocated the creation of a famous mark list primarily using the criteria set forth in the WIPO report. However, it also called for the use of additional objective criteria to provide some safeguards from the list growing out of control. The Palage Position Paper would allow for a famous trademark owner to register a number of domain name variations during a sunrise period to protect its sub-string variations. This sunrise period would last for a fixed period of time prior to the top-level domain being opened to the public for registrations.

*Eileen Kent Position Paper:* This was a paper submitted during the position paper submission period and called for a free market system in which all trademark owners would be able to subscribe to a notification system. This proposal did not call for the creation of a famous marks list.

*Harald Alvestrand Position Paper:* This paper was also submitted during the position paper submission period and called for the creation of a finite list of famous marks by WIPO of between ten (10) and one hundred (100) marks. This proposal would allow the famous mark owner to register the mark and a small number of identically similar marks, i.e. 's, dashes, etc. If the famous trademark owner did not elect to register the mark, an Internet user would be directed to a default page stating that the domain name is intentionally not being used.

*Intellectual Property Constituency Position Paper (version 1) :* The original IPC paper essentially adopted the basic principles set forth in Chapter Four of the WIPO report.

Following the publication of these position papers, the Registrar Constituency began to mobilize when several of the position papers advocated the use of filters in connection with the registration

process. Prior to the ICANN regional meeting in Cairo, the registrars drafted the following position paper.

*Registrar Proposal (version 1):* The Registrar Constituency supports the use of a sunrise period to protect the interests of the famous trademark holders. However, in light of the difficulty and controversy surrounding the creation of a famous marks list, the registrars support a sunrise program where all registered trademark owners could participate.

Prior to Cairo, both Names Council Co-Liaisons circulated the following position paper in both Working Groups B and C.

*Philip Sheppard/Kathryn Kleiman Compromise Position Paper:* Sheppard and Kleiman, co-liasion Names Counsel representatives of WG-B appointed fairly recently by the Names Council, sat down together to try to bridge seemingly unbridgeable gulfs. In a paper drafted by Sheppard and now circulated to WG-B and WG-C, Sheppard and Kleiman propose a new "common ground" based largely on the "Principle of Differentiation" – "that the selection of a gTLD string should not confuse net users and so gTLDs should be clearly differentiated by the string and/or by the marketing and functionality associated with the string." The paper did not explicitly call for chartered domains, but does imply that even open domains should have added value and so be more than imitations of dot com. The authors believe that finding agreement to the specific solutions to trademark concerns will be considerably easier once it is known that domain names will be selected on the basis of these principles.

Other principles support the goal of "findability" – that coke as a power source and coke as a beverage can coexist as domain names in new gTLDs provided the new gTLDs provide the Internet user with a sense of their different purposes and uses. The paper did not explicity call for chartered domains but does imply that even open domains should have added value and so be more than imitations of dot com. The authors believe that finding agreement to the specific solutions to trademark concerns will be considerably easier once it is known that domain names will be selected on the basis of these principles.

In Cairo the Intellectual Property Constituency (IPC) released the following revised position paper.

*Intellectual Property Constituency Position Paper (version 2):* This revised position paper advocated the creation of a famous marks list that would be used to preclude the registration of a domain name that is identical to or nearly identical to a famous mark on such list. The creation of a famous marks list would be based on the criteria set forth in paragraphs 284-285 of the April 30, 1999 'Report of the WIPO Internet Domain Name Process.'

Following cross-constituency negotiations between the registrars and the IPC in Cairo, the registrars expressed an interest in supporting the creation of a famous marks list by WIPO to be used in connection with the sunrise period, Registrars (version 2). Upon leaving Cairo, the registrars and the IPC expressed a willingness to continue to work together in an effort to forge a common ground. This was reported in my Working Group B Status Report that was submitted to the Names Council last month.

On Friday the 14th of April, the day before the deadline for my report, the IPC submitted to me a

revised position paper which I have summarized below and included as Attachment #1.

*Intellectual Property Constituency Position Paper (version 3):* The revised position paper advocates a Sunrise Proposal to be incorporated into the rollout of new top-level domains. During the Sunrise

Period, owners of trademarks and service marks (marks) would be able to register their marks as domain names on a first-come-first-served basis in a new top-level domain before that new domain is opened to the general public. In order, to protect their sub-string variations without the need for filters, the trademark owner would be able to register up to 20 variations of the mark.

This proposal is nearly identical to the Registrars' first Sunrise proposal prior to Cairo. Unfortunately due to the time in which this report was submitted to me and the rest of the Working Group, there was not adequate time for proper discussion among the Working Group B participants.

Despite the recent progress of the IPC and the registrars There remains strong opposition among many members of the Working against any additional protections for trademarks beyond the Uniform Dispute Resolution Policy and national laws such as the U.S. Anticybersquatting Act and the new trademark monitoring services now coming into existence. Many of these viewpoints have been included in the attachment to this report.

**Summary of Consensus Items:**

In light of the most recent IPC proposal, I am glad to report on the following apparent points of consensus. Due to the lack of time, a formal vote could not be conducted among the Working Group B participants, but the Chair after consultation with the joint Names Council Liaisons believe that the following are accurate points of consensus:

1. There does not appear to be the need for the creation of a universally famous marks list at this point in time.

> Comments: The creation of a universally famous marks list was a political hot potato. Issues such as who should create the list, the criteria that should be used, limits on the size of the list, etc. were hotly debated with no clear compromise in sight. The current Sunrise proposal being advanced by the IPC and Registrar Constituency do not require the creation of such a list. However, if and when a universally famous marks list is created, it would be prudent for ICANN to consider whether the list is applicable to the then-existing gTLD registration process.

2. There appears to be a consensus that protection afforded to trademark owners will depend upon the type of top level domain.

> Comments: This consensus item is based upon the recognition that a sunrise program is probably not suitable for every new top-level domain, especial certain non-commercial domains. However, this consensus item is conditioned on many tangential issues, i.e. the scope of chartered gTLDs, the enforcement mechanism for charter, etc. Defining the procedures for classifying what constitutes a non-commercial top-level domain, is better left to Working Group C. However, nothing in the consensus item should be construed as creating immunity from the UDRP or other legal proceeding should a domain name registrant in a charted top-level domain violate the charter or other legal enforceable rights.

**Point of Agreement, but not Consensus:**

Working Group B has worked tremendously hard to find some middle ground of practical protection for trademark owners within commercial gTLDs that would be within existing law and within the scope and power of ICANN. The Sunrise Proposal allowing pre-registration for all Trademarks now has strong support in the registrar and IP communities. Some members of the Noncommercial and

Small Business Communities also have expressed support for this Proposal, providing clear limitations and safeguards are created and followed.

The basic principle of the Sunrise provision as set forth in the various position papers summarized above, includes a mechanism whereby a trademark owner could pre-register domain names in a select commercial top-level domain prior to its being open to the general public. Additionally, the trademark owner would be eligible to register a limited number of domain name variations that were similar or nearly identical to the registered mark. The Registrars have proposed 5 variations of the trademark; the current Intellectual Property Proposal sets out 20 variations of the trademark.

This compromise would eliminate the need for Registries to filter out domain names that potential infringe a trademark on an ongoing and permanent basis. More importantly, this right of pre-registration would be for a finite time prior to the top-level domain being added to the root and would convey no rights or privileges to the trademark owner after the conclusion of the sunrise period.

Some members of the noncommercial and small business communities have conditioned their support for this Sunrise Period for All Trademarks on its application only to chartered commercial gTLDs (such as a .CAMERA or .AIRLINES) and only for a limited number of new gTLDs introduced in a limited initial period of time (sometimes called "the testbed period"). These safeguards will protect trademarks owners during the early period of time where the new commercial gTLDs might create some chance of confusion, without imbedding a permanent bias in favor of existing businesses.

Some reasons this Agreement seems consistent with the consensus items of this Working Group are:

- it does not create a list of globally famous marks which might or might not be famous in the individual countries of the registries, registrars and domain name holders;
- it does not create a list of globally famous marks which might fall outside the scope and mandate of ICANN;
- it does provide protection for both large and small trademark owners within commercial domains on a first come, first served basis;
- it does protect noncommercial speech and noncommercial use of gTLDs and domain names;
- and it provides protection for the new registries who fear that without clear policies for protection of trademarks in the initial rollout (called the testbed period of new gTLDs) that they will be sued for failure to protect large trademark owners trademarks in new gTLDs.

Thus, this Sunrise Proposal is a pragmatic way to bridge the gap of opinions in Working Group B and to allow the responsible rollout of new gTLDs. We are sure that the details of the Sunrise Proposal need to be worked out by the Internet Community, the Names Council and the ICANN Board, but the proposition itself is the best way to achieve the goal of expanding the name space in a controlled reasonable manner within the next year.

### Summary of Controversial Items:

In response to the recent IPC and Registrar proposals advocating a Sunrise Proposal, several participants in the Working Group have criticized this proposal as being technically unfeasible, unfounded in law, and greatly expanding the scope of Working Group B's original charter. I have attempted to include all of the criticisms of the sunrise proposal received to date as part of the Attachment accompanying this report.

Another point that needs further clarification is how to handle the potential conflicts among

trademark owners during the sunrise period. For example, the current IPC proposal calls for a first come first serve model, whereas the original Registrar proposal contemplated a potential expanse of the UDRP to handle conflicting priority claims. Defining the procedures and mechanisms that will be employed to handle trademark disputes during the sunrise period is probably best left to a drafting committee composed of representatives from a cross-section of the DNSO should this proposal be further considered.

One other point of clarification is the contractual language that will accompany the "take down" provision currently embodied in the latest IPC proposal. Although the registrars are currently contractually bound to correct faulty registration data, there may be the need for additional language to shield them from any liability in connection with the take-down provision. Again, this clarification is best left to a drafting committee to resolve should this proposal be further considered. The registration authorities are sensitive to the fact that the take down provision is crucial to the IPC proposal. This is particularly so since there is no requirement for the registrar to verify the existence of a registered trademark prior to registration during the sunrise period. There also appears to be some further consideration as to what happens after a sunrise registration is taken down, i.e. who gets priority in that domain name where there are multiple claimants.

**Working Group B Chair Michael Palage's Comments:**

At first blush, the recently proposed IPC Sunrise Proposal and the Registrars' original Sunrise Proposal on its face appears to greatly expand the scope of protection afforded to trademark owners from just famous trademarks to all registered trademarks. However, upon closer examination, it is my opinion that this potential compromise offers an immediate solution to the protection of trademark interests during the test period for new top-level domains.

In addition to my duties as Chair of Working Group B, I am also the Secretariat of the Registrar Constituency. Although I have not been able to discuss the recent IPC proposal in detail with all the registrars, most of the ones that I have spoken with have expressed a guarded optimism that the Sunrise Proposal can provide a basis for further consensus building efforts. Although there have been several registrars that have questions about implementation and procedure, only one has gone on record as rejecting the IPC latest proposal, see Attachment #5.

Although Jonathan Weinberg has done a yeoman's job trying to forge consensus in Working Group C, based upon the concerns expressed by some participants in this Working Group the following points need further study by the Names Counsel and ICANN staff in preparing the reports for public comment:

- Is the current proposal for six to ten top-level domains overly ambitious considering we have failed to identify the specific safeguards designed to protect the trademark interests.
- The legal requirements set forth in any proposed charted top-level domain needs to be clearly set forth as well as the mechanism for charter violations.

**Names Counsel Liaison Comments:**

**I. Philip Sheppard** (European Brands Association, and a Names Council representative of the Commercial and Business Constituency)

Working Group B has had much intelligent and thought provoking discussion. The group understands that while its subject matter is intellectual property, its objectives are the protection of consumers and net users from fraud, misrepresentation and confusion.

Within the options that have been discussed in this working group lie solutions to a increase in the domain name space in a way which produces diversity, fairness and consumer protection.

The creation of new domain names is the prime activity by which the ICANN process will be judged. The Names Council and the board of ICANN needs to simultaneously consider the work of WG B with that of WG C.

## II. Kathryn Kleiman (Association for Computing Machinery's Internet Governance Project, and a Names Council Representative from the Noncommercial Constituency)

The Working Group B Report is the product of the hard work of the members of Working Group B and the strong drive of Michael Palage to craft consensus from widely divergent views and needs. The Report now goes to the DNSO Names Council for a public notice period, and then to the ICANN Board for a public notice period, and then a public discussion at the Japan ICANN meeting this summer.

What this Report needs now is You – it needs the comments, input and ideas of the Internet Community. We have found a few areas of consensus, some additional areas of agreement, and many questions. To those of us close to the WG-B effort, the open questions are stark and clear. Therefore, I have used my comment space below to share with you where I think specific comments would be most helpful to the Names Council and ICANN. There are certainly many other areas in which you might comment. Please feel free to contact me if you would like me to clarify any question below (KathrynKl@aol.com).

(1) Two Overall Issues for any Working Group Report

The following two questions must be asked of any working group:

- o Are the proposals consistent with existing law? In this case, do the WG-B Report and its consensus and agreement points conform to the scope and limits of trademark law?
- o Since ICANN has a limited scope as set out in its bylaws and agreements with the US `Department of Commerce, do the WG-B proposals fall within the scope and mandate of ICANN?

(2) Is the Protection of Famous Marks Necessary in New gTLDs?

It is important to note that the October 1999 vote in favor of famous mark protection passed by only one vote. Starting from this shaky basis of one vote, the support for famous mark protection in new gTLDs is lukewarm at best.

A question for those who will comment on this Report: Particularly, in light of the success of the Uniform Dispute Resolution Policy and the strong US Anti-Cybersquatting Act (protections not in existence when WIPO drafted its reports and particular the Chapter 4 Famous Mark protections), is special trademark protection still needed in the new gTLDs?

1. If trademark protection is needed, how should it be structured?

If you agree that the trademark protection being proposed in the Sunrise Period is a good one, at least for a limited testbed period to get us over the hump of initial confusion as new

commercial gTLDs are rolled out, then please help us further define some key issues:

How long should the testbed period last?
- To what gTLDs should it apply (all commercial gTLDs, only the chartered or limited use gTLDs, other?)?
- To what trademarks should the protection apply (all trademarks, only trademarks older than 1 year, other)?
- Should the Sunrise Period advance registration apply to variations of trademarks, and if so, what type of variations and how many should be allowed (e.g., punctuation, plurals, any addition of any number of letters, other)?

2. How do we protect noncommercial speech and activity in new gTLDs?

There is general agreement, even consensus (since it crosses constituency lines), that the Sunrise Period's advance registration of trademarks should not apply to noncommercial gTLDs. This is a good agreement, and consistent with national and international law. There is not consensus, however, on how to define Noncommercial gTLDs. Further, there are a variety of different proposals (none final) that would create special exposure to noncommercial domain name holders and unfortunately allow much easier revocation of their domain names.

The Internet Community, and particularly the Noncommercial Community's comments, would be very useful on the following points:
- How do you expect to use Noncommercial gTLDs (now and in the future)?
- Does the Noncommercial Community need undifferentiated (unchartered) gTLDs as well as chartered gTLDs?
- How can ICANN (or whatever approving body it creates to approve new gTLDs) recognize a new Noncommercial gTLD?
- Should Noncommercial gTLD domain names be given less protection than domain names in commercial gTLDs?
- Under what circumstances and procedures should a Noncommercial gTLD domain name be subject to challenge and possible revocation?
- How does existing law in your country protect noncommercial speech (and also noncommercial use of domain names)?

3. How do we protect the new registries who will introduce the new gTLDs?

One of the main reasons for the creation of trademark protection within the new gTLDs is the fear that trademark owners will sue new registries. This fear drove Network Solutions, Inc., in 1995, to create a domain name dispute policy, which equated domain names with trademarks. The policy had no basis in the traditional protections and limits of trademark law; it was designed solely to protect Network Solutions from lawsuits. It resulted in the loss of thousands of domain names of individuals, noncommercial organizations and small businesses (through the NSI process and also from intimidating letters and threats), which was not consistent with law or equity.

How do we protect Registries without endorsing a position that goes beyond the bounds of existing protection for trademark owners. We need your comments! In your country, are Registries who choose not to get involved in trademark/domain name disputes protected by national laws or by court decisions? Do you think a policy from ICANN urging the neutrality and immunity of gTLD Registries help them to avoid suits and to win suits that might be brought in your country? What protections of new Registries do you think lie within the limited scope and mandate of ICANN?

(6) Final Note – A Hearty Thanks to Michael Palage.

Working Group B's Chairman, Michael Palage, has set a new precedent for hardworking working group chairs. He participated in online and in person meetings worldwide, attended an untold number of official and unofficial forums, acted as mediator, listed to all sides, and rallied the troops. He saw his job as bridging the gaps (chasms, actually), which divided the working group and have halted the rollout of new gTLDs for over four years. Michael helped everyone to see the needs of the Registrar Community, from which he hails, but also the needs of the other Constituencies and Internet communities. No one can count the hours, days or nights that Michael has decided to this effort. He has my thanks, gratitude and admiration. His work now turns over to you – the Internet Community!

Respectfully submitted,


Michael D. Palage
Chair Working Group B



See the accompanying attachment for the following documents:

Attachment #1 – The Intellectual Property Constituency Sunrise Plus 20 Proposal

Attachment #2 – Office of Advocacy – US Small Business Administration

Attachment #3 – Open Root Server Confederation (ORSC)

Attachment #4 – Ellen Rony Personal Comments

Attachment #5 – TUCOWS Comments

Attachment #6 – Consumer Project on Technology

Attachment #7 – Professor Froomkin' Personal Comments

Attachment #8 – Mark Langston's Personal Comments

---

# ATTACHMENT # 1

### Sunrise Proposal Plus Twenty

I. General: The Sunrise Proposal Plus Twenty shall be incorporated into the rollout of new top-level domains. During the Sunrise Period, owners of trademarks and service marks (marks) will be able to register their marks as domain names on a discounted, first-come-first-served basis in a new top-level domain before that new domain is opened to the general public.

II. Eligibility: Any owner of a valid national trademark or service mark registration is eligible to seek to

register as a domain name during the Sunrise Period that mark and up to an additional twenty (20) variations of such mark, provided that the national registration for that mark issued at least one (1) year prior to the date on which the mark owner applies to register the mark and any variations of the mark as a domain name. The name of the domain name registrant must be the same as the name of the owner of the mark registration. At least one domain name registration must contain the material textual element (excluding punctuation) of the registered mark.

III. Procedure for Sunrise:

A. ICANN must provide at least ninety (90) days notice to the general public of its intention to introduce a new top-level domain. Notice must be in the form of both an announcement on ICANN's website and an official Press Release issued by ICANN.

B. At least 60 days prior to the beginning of the Sunrise Period, ICANN shall post a list of all registrars participating in the Sunrise Program, along with a hyperlink to each registrar's website.

C. At the end of the ninety (90) days notice period, a thirty (30) day Sunrise Period shall begin, at which time a mark owner that is eligible for this program under Section II may submit a domain name registration application to register a domain name which is the same as the mark it owns, along with applications for registration for up to an additional twenty (20) variations of such mark. These domain names shall be registered on a first-come-first-served basis.

D. At the end of the Sunrise Period, the top-level domain shall be open for registration of domain names to the general public.

IV. Application Template:

A. In order to qualify, the Application must contain, inter alia:

a. the name of the domain name registrant

b. the domain name

c. the name of the mark

d. the date of registration of the mark

e. the country of registration of the mark

f. the registration number of the mark

g. the name of the owner of the registered mark

B. The domain name registrant must affirmatively check off a box on the Application Template stating that it has a valid national mark registration that issued at least one (1) year prior to its application for registration as a domain name.

C. The Application Template should affirm that the registrar shall have no liability for administering the Sunrise Program so long as the Registrar acts in accordance with the

policies set forth in the Sunrise Proposal.

D. The domain name registrant must affirmatively check off a box on the Application Template stating that the domain name registrant's registration of the domain name is in conformity with the charter for that particular top-level domain (if not a generic TLD).

E. Registrars would be under no obligation to check the information contained in an application to register a domain name submitted during the Sunrise Period; however, registrars would be obligated to promptly "take down" any domain name registered by anyone not eligible to register domain names during the Sunrise Period once that fact was called to their attention.

V. Use Limited, Chartered Top-Level Domains: The IPC recommends that although a Sunrise Period should be incorporated into the roll-out of every new top-level domain, there may be specific, use limited, chartered top-level domains in which a Sunrise Period may not be necessary. This underscores the reality, however, that the process by which proposed charters for new, use-limited, chartered TLDs are developed and approved will be of critical importance to their success. Such a determination should be on a case-by-case basis as part of a "Charter Certification" process. The IPC recommends that this process include, inter alia: (1) means to ensure that charters are as clear and as specific as possible about permitted and prohibited registrants and uses, (2) an obligation for registrars to "take down" any domain name that is used in a manner that is inconsistent with the use limitations in the charter once that use is called to their attention, and (3) consideration of additional means for resolving bona fide disputes concerning the uses of domain names in a manner inconsistent with charter limitations.

---

# ATTACHMENT # 2

## Office of Advocacy
## U.S. Small Business Administration

April 14, 2000
*Sent via e-mail*

Michael Palage
Chair of Working Group B
Internet Corporation for Assigned Names and Numbers
Re: Small Business Impact of Famous Mark Protection

Dear Mr. Palage:

As you are aware, the Office of Advocacy of the U.S. Small Business Administration has held a roundtable discussion and conducted other outreach efforts to ascertain the small business impact of a proposal under consideration of Working Group B on the Internet Corporation for Assigned Names and Numbers ("ICANN"), which is tasked with the project of determining famous trademark protection. Regrettably, the Chief Counsel, Jere Glover, is out of town this week and was unable to review the information gained during the roundtable and our other outreach efforts. As a consequence, I am submitting these comments under my own signature. The Chief Counsel will review and make additional comments as needed when he returns to the office.

As a consequence of these outreach efforts, Advocacy has concluded that the current "modified sunrise proposal" would have a detrimental impact on small business and should not be adopted. Instead, Advocacy recommends that the working group adopt one of the three alternatives that we describe below.

To our understanding, the modified sunrise proposal contains the following elements:

1. Registered trademark holders would have the option of registering their trademark and a number of variations thereof, as domain names during a "sunrise period" whenever a new general Top Level Domain ("gTLD") is added to the Internet. The sunrise period would be a brief period of time before the new domain is available for the general public to register.

2. The trademark holder could only use the sunrise period to register in unrestricted gTLDs and chartered gTLDs that correspond to the class of industry in which the trademark is registered.

3. The trademark holder would have to pay for each registration.

4. Once registration is opened to the general public, trademarks do not receive any further benefit. There would be no use of filters on domain name registrations.

5. The sunrise period would be inapplicable to gTLDs designated for personal and non-commercial use.

## Flaws in the Modified Compromise Proposal

Based upon information gained through our outreach efforts, Advocacy believes that the modified compromise proposal has foundational flaws that prevent the office from endorsing its adoption.

First, the sunrise provision allowing early registration by trademark holders is not grounded in law. U.S. trademark law is a balance of the rights of holders and the rights of non-infringing users of the mark. Furthermore, under U.S. trademark law, the holder has duty to police its mark. An early registration is granting trademark holders rights that are above and beyond the law. It is also overly-broad and will impact entities who aren't infringing the mark, as well as giving preferential treatment to one class of commercial entities over another. Finally, the sunrise creates a presumption that commercial use is the superior use of the Internet. While Advocacy believes that commercial use of the Internet is valuable to the economy, we do not believe that it should be given superior rights to individuals and non-commercial interests.

Second, the sunrise provision will not be effective in curbing trademark violations. The number of variations whether it be 5, 20 or 100 will never be enough to prevent all of the possible variations of trademark violation. Also, trademark violation can occur at the third or fourth levels of the domain name, such as www.nike.something.com. With the near infinite variations on trademarks and ability to circumvent the sunrise protections, the sunrise will be overly-broad, as discussed above, and underinclusive as it will not prevent trademark violation while depriving thousands of non-trademark holders of the ability to register for the name they desire to use in a non-infringing manner.

Third, as Advocacy started in its April 4, 2000 letter, trademarks are already adequately protected by the Uniform Dispute Resolution Policy ("UDRP") and the Anticybersquatting Consumer Protection Act ("ACPA"). Also, through its outreach, Advocacy has learned private companies are now offering a monitoring service, which will track domain name registrations and notify a trademark holder when

a domain is registered that is similar to the holder's trademark. Between the UDRP, the ACPA and these monitoring services, trademark holders have all the tools they need to prevent cybersquatting and enforce their trademark rights.

Fourth, there are factual differences between the circumstances surrounding the introduction of new generic Top Level Domains ("gTLDs") and the historical trademark violations in .com. All trademark holders will be on notice of the introduction of new gTLDs. No one will be taken by surprise when a new technology erupts on the scene like it did with .com. Also, the legal landscape has changed with the introduction of the ACPA and the UDRP to prevent cybersquatting.

Fifth, Advocacy is concerned that the sunrise period could create legal liabilities for ICANN. As a non-profit corporation registered in California, ICANN is subject to U.S. law, and there is a question whether this registration preference violates the First Amendment of the U.S. Constitution as a restriction of free speech. In addition, it is conceivable that a sunrise period would constitute a restraint in trade or an attempt to combine with other persons to monopolize the name space, which is a violation of Sections 1 and 2 of the Sherman Act.

**Alternatives that Protect Trademarks without Negatively Impacting Small Business**

Three alternatives were proposed by Advocacy or the participants during the course of its outreach efforts. Advocacy believes that all three of these alternatives satisfy the rights of trademark holders while preserving opportunities for small businesses.

The first alternative is to introduce a large number of new gTLDs. This expansion of the name space will provide alternative names to businesses and diminish the value of cybersquatting. With each new gTLD, the ability for any cybersquatter to extort payment from a particular trademark holder diminishes. Furthermore, as new gTLDs are introduced to the Internet, consumers will become aware that a .com Web site is different than a .biz Web site, lessening confusion. This alternative is especially attractive because of the need for new gTLDs that currently exists and the opportunities such an expansion will bring to small businesses. The total number of gTLDs ultimately introduced must be high for this alternative to work effectively. The introduction could be measured and at a reasonable pace but must be continual and limited only by what the market will bear.

The second alternative is to create a chartered gTLDs for use by trademark holders. This gTLD could be called .fame or .tmk. It's charter would allow all registered trademarks to register within it. This insures that trademarks would have the domain name of their choice, assuming that another trademark holder did not register it first.

The third alternative is a variation of the modified sunrise proposal. Under this alternative, the holder of a registered trademark could register the name identical to its trademark during the sunrise period for a chartered gTLD whose charter corresponds to that trademark's international class of industry and service. This means that a the sunrise registration would only apply to chartered gTLDs and that only those trademarks whose class of industry or service corresponds with that charter could register during the sunshine period. Furthermore, the holder may register the domain name identical to the trademark – no variations. There would be no sunshine period for unrestricted gTLDs and gTLDs whose charter does not correspond with a class of industry.

Advocacy believes that this proposal will not have an overly burdensome impact on small businesses, while affording some measure of special protection for trademark holders. Furthermore, it will be efficient for registrars because they only have to ascertain that the sunrise registered name is a registered trademark instead of ensure that 20 or so other names are variations of a trademark.

To conclude, Advocacy asks the working group not adopt the modified sunrise proposal. Instead, it should adopt one of the three alternatives that Advocacy has listed in this letter. We will gladly continue to work with you and the working group to reach a conclusion that is satisfactory to all.

Sincerely,

Eric E. Menge
Assistant Chief Counsel
for Telecommunications

---

## ATTACHMENT # 3

### Two Objections to the IPC "Famous Names" or "Sunrise" Proposals for Controlling Entry Into New gTLDs

Richard Sexton
John Berryhill, Ph.D. esq.

(1) - The Exclusionary Proposals Have No Basis In Technology Or Law

These comments essentially boil down to the fundamental maxim of Law, "Where there is a right, there is a remedy." The ICANN Intellectual Property Constituency's various exclusion or "sunrise" proposals are not in accordance with the remedial nature of the Law. These proposals are for prospective, pre-emptive restraints of the kind that we do not permit our own government to exert in the enforcement of criminal law relating to the use of words. Even where an injunction is granted, an injunction is (a) directed to identifiable individuals, (b) for cause and (c) based on an adjudication of relative harms. Why should private individuals have greater power to pre-empt the actions of others to prevent potential civil liability when we do not grant government that power to prevent criminal violations?

A trademark gives the owner a right to seek a remedy for a violation of the trademark. Trademarks do not provide an automatic, a priori pre-emption of the use of alphanumeric characters in the real world. Trademark law has developed to balance various interests. There is no reason to provide a new kind of trademark right on the Internet which does not correspond to any principle of trademark law in the offline world.

The IPC proposals have perverted Law to "Where there is a right, there is a way to prevent people from violating it." That has never been the way Law functions in our society, and it has certainly never been the way the Internet functions. If it's not "technical administration", and if it is not "law", then what is it? Technical concerns say (a) domain name allocations are to follow RFC1591 - first come, first served and (b) there is a need for a larger name space. The Law says that RFC1591 has valid legal regulatory authority (as per the PGMedia decision of the DC Court of Appeals) and that violations of private rights can be remedied after the fact. The IPC proposals do not arise from valid technical or legal principles.

[redacted by chair]IsaPedophile.com is libelous, and has legal consequences as a string of text.

HaveSexWithMeForMoney.com is a criminal solicitation.

TheHolocaustIsaJewishLie.com is likewise a criminal utterance, but in Germany, not the U.S.

MuhammadTheProphetAtePork.com is blasphemous and likely a capital offense in several countries.

Yet, despite these and other categories of legally significant alphanumeric character sequences, some even criminal in nature, nobody is proposing a prior restraint on them.

Trademark infringement is only a subset of a much larger category of legally-proscribable uses of alphanumeric characters. Why, among all forms of legally significant text strings, are trademarks singled out for a heretofore unknown pre-emptive right? Because ICANN, a technical body, has an "Intellectual Property Constituency" with non-technical concerns.

There is no "Libel Constituency", "Anti-Obscenity Constituency", "Criminal Solicitation Constituency", or "Religious Constituency". Why not? Because these issues do not relate to technical administration, which is the mandated mission of ICANN.

Despite the talk about the "importance of stability to the development of e-commerce", ICANN was not chartered to be about commerce or whatever else for which the internet might be used. They are supposed to be running narrow technical aspects of a computer network. "Do the bits get from one end of a wire to the other?" is not a legal question. Re-engineering the remedial principle of law as a proscriptive technical policy makes no sense.

Trademark infringement happens in telephone book listings. All kinds of shady folks get fradulent telephone book listings, or use "Yellow Page" ads which infringe trademarks or convey a false or unfair commercial impression. These situations are dealt with all of the time by trademark lawyers. They are not dealt with by providing a pre-emptive famous name list or a sunrise period for telephone books. In fact, the makers of the telephone books are not held liable for these kinds of things. In the context of 800 number assignments, the FCC has decided that dealing with trademark issues is a job for trademark lawyers, and not for technology policy makers at the FCC. Why should ICANN be any different?

The DNS is a telephone book. It maps names to numbers in precisely the same way. Why is it that we manage to publish telephone books without difficulty? Why would we argue about adding a new telephone exchange in an area code, become concerned that the possibility of a greater number of telephone listings would provide more opportunities for trademark infringement, and suggest that it would subject the telephone book publishers to legal liability? Because they are ridiculous assertions. But somehow the analogous assertions are taken seriously in the context of the DNS.

Even when someone has successfully asserted a trademark right involving a telephone listing, the books themselves are not published again until a year later. The DNS can be altered within a matter of hours to reflect a succesful, and remedial, assertion of trademark rights. That serves the interests of IP owners even more efficiently than an analogous system -phone books - with which we have lived comfortably for years.

To make the picture even clearer. I can infringe trademarks with my business card, letterhead stationery or outdoor signs. But when I walk into the print shop, there is no IP daemon sitting on the shoulder of the printer with the job of determining what words I may or may not have imprinted on my business materials. I bear the legal consequences of my choice, but I am

as free as anyone else to have my own business materials without having to wait outside during a "sunrise period" in which the "first among equals" negotiated what is to be left over for me to have.

And so we develop a byzantine system of chartered and non-chartered TLDs, and a system of restrictions and lists and sunrise periods on top of that. The next day after I, a lowly individual, am allowed to register domain names with the great unwashed masses, I obtain generic.generic (in the new "generic" TLD). And the day after that I set up my server to resolve the URL:

kodak.ibm.cocacola.generic.generic/kiddieporn.html . Then what did any of this nonsense buy for anyone other than delay and large expense account bills?

Bold prediction #1 - there will continue to be rampant intellectual property violations on the Internet.

Bold prediction #2 - there will be no way to prevent it, but there will remain remedies at law.

(2) - Artificial Constriction of the Name Space by the IPC is Hurting Small Business

There already are mechanisms to enforce trademark rights in cyberspace - the UDRP and the ACPA among them. Both of these mechanisms are available to anyone who can afford a lawyer, which, with the UDRP, includes many but not all small businesses. Genuine cybersquatting hurts small businesses in smaller gross monetary terms, but perhaps in larger proportionate terms for

the affected businesses, than it does larger businesses.

However, when BigBusinessCo is faced with a squatter who has occupied BigBusinessCo.com, .net and .org, then BigBusinessCo can readily afford to get rid of the squatter. Joe's Fish Market is faced with a much larger problem, because they cannot so readily afford to do the same thing.

The presence of a large, and we mean very large, number of TLDs does two things to help Joe's Fish Market - it increases the cost of pre-emptive cybersquatting and it decreases the value of any one domain name occupied but not used.

If someone is sitting on the domain "cocacola.irrelevant", not producing any content at a corresponding website, and demanding thousands of dollars from Coca-Cola, then why would anyone, including Coca-Cola care? The commercial injury to Coca-Cola of a tiny vacant island in a sea of thousands of TLDs is approximately zero. In fact, it is actually zero. The squatter with his do-nothing domain name can pay annual registration fees to his heart's content and remain unnoticed and ignored.

Now, yes, there is such a thing as trademark infringement, but if the only thing one sees at a web site is "This Domain for Sale!" or "We Registered At Lousynames.com!" then what is the basis for any consumer to be confused about anything? They were looking for a brown fizzy beverage in a red can. "Hmm.... must not be at this domain name...."

Conclusions

Several have floated a compromise proposal of a mixture of "chartered" versus "non-chartered" TLDs, and how many of each there should be. The question of how many is comparable to the question of whether it would be a good idea to have a large quantity of even numbers or odd

numbers. In fact, there is no good reason not to have an infinite supply of both.

The mechanisms for restricting registrations according to various pre-emptive systems are flawed technically as they do not accord with RFC1591, and they are flawed legally as they do not accord with the remedial character of Law as we in the West have come to know it over a learning

curve of hundreds of years. The IPC does not have the technical background to dictate how to run the Internet, and WG-B does not have the legal sophistication to re-write fundamental principles of trademark law, or law generally, in single weekend.

This is not how to run a computer network.

Richard Sexton
Bannockburn, Ontario CA
richard@vrx.net
rich@rd.sexton

John Berryhill, Ph.D. esq
Philadelphia, Pennsylvania US
john@johnberryhill.com

The following individuals endorse the comments above:

Mikki Barry
ooblick@netpolicy.com

Judith Oppenheimer
icbtollfree.com
joppenheimer@icbtollfree.com

Mark C. Langston
mark@bitshift.org
Systems & Network Admin
San Jose, CA

Gordon Cook
publisher, The Cook Report
cook@cookreport.com

Gene Marsh
president, anycastNET Incorporated
marshm@anycast.net

Dena Whitebirch
@quasar Internet Solutions, Inc.
shore@quasar.net

Christopher Ambler
Image Online Design
chris@the.web

John Palmer
jp@ADNS.NET

Peter da Silva
peter@taronga.com

David Schutt

Speco, Inc
david@speco.com

Michael Brian Scher
Anthropologist, Attorney, Policy Analyst
strange@netural.com

Mike Sondow
International Congress of Independent Internet Users
msondow@iciiu.org

Joseph Baptista
baptista@pccf.net

Dan Steinberg
SYNTHESIS:Law & Technology
synthesis@travel-net

Philippe Landau
info@A-Z-Internet.com

Kai Henningsen
kaih@khms.westfalen.de

See http://www.open-rsc.org/issues/sunrise/for more signatures.

---

## ATTACHMENT # 4

### Working Group B - Famous Names
### Viewpoint of Ellen Rony

Co-author, The Domain Name Handbook: High Stakes and Strategies
in Cyberspace (R&D Books, 1998)

On June 25, 1999, the Names Council resolved to create Working Group B to review the treatment of Famous Trademarks. [1]

On March 21, 2000, the Chair of Working Group B submitted a Status Reportto the Names Council. [2] It outlines the position papers submitted to date but does not represent a collaborative effort or consensus recommendation.

On March 10, 2000, before Working Group B completed its Interim Report,ICANN accepted a 1999 offer by the World Intellectual Property Organization (to prepare a list of globally famous trademarks. [3] Although ICANN said that such a list "would be helpful to its assessment of proper action on expansion of theTLD space," there is no doubt that the list might be used to offer exclusionary rights across all gTLDs for marks that are deemed famous.

Further, in making the request for such a list without the deliberative input of Working Group B, ICANN bypassed its own structural process andplaced WIPO in a quasi-judicial role, absent international agreement forsuch authority.

The entrance criteria for what is globally "famous" are not defined and donot exist. In its Final Report, WIPO recommended the following criteria: [4]

(a)    degree of knowledge or recognition of the mark in the relevantsector of the public;

(b)    duration, extent and geographical area of any use of the mark;

(c)    duration, extent and geographical area of any promotion of themark;

(d)    duration and geographical area of any registrations of themark;

(e)    the record of successful enforcement of the rights in the mark;

(f)    value associated with the mark; and

(g)    evidence of registration of domain names that are the same ormisleadingly similar to the mark.

(a) If famosity is defined in terms of knowledge or recognition of themark, it have deep market penetration in one country while being virtuallyunknown elsewhere.

(b) If famosity is defined in terms of geographical area of any promotionand use of the mark, the easy global reach of the Internet will quickly blur these lines as a delineator.

(c) If famosity is defined in terms of duration, newcomers to the marketplace such as Netscape and Yahoo, who arguably have driven e-commercegrowth, may not pass this qualifier. It is quite likely that anothersuccessful start-up will come along which meets all the criteria save this one.

(d) If famosity is defined in terms of the number of country trademarks acquired, then famous only means having deep pockets, and reflects an opportunity for companies to buy global ownership of a slice of the global name space, exclusive worldwide rights to a domain name.

(e) If famosity is defined in terms of successful enforcement of rights inthe mark, how will this qualifier be applied to marks that remain untested in the legal process.

(f) If famosity is determined by the value associated with the mark, presumably defined in terms of sales receipts or advertising expenditures, what happens if there is a financial reversal or an acquisition that absorbs the famous name?

(g) Using evidence of registration of domain names that are the same or misleadingly similar to the mark to determine famosity is unworkable since trademark registrations can issue for identical marks. Individual determination would be required to assess which trademarks were responsible for which domain name registrations.Further, how is "misleadingly similar" to be determined? At what point does "misleadingly similar" become something altogether different from the original mark.

Interestingly, none of these qualifiers acknowledge fanciful and invented names nor the fact that the famosity of a mark is subject to change. Woolworth's was famous for decades and was traded on the stock exchange bythe letter "Z".The stores are now closed, so does it lose its famosity status? A historian might say once famous, always famous, but most of us in the high tech world for the past 20 years have seen companies both soar and fall.Would loss of famosity be monitored annually? Would loss of famosity result in concurrent loss of the right to exclusivity? Would that result in a scrambling for those names released back into the available pool?

The disputed rights to use a domain name should be reserved for the courts. Sufficient legal protections for trademark owners (in the U.S. at least) exist through the Trademark Cyberpiracy Act and Uniform Dispute ResolutionPolicy so that exclusive worldwide protections for famous names seems superfluous, not to mention potentially capable of unleashing a new bag of worms. How many, which ones, how determined, who decides? These are not insignificant issues. This famosity list could unleash a Pandora's box of woes and paradoxical situations that have not been adequately assessed.

Most likely, the famous marks list will become politicized and result in inconsistent determinations and constant cacophony over which marks get anointed as famous.

When you begin talking about rights in gross that cross international boundaries, the debate should be moved up to the level of international treaty. Even judicial determinations that a mark is famous within a cause of action arising under the Federal Dilution Act are only appropriate within the U.S. The WIPO consultations reported that there may be no more than 1,000 famous marks.The burden of identifying them and, among registrars, of providing themwith gTLD exclusions seems excessive given what a small percentage of the 11+ million domain name registrations such famous marks represent. A more fitting activity would be the creation of a top level domain called.TMK, where a national trademark registration would be a bright line qualifier.

Lastly, certainly not least, determining famosity and enforcing the definition against third parties is not an appropriate function of a private corporation whose charter is the technical coordination of the Internet.

ICANN has exceeded its authority to manage and perform four specificfunctions related to coordination of the domain name system:[5]

> 1) set policy for and direct allocation of IP numberblocks to regional Internet number registries;

> 2) oversee operation of the authoritative Internet root server system;

> 3) oversee policy for determining the circumstances under which new TLDsare added to the root system; and

> 4) coordinate the assignment of other Internet technical parameters asneeded to maintain universal connectivity on the Internet.

In conclusion, I do not support the implementation of any mechanismfor the exclusionary protection of famous marks because legal mechanismsalready exist and because this exceeds the scope of ICANN's authority.ICANN's purpose is not to safeguard the Internet for a specific class of users--the holders of famous marks.


Ellen Rony
http://www.domainhandbook.com
March 30, 2000

---

[1] Results of DNSO Names Council meeting on June 25th,1999 -
http://www.dnso.org/dnso/notes/19990625.NCmeet.html

[2] WG-B Status Update by Michael D. Palage(Chair) - http://www.dnso.org/wgroups/wg-b/Archives/msg00655.html

[3] Preliminary Report, Meeting of the ICANN Board in Cairo (March10, 2000) - http://www.icann.org/minutes/prelim-report-10mar00.htm

[4] Final Report of the WIPO Internet Domain Name Process(April 30, 1999) - http://ecommerce.wipo.int/domains/process/eng/final_report.html

[5] U.S. Department of Commerce, Management of Internet Names andAddresses, National Telecommunications and Information Administration

Statement of Policy (June 5, 1998) - http://www.ntia.doc.gov/ntiahome/domainname/6_5_98dns.htm

---

# ATTACHMENT # 5

15 April, 2000

Michael Palage
Chair, Working Group B/Registrars Constituency Secretariat
Domain Name Supporting Organization
Internet Corporation for Assigned Names and Numbers

Michael,

TUCOWS.com Inc. is responding in the limited time available to your request that we comunicate our views concerning the latest proposals from the Intellectual Property Constituency, called "sunrise plus twenty."

While we are aware that you are acting as best you can in limited circumstances of budget and time, TUCOWS must protest the inadequate consultation that has taken place in regard to these proposals, and must on grounds of substance reject them in their entirety. We find it increasingly anomalous that the secretary of the registrars association is acting to compromise the interests of IP holders with the interests of the vast mass of Internet users in this way.

The essence of ICANN's problem is the disproportionate attention which is being given inside the working groups, and, increasingly outside, in private conferences, to the pretensions of the IP community to stall the process of domain name expansion, on grounds that we and our Internet users consider to be dubious and, in some cases, in outright error: error both in regard to policy as regards the future direction of the Internet, and more fundamentally, as to their power to hold up domain name expansion based on the monopoly of the NSI over the root server.

You have received commentary from John Berryhill, which, in our view, devastates the position of the IPC that they are entitled to extra-legal privileges in the matter of establishing domain names for famous names, and lately, for all trade mark holders in all countries.

The IPC's contentions that trade mark holders are owed a special set of privileges regarding domain names, different from and superior to those worked out in national legislatures, is not something that

other users of the Internet need to accept. Moreover, it is unnecessary. The fastest way to eradicate the problem that the IPC pretends to solve is to have a rapid, large expansion of domain names. The IPC is threatened by this approach because it diminshes the value of what they are protecting, and the value fo the services they render.

The issue is not, as they suppose, "confusion" in the marketplace, or the protection of consumers. It is the protection of the economic position of intellectual property lawyers.

What we are actually observing in the saga of domain name expansion is a power-grab of major proportions over the architecture of the Internet, using ICANN not so much as a representative forum for IP interests as the embodimenet of IP lawyers' interests. This tendency is not good for the Net, for Internet users, for small businesses which need the increase of namespace, and ultimately it will lead, if unchecked by common sense and contrary interests, to the avoidance of the DNS and the downfall of ICANN.

The policy that should be followed in relation to IP interests is this:

no privilege shall be granted to any trade mark or famous name holder by ICANN that is not available under domestic trade mark law. We understand that this principle will need adjustment to accord with the global nature of top level domains, but by sticking to it ICANN will do better for the Internet, for millions of users, and even for the interests of IP owners, than a policy of restriction.

TUCOWS has been supporting reasonable compromise between IP owners and domain name expansion for some time. On reflection, We have decided that we are not going to get domain name expansion in this way, and that we are in fact acceding to a takeover of the political processes of ICANN by a set of interests that oppose what the Internet stands for. We urge you to reconsider the nature of the compromises you may be making, and what you may consider to be realistic. To us at TUCOWS, compromise with the kinds of proposals we are seeing coming from the IPC will get us nowhere.

Yours sincerely,
Ross Wm. Rader
Director, Assigned Names Division
TUCOWS.com Inc.

---

## ATTACHMENT # 6

## Consumer Project on Technology WG-B Comment:

By extending the sunrise first right of refusal to all trademarks, and to 20 variations of names, it appears as though ICANN will be shielding trademark owners for a wide range of common forms of criticisms and civil society organizing (aolsucks.com, ibmunion.com), plus, extending rights in a given line of commerce into all lines of commerce and activity -- a right that goes beyond current global legal traditions.

I would note also that already some persons are claiming that a domain like boeing.union would be a commerical use, because unions represent the commercial interests of workers. The some could be said for bellatlantic.customers, if that TLD was used to organize Bell Atlantic customers in regulatory proceedings. This illustrates only a few of the problems with the IPC proposal, and the degree to which some would use trademark law to prevent workers, consumers or others to defend their interests in the global economy.

Like most people with other interests than ICANN, I have a very difficult time keeping up with everything. But it seems to me that this was presented very late in the game, and without any warning. Correct me if I am wrong about this. However, if this is the case, you should provide additional time for comment.

I would indicate also that I am not unsympathetic of the need for protections of trademarks, and among other proposals, have suggested that all the applicants for registry test bed make their own proposals to address the concerns of trademark owners, and that these different approaches be part of the test bed.

Jamie Love

---

## ATTACHMENT # 7

I would like to endorse the comments made by Tucows and others regarding the flaws in the 'sunrise' proposal. A few additional points:

1) The latest proposals are utterly unfair and unnecessary. It is so hard to take them seriously that one is almost forced to assume they are proposed for tactical reasons—either to stall the process entirely, or make the unworkable famous marks lists proposal seem almost sensible by comparison. To take only the most obvious problem: everything depends on having some detailed and specific mechanism for sorting out conflicting claims to millions of names; hand-waving that a dispute settlement mechanism will have to be found at some later stage is a recipe for either gridlock or chaos.

2) The proposals are completely outside the mandate of your working group as they do not relate to famous names.

3) Famous names worldwide are now protected by the in rem provisions of the the US anti-cybersquatting law. The situation which produced a demand for protection of famous names during the WIPO process, and which has cruised along on auto-pilot throughout the ICANN process, simply does not exist any longer. Famous marks may or may not still need extra protections in the DNS, but whatever need exists is radically different from 12 months ago.

In other words, the 'sunrise' proposal has the potential to become a classic ICANN "consensus policy" much like the ill-fated indirect election of membership directors.

Thank you for allowing persons whose access to the debate is limited to the mailing list to have as much as 48 hours to comment. Howver, you should be aware that, contrary to the unkind comments of some ICANN observers, this is actually *less* than the average amount of time ICANN usually allows, which has sometimes been as high as two weeks. Also, it has become something of a habit to have comment periods during the work week, rather than mostly on weekends (albeit sometimes in the August holiday period).

--

A. Michael Froomkin | Professor of Law | froomkin@law.tm
U. Miami School of Law, P.O. Box 248087, Coral Gables, FL 33124 USA
+1 (305) 284-4285 | +1 (305) 284-6506 (fax) | http://www.law.tm

-->It's warm here.<--

## ATTACHMENT # 8

First, the "sunrise" proposal. This was not been discussed on-list, and if any consensus-building has occurred around it, it's occurred behind closed doors. I urge you to not include it in the report. If you do, a very large, public stink will ensue.

Given the TM interests concerns, I would be willing to entertain a famous mark list, a sunrise period, and other remedies IN THE FOLLOWING CIRCUMSTANCES:

Certain chartered TLDs are created to correspond to the mark categories created and managed under US law and international treaty. The remedies I will accede to will only be applied to these TLDs as an exception to namespace, not as the rule. I.e., these remedies will only by applied to those chartered TLDs that correspond directly and by definition in the charter to business categories.

For example, create TLDs under the existing country-code TLDs that correspond to each of the 30-odd categories currently defined under US and international law. Any remedies that the TM interests wish to apply may exist under these, and only these, TLDs. This creates a 'sandbox' of a sort for the TM interests. It also addresses the following issues that the TM interests have raised in opposition to the introduction of new TLDs:

- Policing cost. By creating a limited number of commercial, IP-only TLDs, there will be a finite set of TLDs the TM interests must police, because...
- Consumer confusion. By establishing these new TLDs, consumer confusion can be minimized. If there's ever any doubt as to where a famous or popular mark owner has a presence, the consumer can confidently look to these new TLDs and know that the framework in place guarantees that the site found is the legitimate site corresponding to said mark. All other TLDs become irrelevant as regards policing and consumer confusion, because the TM interests have their own special, bounded space in which to conduct their business.
- Cybersquatting. Given the limits and direct application of existing legal boundaries and categories to these new TLDs, cybersquatting will be minimized. TLDs outside these will be irrelevant, since the branding will lead consumers to know that only those domains within these special TLDs are those that correspond to famous marks.
- No new movement, elimination, or re-branding. Owners don't need to migrate away from .com, or rebrand. These new domains will be in addition to their existing holdings. So, for example, Amazon.com will have amazon.FOO, and can simply redirect it to amazon.com. If there's ever any doubt in the consumer's mind (confusion) as to the real amazon site, they can visit amazon.FOO to be sure.

Mark C. Langston
mark@bitshift.org
Systems & Network Admin
San Jose, CA

Comments concerning the layout, construction and functionality of this site
should be sent to webmaster@icann.org.

http://www.icann.org/dnso/wgb-report-17apr00.htm                                    8/21/2002

# Appendix 4

## Sunrise +20: The Numbers Tell the Story

### Ellen Rony
### coauthor of the Domain Name Handbook

### April 28, 2000

*The trademark lobby must be placated because of its potential ability and inclination to bankrupt new registrars and wreck havoc on their registrant databases.*
--Michael Palage, Chair Working Group B (6-Jan-00), SBA Office of Advocacy Rountable on Internet Domain Names

# Sunrise+20: The Numbers Tell the Story

*This is a response to the Formal Report of Working Group B, which was written by the Chair and submitted to the Names Council on April 17, 2000. This response was submitted to ICANN on May 2, 2000. See also Words First! on this website.*

Working Group B was created in Berlin last summer explicitly to address Chapter Four of the Final Report of the WIPO Internet Domain Name Process, "The Problem of Notoriety: Famous and Well-known Marks ". The WIPO Report recommended that a mechanism be established for granting exclusions to famous and well-known marks when new gTLDs are introduced. This has been the focus of the discussion in Working Group B for nearly nine months.

The Formal Report of Working Group B, written by the Chair, identifies two consensus conclusions:

> *The creation of a universally famous marks list does not appear to be needed at this point in time.*

> *There appears to be a consensus that protection afforded to trademark owners will depend upon the type of top level domain.*

The report also insinuates support for a Trademark Sunrise+20 Proposal submitted on deadline by the Intellectual Property Constituency. Regrettably, too much attention is devoted to this strawman proposal, which was not vetted at all by members of Working Group B. Recommending a sunrise exclusion for ALL trademarks exceeds both the scope of WGB and ICANN's charter as the technical coordinator of Internet administration. The sunrise proposal is inherently inequitable, operationally impractical, internally inconsistent, and nonconforming with the tenets of trademark law.

Domain names possess characteristics that cannot be inferred to marks. They are extraterritorial and require no contextual association. And they are unique. The ISP Sunrise+20 on-deadline proposal thus fails to present a substantive solution to the problems confronting the holders of famous marks. Instead, it represents a wish list for two constituencies who have the most to gain.

## The numbers tell the real story.

According to the US Patent and Trademark Office, the US alone has more than one million active registered marks. Sunrise+20 variations therefore represents a potential set-aside of 20 MILLION domain names before a single, markless individual, association, organization, foundation, cause or event gets even one. This proposal

gives trademark owners their top choice of domain names without competition against other legitimate users, the general public. And the registrars get an immediate, potential windfall of 20 million registrations, which would add in excess of $200 million to their coffers. Of course, they will support such an immediate financial opportunity.

The WGB Formal Report comments, "This compromise would eliminate the need for Registries to filter out domain names that potential infringe a trademark on an ongoing and permanent basis". This is a red herring. It has been well-established that registries have *no* obligation to engage in such filtering on behalf of the trademark owners.

> *"Nothing in trademark law requires that title to domain names that incorporate trademarks or portions of trademarks be provided to trademark holders. Instead, the law simply prevents others from making use of a company's trademarks in a manner likely to confuse the consuming public."*
> --Washington Speakers Bureau, Inc. v. Leading Authorities Inc., 51 USPQ2d 1478, (E.D. Va. 1999)

The Sunrise+N (any number of variations) proposal does not address how multiple owners of identical marks determine which one gets the most desirable domain names. Nor does it consider when the choice of a variation becomes an unreasonable stretch of the imagination. And while trademark offices in more than 130 countries follow the same International Classification standard for goods and services, the application requirements, examining procedures, processing time and legal protections vary from one country to the next. Thus, this proposal will encourage trademark forum shopping and, perhaps drive-by, 48-hour turnaround trademark certifications.

In the trademark-centric view of the Internet, a domain name alone gives rise to a "chance of confusion". Yet, with so many creative variations of any word or mark by adding prefixes and suffixes, plurals, numbers and dashes, the days when people merely guess at a domain name to find a particular site are over. If a domain name alone gives rise to a chance of confusion, then the trademark owners that register 20 variations will be the greatest source of such confusion.

The meta question here is what justifies giving owners of trademarks or even "famous" marks a preemptive right to register any domain names or any variations. Why should trademark owners receive preferential treatment in a publicly accessible, global communications medium?

One of the tenets of the Department of Commerce Statement of Policy, a.k.a. the White Paper, is, "the new corporation should operate as a private entity for the benefit of the Internet community as a whole." A sunrise proposal for trademarks or famous marks provides an unsupportable pre-emptory bias to the commercial sector of the Internet over all other legitimate uses of the same or similar character strings. Indeed, this proposal condones corporate hoarding of a significant percentage of domain names before a single non-commercial user is allowed to select an online moniker.

Registering 20 variations of a mark will not make the task of policing marks disappear. But it will lead to stuffing the registry database with redundant domain

name registrations and a multi-million set-aside of names which have scant association to the registered marks.

While people have sympathy for companies and individuals who face true infringement and misappropriation of their marks, these are not new problems to the intellectual property community, and strong legal sanctions already exist in the U.S, and elsewhere to address such concerns.

Instead of providing pre-emptory registration rights for one segment of the Internet community, encourage ICANN to establish a new, chartered top level domain, .TMK. Bid adieu to the sunrise proposal, to exclusion, preemptive variations and take downs. Bid adieu, too, to those who want to exploit the goodwill developed in those marks. Let .TMK be an exclusive sandbox only for those who possess a trademark registration certificate.

## In summary:

1. There are sufficient existing protections for trademarks, including federal law and statutes, the UDRP and monitoring mechanisms. Preemptive exclusions or a sunrise proposal are unnecessary.
2. A famous marks list used for exclusionary registrations creates new preemptive rights that do not exist in law.
3. A sunrise period is not likely to reduce the number of cybersquatters nor diminish the trademark owners concerns over policing the use of their marks
4. Introduction of a top level domain solely for registered owners of trademarks is the most efficient way to assure that users find the sites associated with those marks and limit the value of cybersquatting.

*By Ellen Rony*
*April 28, 2000*

# Appendix 5

# Final Report of ICANN Working Group B

# June 12, 2000



# Final Report of Working Group B

## (posted 12 June 2000)

**ICANN**

---

**Working Group B (WG-B) Final Report**

**Written by Michael Palage, Chair of WG-B**

**Presented to DNSO Names Council**

**On May 15th, 2000**

**The Working Group has reached consensus on the following three items:**

(1) Some type of mechanism, yet to be determined, is necessary in connection with famous trademarks and the operation of the Domain Name System.

Comment: In October 1999, there was a vote among the participants of the Working Group at that time and a consensus was reached (30 out of 42 voters - 71%) that additional mechanisms were needed to protect famous trademark interests in connection with the domain name system. Notwithstanding a controversy over the tabulation of votes during this ballot (see Kathy Kleiman's report) at worst there was a rough consensus in support of is position.

(2) There does not appear to be the need for the creation of a universally famous marks list at this point in time.

Comments: The creation of a universally famous marks list was a political hot potato. Issues such as who should create the list, the criteria that should be used, limits on the size of the list, etc. were hotly debated with no clear compromise in sight. The current Sunrise proposal being advanced by the Intellectual Property Constituency (IPC) and a significant portion of the Registrar Constituency does not require the creation of such a list. This position appears to coincide with the Non-Commercial Constituency that has vehemently opposed the creation of such a list. However, if and when a universally famous marks list is created, it would be prudent for ICANN to consider whether the list is applicable to the then-existing gTLD registration process.

(3) The protection afforded to trademark owners should depend upon the type of top-level domains that are added to the root.

Comments: This consensus item is based upon the recognition in the Registrar and IPC proposals that this mechanism is probably not suitable for every new top-level domain, especial certain non-commercial domains. However, this consensus item is conditioned on many tangential issues, i.e. the scope of chartered gTLDs, the enforcement mechanism for charter, etc. Defining the procedures for classifying what constitutes a non-commercial top-level domain, is better left to another group.

However, nothing in the consensus item should be construed as creating immunity from the UDRP or other legal proceeding should a domain name registrant in a charted top-level domain violate the charter or other legal enforceable rights.

**Conclusion**

I regret to inform the Names Counsel that there does not appear to be consensus among the Working Group B participants as to the type of mechanism that should be incorporated into the rollout of new top-level domains. However, I encourage the Names Counsel Representatives to review the proposals contained in my April 17, 2000 formal report. During the comment period, the most hotly debated proposal involved the Sunrise Proposal. The supporters and detractors of this proposal each made meritorious arguments in behalf of their position. I encourage the Names Counsel and/or Board to continue exploring other ideas and I stand ready to assist in whatever way possible.

Respectfully Submitted,

Michael D. Palage

---

Comments concerning the layout, construction and functionality of this site should be sent to webmaster@icann.org.

Page Updated 13-May-00

(c) 2000  The Internet Corporation for Assigned Names and Numbers. All rights reserved.

# Appendix 6

# ICANN DNSO Names Council Resolution

# on

# Famous Trade-Marks

# and the

# Operation of the Domain Name System

# May 19, 2000

*ICANN/DNSO*

**DNSO Names Council Resolution on Famous Trade-Marks and the operation of the Domain Name System**

19 May 2000

DNSO Names Council Resolution on Famous Trade-Marks and the operation of the Domain Name System

The Names Council recognizes the enormous work undertaken by Working Group B. The Names Council acknowledges that according to its final report, Working Group B has reached consensus on three points, namely:

1. Some type of mechanism, yet to be determined, is necessary in connection with famous trademarks and the operation of the Domain Name System.
2. There does not appear to be the need for the creation of a universally famous marks list at this point in time.
3. The protection afforded to trademark owners should depend upon the type of top-level domains that are added to the root.

With regards to points (1) and (3), the NC notes that the Working Group members could not reach consensus on the type of mechanism that should be incorporated into the roll-out of new gTLDs (point (1)), which is understandable given their consensus in point (3) that the protection should likely vary depending on the type of top-level domain.

The NC concludes that there is community consensus and recommends that there should be varying degrees of protection for intellectual property during the startup phase of new top-level domains. Therefore, the NC recommends that the ICANN Board make clear that nothing in the general consensus items, or areas of non-consensus, should be construed as creating immunity from the UDRP or other legal proceeding should a domain name registrant in a chartered top-level domain violate the charter or other legal enforceable rights. The NC notes that the principles of differentiated gTLDs (from WG-C) may provide additional assistance in avoiding confusion.

With regards to item (2) on universally famous marks, the NC concludes that there is no consensus in the community at the present time that such a list should be adopted by ICANN.

The NC also recommends to the ICANN Board that it take note of the Working Group B report, including the submissions by participating parties.

The NC would like to express its gratitude to the hard work of Michael D. Palage, Kathryn Kleiman, and Philip Sheppard in steering the Working Group and seeking to guide them towards consensus on the difficult set of issues they were assigned.

Annex: Summary of WG-B work, July 1999 - May 2000 http://www.dnso.org/dnso/notes/20000519.NCwgb-final.html

---

Information from:   © DNSO Names Council

**Appendix 7**

**ICANN Yokohama Meeting Topic**

**Introduction of New Top-Level Domains**

**June 13, 2000**

## F. **Start-up challenges and the protection of intellectual property**.

The statement adopted by the DNSO Names Council on 18/19 April 2000 urged that, in connection with the implementation of a policy for introducing new TLDs, due regard be given to "promoting orderly registration of names during the initial phases." On 15 May 2000, Working Group B issued its final report, which amplified on the concern that the startup phases of new TLDs can pose special risks to intellectual property and found consensus that some type of mechanism, yet to be determined, is necessary in connection with famous trademarks and the operation of the Domain Name System.

In its statement of 19 May 2000, adopted after considering Working Group B's final report, the Names Council concluded that there is community consensus and recommended that there be varying degrees of protection for intellectual property during the startup phase of new top-level domains.

One method of protecting intellectual property that has been proposed is to prohibit the registration of famous and well-known trademarks. Indeed, the White Paper suggested that ICANN consider adopting "policies that exclude, either pro-actively or retroactively, certain famous trademarks from being used as domain names (in one or more TLDs) except by the designated trademark holder." In its deliberations, Working Group B extensively explored the use of a famous-names list for exclusion and reached consensus that such a list was not necessary or appropriate at the present time. In its 19 May 2000 statement, the Names Council "conclude[d] that there is no consensus in the community at the present time that such a list should be adopted by ICANN." Thus, it seems clear that measures other than a famous-names list for the protection of intellectual property during the start-up phases of new TLDs must be considered.

The Names Council also concluded that different types of TLDs warrant different types of protection for intellectual property. For example, some have reasoned that more protections are appropriate in a commercial TLD than in one designated for non-commercial uses.

Along with its recommendation for varying intellectual-property protections depending on the type of TLD, the Names Council also recommended that, as a minimum, the basic methods for enforcing infringed rights should always apply. In its 19 May 2000 statement, the Names Council recommended that the existing procedures (the UDRP and conventionally available legal proceedings) should apply where a domain name registrant in a chartered TLD violates the charter or other legal enforceable rights.

Concerns over the effectiveness of the UDRP have prompted some in the DNSO Business Constituency to propose that the policy be evaluated and overhauled before any new TLDs are introduced. For example, as of 13 June 2000 the Business Constituency was considering version 5 of a position paper entitled "A practical approach to new Internet domain names," which (as one option) proposed a multi-phase process under which there would be several prerequisites to the introduction of new TLDs:

"Phase I

"1. Rapidly evaluate the first 12 months operation of the Uniform Dispute Resolution Process (implemented 24 October 1999), and subject to a conclusion that it has been successful in meeting its objectives, proceed to phase II.

"2. Extend the UDRP wef 1st October 2000 to evaluate claims for ownership transfer based on the relevance of a well-known trademark to a charter gTLD. Once implemented

# Appendix 8

# Report of Working Group B

# (Famous Names)

# Presented to Names Council

# March 21, 2000



# Report of Working Group B (Famous Names) Presented to Names Council

(21 March 2000)

**ICANN**

# The State of Affairs in Working Group B

Working Group B was created in Berlin last year. Since then the group has met at each of the last three ICANN regional meetings. There are currently over 120 participants on the Working Group B mailing list. Although the majority of the participants are trademark attorneys and/or brand managers, the remaining participants are scattered among a diverse cross section of the other six DNSO constituencies.

At the end of last year, there was a call for position papers among the groups' participants. From these papers and subsequent discussions there have emerged a number of viewpoints which are summarized below.

Unlike the Paper presented to the Names Council from WG-C, the following "State of Affairs in Working Group B" is not a collaborative effort by WG-B, and has not been seen, discussed or reviewed by WG-B. It is a good faith effort by elected WG-B chair Michael Palage, with some edits from Kathryn Kleiman, to respond in a timely effort to the request of the Names Council for a status report. The report will now be circulated for review and discussion by the WG-B, and for additional work on consensus. It is contemplated that within three weeks a formal report will be submitted to the board.

**Non-commercial Constituency Position Paper:** This position paper argues that the creation of a list of famous marks which are then excluded from all new gTLDs would greatly expand the existing rights of famous mark holders. It would allow those who hold marks that are famous in one context, to block future domain name holders in the new gTLDs from using words in noncommercial and generic ways that are specifically protected under domestic laws of sovereign countries internationally. It would eliminate the ability of individuals, noncommercial groups and small businesses to register domain names in new gTLDs for protected noncommercial uses(such as "bell" by a school group or "apple" for a children's noncommercial program) and also for protected generic uses(such as "bell" by a bell manufacturer or "apple" by an small apple farmer). Instead of the WIPO/IPC proposal, the Non-Commercial Paper proposes creation of a .TMK top! level domain (others have called it .FAME) for famous marks in which WIPO could create a list of famous marks owners, these famous names would be registered in this new gTLD, and the gTLD would be branded as "the place to be in e-commerce."

**Registrar Proposal:** The Registrar Constituency did not formally submit a position paper. However, the constituency has recently backed the principles set forth in the Palage Proposal. Specifically, the use of a sunrise period to protect the interests of the famous trademark holders. Prior to Cairo, the registrars opposed the creation of a famous trademark list and instead advocated all registered trademark owners being able to participate in the sunrise period. However, as a result of subsequent negotiations with the IPC, they are now willing to support the creation of a Famous Trademark list as long as such list is used exclusively as part of the sunrise period and not as part of any filtering

mechanism. During this sunrise period the famous trademark owners would be able to register a limited number of variations of domain names related to the core famous trademark. The registrars are now seeking to gain support for this revised proposal among a broad base of regis! tration authorities, i.e. gTLDs and ccTLDs.

**Palage Position Paper:** This position paper advocates the creation of a famous mark list primarily using the criteria set forth in the WIPO report. However, it also advocated the use of some objective criteria to provide some safeguards from the list growing out of control. As previously stated in the Registrar Proposal, the Palage Position Paper would allow for a famous trademark owner to register a number of domain name variations during the sunrise period to protect its sub-string variation interests.

**Intellectual Property Constituency Position Paper:** The IPC's most recent position paper advocates the creation of a famous marks list which would be used to preclude the registration of a domain name that is identical to or nearly identical to a famous mark on such list. The creation of a famous marks list would be based on the criteria set forth in paragraphs 284-285 of the April 30, 1999 'Report of the WIPO Internet Domain Name Process.'

**Eileen Kent Position Paper:** This was a paper submitted during the position paper submission period and called for a free market system in which all trademark owners would be able to subscribe to a notification system. This proposal did not call for the creation of a famous list.

**Harald Alvestrand Position Paper:** This paper was also submitted during the position paper submission period and called for the creation of a finite list of famous marks by WIPO of between ten (10) and one hundred (100) marks. This proposal would allow the famous mark owner to register the mark and a small number of identically similar marks, i.e. 's, dashes, etc. If the famous trademark owner did not elect to register the mark, an Internet user would be directed to a default page stating that the domain name is intentionally not being used.

**Philip Sheppard/Kathryn Kleiman Compromise Position Paper:** Sheppard and Kleiman, co-liasion Names Counsel representatives of WG-B appointed fairly recently by the Names Council, sat down together to try to bridge seemingly unbridgeable gulfs. In a paper drafted by Sheppard and now circulated to WG-B and WG-C, Sheppard and Kleiman propose a new "common ground" based largely on the "Principle of Differentiation" — "that the selection of a gTLD string should not confuse net users and so gTLDs should be clearly differentiated by the string and/or by the marketing and functionality associated with the string." Other principles support the goal of "findability" — that coke as a power source and coke as a beverage can coexist as domain names in new gTLDs provided the new gTLDs provide the Internet user with a sense of their different purposes and uses.

# Update Section

Following the ICANN meeting in Cairo and there has been much activity among a couple of the Constituencies, namely the Registrar and Intellectual Property Constituencies. Outlined below are some of the activities that each Constituency has reported

### The Registrar Constituency:

Since Cairo, the registrar constituency has potentially agreed upon the following amendments to it original position statement. Specifically, the Registrars are willing to back the creation of a Famous Marks list by a qualified administrative panel such as WIPO, provided that such list is only used in connection with a voluntary sunrise period and NOT in connection with any filtering mechanism.

The registrars, in an effort to seek consensus on behalf of the Intellectual Property (IPC) and the Non-Commercial (NCC) Constituencies, are also considering the following: 1) to address the concerns of the IPC with regard to sub-string protection, which is not currently part of the WIPO Chapter Four proposal, allowing the famous mark holders the ability to register a limited number of sub-string variations during the sunrise period; and 2) to address the concerns of the NCC, whether such a sunrise period is appropriate in any new chartered non-commercial top-level domains.

The registrars are sensitive to the IPC concerns about the sunrise period being perceived by its membership as a forced sale. However, the Registrars believe that such a sunrise provision is inherently more favorable than the current WIPO proposal that only entitles the Famous Trademark owner to an exact match exclusion and an evidentiary presumption in connection with any variation of the mark with respect to the UDRP (see Paragraph 288 of the WIPO Final Report). The registrars will continue to work with all DNSO constituencies to find an equitable solution to this problem. The registrar constituency has also informed the IPC that it is currently working on a Registrar Code of Conduct that should address some of its other concerns related to the controlled responsible growth of the name space.

With regard to the joint proposal by Sheppard and Kleiman, the registrars believe that the document is overall non-responsible to the core issues of Working Group B, i.e. protection of famous trademarks. Moreover, several registrars have voiced strong opposition to the proposal because it appears on it face to advocate the expansion of the names space with chartered top-level domains only. However, there are basic principals within this document that are consistent with the registrar constituency's viewpoints.

## The Intellectual Property Constituency:

The representatives of the IPC in Cairo were encouraged by the informal discussions which they held with representatives of the Registrars Constituency. At a high level, it seemed to the IPC representatives that the two constituencies were in fundamental agreement that trademarks should be protected against the abusive registration of domain names by cybersquatters and that this protection should encompass a certain penumbra around the trademark. These discussions gave the IPC representatives a certain degree of cautious optimism that a solution could be found to this problem with continued good faith efforts and dialogue between the constituencies. Achieving a solution to this problem together with a robust, freely available and searchable WHOIS which includes complete and accurate registrant contact data, an equitable and efficient dispute resolution policy, and an effective mechanism by ICANN to ensure compliance with best practices would significantly alleviate th! e concerns of the IPC. In addressing these areas, we believe that the two groups can help to ensure the integrity and trust which consumers and businesses need in the Internet.

## The Non-Commercial Constituency:

The Non-Commercial Constituency is currently working on providing the Working Group with its latest consensus building efforts. Kathy Kleiman has notified me that at such time when this information is available it will be forwarded to me for inclusion into the report.

Respectfully Submitted

Michael D. Palage
Chair Working Group B

---

# Appendix 9

# Afilias Proposal to ICANN

# Policy Deliverables

# October 2, 2000

**E15.** *Will you offer any "sunrise period" in which ce rtain potential registrants are offered the opportunity to register before registration is open to the general public? If so, to whom will this opportunity be offered (those with famous marks, registere d trademarks, second-level domains in other TLDs, pre- registrations of some sort, etc .)? How will you impleme nt this?*

Trademark owners have expressed concerns over the introduction of new gTLDs into the DNS, asse rting that additional gTLDs will provide cy bersquatters with new oppor tunities to re gister the trademarks of others as domain names. Afilias strongly c ondemns the pra ctice of cybersquatting, and will im plement a series of special policies during a "Sunrise Period" in an a ttempt to minimize the risk of c ybersquatters obtaining re gistrations in the proposed gTLD. The Sunrise Period is intended to permit qualified tra demark owners to pre-register the ir trademarks as domain names in the propo sed gTLD during a special closed re gistration proce ss, prior to opening r egistration up to the general public.

### Eligible Parties

During this S unrise Period, owners of any subsisting trade mark or service mark registration having national effect (i.e. no United States state tra demark applications or foreign equiva lents) and tha t issued prior to October 2, 2000 will be eligible to register a domain name tha t is identica l to its mark, using ASCII c haracters only. Afilias established the Oc tober 2nd registration re quirement to pre vent potential cybe rsquatters from obtaining trade marks identical to existing trademarks and taking a dvantage of the Sunrise Per iod.

In the registration reque st submitted to the re gistrar, the applicant will re present that the domain name registration it i s seeking mee ts the above-referenced criteria. In the event that separate applicants submi t registration requests for identical tra demarks, the first request to be submit ted to the registry da tabase will be awarded the registration.

### Processing

Afilias expe cts to rece ive a large volume of registration requests during the Sunrise Period. Accordingly, it will process Sunrise Period r egistration re quests using the queue system applicable to the Star t-Up Period, as described in <u>Section E13</u> above. A dditionally, the modifica tions to standa rd Company policies de scribed in <u>Section E13</u> will also be followed dur ing the Sunrise Period.

### Length of Sunrise Registrations

Afilias believe s that parties se eking domain name r egistrations during the Sunrise Per iod will select as long a registration ter m as is available to them, in orde r to protect their valuable asset as a domain name for as long as possible. Therefore, domain name registrations that issue during the Sunrise Period will have a minimum term of five years.

### Schedule for Sunrise Pe riod

The schedule for the Sunrise Period will be a s follows:

- At least ninety days pr ior to the proposed gTLD being ope ned to the ge neral public, A filias, in coordination with the intellec tual property community, will make a general public annou ncement with the estimated date tha t it will open the pr oposed gTLD to the general Internet communit y.

- Although it is likely that registrars and others will begin accepting pre -registrations long bef ore the beginning of the Sunrise Per iod, the Company will not begin to collect and process Sunrise Per iod requests until at least thirty days a fter the announc ement. Onc e it begins proc essing these requests, the Company will continue to do so for a period of sixty days.

- After this sixty day period, there will be an "evaluation period" of at least thirty days. Afilias believes that this evaluation period will provide two benefits to the Internet community. First, trademark owners will be given the opportunity to investigate any fraud by Sunrise Period registrants and to initiate challenges against third parties that may have obtained a Sunrise registration in a fraudulent manner. Additionally, it will provide the Company with the opportunity to evaluate the operation of the registry and round robin systems and to make any necessary modifications prior to the opening of the gTLD to the general Internet community.

## Additional Whois Information

Afilias anticipates that disputes may arise regarding whether registrations that issue during the Sunrise Period were validly obtained. Accordingly, to simplify the verification of Sunrise registrations, applicants will be required to provide the registration number and the country of registration for the mark as part of a Sunrise registration request. These additional data fields will each be included in the registration Whois information. Neither the registrars nor the Company will have an obligation to verify this information. However, the Company believes that the information will assist third parties investigating the validity of Sunrise registrations.

## Dispute Resolution

A third party may challenge a registration obtained during the Sunrise Period on the following basis: (i) the registrant did not own a corresponding subsisting trademark or service mark registration; (ii) the domain name was not identical to the trademark or service mark registration; or (iii) the trademark or service mark registration did not issue prior to October 2, 2000. All challenges will be subject to a challenge fee of US $250, payable to Afilias upon assertion of the challenge.

Parties may challenge Sunrise registrations for a period of ninety days following the date that Afilias stops accepting Sunrise Period registration requests in accordance with the procedure described below. During this ninety day period, the Company will prohibit the transfer of all registrations obtained during the Sunrise Period except for transfers necessary as a result of a successful challenge or pursuant to a court order. Following the ninety day dispute period, parties disputing the validity of a Sunrise Period registration must utilize the UDRP or available courts of law.

Afilias will administer challenges posed against Sunrise registrations as follows. First, the challenger must notify the Company in writing that it wishes to challenge a Sunrise Period registration, and include the challenge fee with any such notification. Upon receipt of a challenge, the Company will record the time and date the notification and fee were received, in order to process multiple challenges to the same domain name registration.

Within five days of receipt of a challenge fee, the Company will notify the registrant of the challenge. The registrant will be required to submit a certified copy of the corresponding trademark registration to the Company within thirty days from the date of such notification. In the event that Afilias receives the certified copy within such thirty day period, then the Company will decide the merits of the challenge within five business days thereafter, and will notify the challenger and the registrant of the decision promptly after its resolution. Multiple challenges to the same Sunrise Period registration will be processed in the order they were received.

If a registrant provides a certified copy of a trademark or service mark registration that meets the above-referenced criteria, then (i) such registrant will retain the domain name registration; and (ii) the challenging party will not be entitled to return of the challenge fee.

In the event that the domain name registrant is unable to demonstrate that it meets the above criteria, then (i) the Company will place the domain name registration on a ten day hold; (ii) the registrant will forfeit the registration fee; and (iii) the Company will refund the challenger the amount of the challenge fee. The Company may thereafter seek reimbursement from the losing registrant for the refunded challenge fee.

During the ten day hold period, a successful challenger will have the option to register the domain name that was the subject of the challenge on its own behalf, provided that it (i) meets the Sunrise Period registration eligibility requirements described above; and (ii) provides Afilias with a certified copy of its trademark registration to enable Afilias to verify its entitlement to the registration. If a challenger meets these criteria, then the challenger may submit a registration application through the accredited registrar of its choice, and Afilias will release the domain name to the challenger. The period of registration of the domain name will be for an initial term of five years, consistent with the Sunrise Period term.

If the successful challenger was ineligible to register the domain name during the Sunrise Period, or if it does not exercise its option to re-register the domain name, and there are no additional challenges, then the Company will release the name from the ten day hold and return it to the general pool of available domain names.

In the event that there are additional challenges to the domain name registration, Afilias will continue to maintain the name on hold and move to the next challenger. Afilias will then request that the second challenger proffer its eligible registration within a ten day period. If the challenger provides a registration that meets the above-referenced criteria, then such challenger will be entitled to register the domain name. If it does not, Afilias will continue to hold the name until all challenges have been adjudicated. If the name is not successfully claimed by any registrant, it will then be returned to the general pool of available names.

# Appendix 10

# Afilias / ICANN Agreement

# Appendix J

# May 11, 2001

## 3. SUNRISE PERIOD

Prior to opening the Registry for general registration, Registry Operator will implement a Sunrise Period registration program.

### Eligible Parties

During this Sunrise Period, owners of any current (non-expired) trademark or service mark registration having national effect (including, for example, European Community Trademarks (CTMs) but excluding United States state registrations) that issued prior to October 2, 2000 will be eligible to register a domain name that is identical to the textual or word elements of such trademark or service mark, using ASCII characters only, and subject to the same character and formatting restrictions as apply to all domain name registrations in the Registry TLD. Where there is a space between the textual elements of a mark, the Registrant may elect at their discretion to use a hyphen or combine the elements together. For example, the mark "SERVICE MARK" could be registered as servicemark.info or service-mark.info. Trademark or service mark registrations from the supplemental or equivalent Registry of any country, or from individual states or provinces of a nation, will not be accepted.

### Schedule for Sunrise Period

The Sunrise Period will be conducted as follows:

Announcement Period: At least forty-five to seventy-five (45 - 75) days prior to the commencement of the Land Rush Period, Registry Operator will make a general public announcement that will provide the following information: (i) the estimated Start Date for the Sunrise Period; (ii) the estimated termination date of the Sunrise Period; and (iii) the estimated Start Date for the Land Rush Period.

Sunrise Period: Following a minimum Announcement Period of at least fifteen to thirty (15 - 30) days, the Registry will begin processing domain name registration requests using the logical queue system set forth above. This Sunrise Period is scheduled to last for a minimum of thirty (30) days. Cooling Off Period: After the conclusion of the Sunrise Period, Registry Operator reserves the right, at its sole discretion, to institute an "evaluation period" of fifteen (15) days. The purpose of such evaluation period is to provide the Registry the opportunity to evaluate the operation of the Registry and round robin systems and to make any necessary modifications prior to the Land Rush Period. Registry Operator reserves the right to increase or decrease the Cooling Off Period in its reasonable discretion.

### Processing

In order for trademark and service mark owners to qualify to receive a registration during the Sunrise Period (a "Sunrise Registration"), the following information must be provided to Registry Operator: (i) the ASCII characters name of the trademark or service mark; (ii) the date the registration issued; (iii) the country of registration; and (iv) the registration number. This information will be required in addition to the standard information that Registry Operator will require all potential registrants to submit in order to register a domain name. This information shall be included in the Whois informational database to

facilitate the resolution of disputes over Sunrise Registrations. The Whois database shall be made available at the commencement of the Sunrise Period. Neither Registry Operator nor the Authorized Registrars will verify any of this information prior to issuing a Sunrise Registration, but Registry Operator reserves the right to refuse or cancel any Sunrise Registration at any time and to request additional information relating to a Sunrise Registration from the registrant.

In the event that separate applicants submit registration requests for identical trademarks, the first request to be processed by the Registry that meets the criteria for a Sunrise Registration will be awarded the domain name registration.

Sunrise Registrations will only be accepted for registration terms of at least five years. A Sunrise Registration request will be filled only if the submitting Registrar has in place a mechanism to pay the registration fees for such registration, as described in its Registry-Registrar Agreement with Registry Operator.

Registry Operator will prohibit the transfer of all domain names registered during the Sunrise Period for a period of up to six months following the last day of the Sunrise Period, except for transfers made as a result of a successful challenge, a decision in a Uniform Dispute Resolution Policy ("UDRP") administrative proceeding, or an order from any court of competent jurisdiction. In addition, Sunrise Registrations that are subject to one or more pending challenges (see "Sunrise Dispute Resolution Policy" below) may not be transferred until such challenges are resolved.

Sunrise Registrations shall be subject to the terms of the Authorized Registrar's Registry-Registrar Agreement with Registry Operator.

## Sunrise Dispute Resolution Policy

All Sunrise Period domain name registrants will agree to be subject to the Sunrise Dispute Resolution Policy described herein for all disputes arising out of Sunrise Registrations.

A third party may challenge a Sunrise Registration on the following basis: (i) the registrant did not own a current (non-expired) trademark or service mark registration; (ii) the trademark or service mark registration was not of national effect; (iii) the second level of the domain name is not identical to the trademark or service mark registration; or (iv) the trademark or service mark registration did not issue prior to October 2, 2000. All challenges will be subject to a challenge fee of US $295 upon assertion of the challenge. Parties may challenge Sunrise Registrations at any time during a period of one hundred twenty (120) days following the conclusion of the Sunrise Period. After such one hundred twenty (120) day period, parties disputing the validity of a Sunrise Registration must utilize the UDRP or available courts of law.

All dispute resolution proceedings involving Sunrise Registration challenges will be conducted in English, and any foreign language certificates submitted by the parties must be accompanied by certified translations. The domain name registrant and challenger may represent themselves in these proceeding or may be represented by legal counsel or other representatives.

Registry Operator, or its authorized third party dispute resolution providers, will administer challenges against Sunrise Period registrations as described below:

1. The challenger will electronically submit a notification to Registry Operator, in a form determined by Registry Operator, in which it sets forth the basis of the challenge, specifically identifies the registrant by name, assumes a contractual obligation to pay the $295 challenge fee, arranges for payment terms for the challenge fee and notifies Registry Operator of such terms. Such terms must be agreeable to Registry Operator in its reasonable discretion. Registry Operator will electronically time stamp each request and forward a copy of the challenge to the domain name registrant and the Authorized Registrar of record. In the case of multiple challenges to a single Sunrise Registration, the first party submitting a complete and accurate challenge will be given priority.

2. If the challenger fails to arrange for payment terms in a manner reasonably agreeable to Registry Operator, the challenge will be dismissed without prejudice, and, if other challenges to the Sunrise Registration remain, Registry Operator will process the next challenge, as shown by the timestamp on its challenge notice, in accordance with these dispute resolution procedures.

3. Upon arranging payment terms with the challenger, Registry Operator will send an electronic notice (email and/or facsimile) to the domain name registrant informing them that the challenge has been completed and will proceed. The domain name registrant will then have to arrange for payment terms of a $295 challenge fee and notify Registry Operator of such terms. Such terms must be agreeable to Registry Operator in its reasonable discretion. In addition, the domain name registrant shall have sixty (60) days from the date of notification of the completed challenge to submit a certified copy of its corresponding trademark or service mark registration, or other evidence sufficient to establish the existence of such registration, to Registry Operator or its authorized agent, when requested.

4. If the domain name registrant fails to arrange for payment terms agreeable to Registry Operator, or is unable to establish the existence of a current trademark or service mark registration within the allotted time, then the registrant will forfeit the domain name registration without refund of any registration or challenge fees.

5. If the domain name registrant arranges for payment terms agreeable to Registry Operator and establishes the existence of a trademark or service mark registration within the allotted time, Registry Operator or its designated agent will use commercially reasonable efforts to determine the merits of the challenge promptly within twenty (20) days of receipt of such terms and such registration information, and will notify the challenger and the registrant of its decision promptly after its resolution.

6. If the domain name registrant arranges for payment terms agreeable to Registry Operator and the domain name registrant's trademark or service mark registration meets the criteria for a Sunrise Registration, then (i) such registrant will retain the domain name registration, and (ii) Registry Operator will refund the registrant's entire challenge fee. The unsuccessful challenger will forfeit its entire challenge fee.

7. If the domain name registrant arranges for payment terms agreeable to Registry Operator and the domain name registrant's trademark or service mark registration does not meet the criteria for a Sunrise Registration, then (i) such registrant will forfeit the domain name registration without refund of any registration or challenge fees, and (ii) Registry Operator will place the domain name registration on a ten day hold.

8. During this ten-day hold period, Registry Operator will offer the prevailing challenger the option of registering the disputed domain name on its own behalf, provided that the

challenger must provide the same information and agree to the same terms as required for Sunrise Registrations. If the challenger elects such option, the Registry will give it an authorization code to allow registration of the domain name through an Authorized Registrar.

9. If the prevailing challenger does not elect, or is not eligible, to register the domain name on its own behalf within the ten day hold period, then the authorization code and the option to register the domain name will be afforded to the first other challenger that submitted an accurate and complete challenge and arranged for payment terms of the challenge fee within the allotted time. The identification of such challenger will be based on the timestamp on its challenge. If no other such challengers exist, the domain name will be returned to the general pool of available domain names in accordance with Registry Operator's procedures for cancelled domain name registrations.

**Outsourcing**

Registry Operator reserves the right to outsource the dispute resolution procedures described in this Appendix J to a third party that, in Registry Operator's reasonable judgment, is qualified to conduct the dispute resolution process. Registry Operator reserves the right to develop, in consultation with such third party dispute resolution provider, supplemental rules to facilitate the dispute resolution procedure, provided that they are consistent with the policy set forth in this document.

# Appendix 11

# Afilias Sunrise Registration Challenge Policy

# For .info

# July 27, 2001

# Afilias Sunrise Registration Challenge Policy for <.info>

(the "Policy")

1. **Purpose.** This Sunrise Registration Challenge Policy (the "Policy") has been adopted by Afilias. It is incorporated by reference into the <.info> Registration Agreement (the "Registration Agreement"). It sets forth the terms and conditions in connection with a dispute between you (as the registrant) and any party other than us (as the registrar) or the registry operator for the <.info> top-level domain (the "Registry") regarding the compliance of your registration of a second-level domain name (the "Domain Name") with the sunrise registration conditions set forth in the Registration Agreement.

   Proceedings under Paragraph 4 of this Policy will be conducted according to the Rules for Sunrise Registration Challenge Policy (the "Rules"), which are available at http://www.afilias.info/ .

2. **Your Representations.** By applying to register a domain name in accordance with the sunrise registration conditions of the Registration Agreement, you hereby represent and warrant to us that (a) the statements that you made in your Registration Agreement are complete and accurate; (b) the registration of the Domain Name complies with the sunrise registration conditions set forth in the Registration Agreement; (c) to your knowledge, the Domain Name will not infringe upon or otherwise violate the rights of any third party; (d) you are not registering the Domain Name for an unlawful purpose; and (e) you will not knowingly use the Domain Name in violation of any applicable laws or regulations. It is your responsibility to determine whether your Domain Name registration infringes or violates someone else's rights.

3. **Cancellations, Transfers, and Changes.** We will cancel, transfer or otherwise make changes to a domain name registration that is subject to this Policy under the following circumstances:

   a.   subject to the provisions of Paragraph 6, our receipt of written or appropriate electronic instructions from you or your authorized agent to take such action; and/or

   b.   our receipt of an order from a court or arbitral tribunal, in each case of competent jurisdiction, requiring such action; and/or

   c.   our receipt of a decision requiring such action in any administrative proceeding to which you were a party and which was conducted under this Policy or a later version of this Policy adopted by Afilias.

We may also cancel, transfer or otherwise make changes to a domain name registration in accordance with the terms of the Registration Agreement or other legal requirements.

## 4. **Mandatory Administrative Proceeding.**

This Paragraph sets forth the type of disputes for which you are required to submit to a mandatory administrative proceeding. These proceedings will be administered by the World Intellectual Property Organization Arbitration and Mediation Center (the "Center").

a.   **Applicable Disputes.** You are required to submit to a mandatory administrative proceeding in the event that a third party (the "Challenger") asserts to the Center, in compliance with the Rules, that:

(i)   at the time of your registration of the Domain Name, no current (non-expired) trademark or service mark registration was issued in your name;[1] or

(ii)   the Domain Name is not identical to the textual or word elements of the trademark or service mark registration on which the registration of your Domain Name is based;[2] or

(iii)   the trademark or service mark registration on which the registration of your Domain Name is based is not of national effect;[3] or

(iv)   the trademark or service mark registration on which the registration of your Domain Name was based did not issue prior to October 2, 2000.

All challenges under this Policy must be submitted to the Center not later than one hundred and twenty (120) days after the conclusion of the Sunrise Registration Period.

b.   **How to Demonstrate Your Compliance with the Sunrise Registration Conditions.** When you receive a challenge, you should refer to the Rules to determine how your response should be prepared. To demonstrate that you have complied with the sunrise registration conditions of the Registration Agreement, you must submit, as part of your response, an original or a certified copy of a trademark or service mark certificate establishing that:

(i)   at the time of your registration of the Domain Name, a trademark or service mark was registered in your name and was current (non-expired), as evidenced by the date(s) set forth in the certificate itself;[4] and

(ii)   the textual or word elements of the trademark or service mark registration are identical to the Domain Name;[5] and

(iii)   the trademark or service mark registration was of national effect;[6] and

(iv)   the trademark or service mark registration was issued prior to October 2, 2000.

c.   **Decision.** The challenge will be decided upon by the Center. The Center's determination of whether your response meets the conditions set forth in Paragraph 4(b) will be based solely on a prima facie examination of any trademark or service mark certificates submitted by you. The Center's decision is of an administrative nature and shall be final. The Center shall not be required to state reasons for its decision.

d.   **Initiation of Proceeding.** The Rules state the process for initiating and conducting a proceeding under this Policy.

e.   **Consolidation.** A challenge may not relate to more than one domain name. In the event a Challenger under this Policy submitted more than one challenge against you, either you or the Challenger may petition the Center to consolidate such disputes. The Center may consolidate before it any or all such disputes in its sole discretion, provided that the disputes being consolidated are governed by this Policy.

f.   **Fees.** In accordance with the Rules, the submission of a challenge under this Policy, as well as the submission of a response thereto, is subject to the payment of, respectively, a Challenger's fee and a Respondent's fee in the amount of USD 295, subject to the provisions of Rules, Paragraph 13. All payments are to be made by credit card. If a challenge is submitted, but the Challenger's fee is not paid in accordance with the Rules, the challenge will be dismissed on the basis of the Challenger's failure to pay its fee. If the Respondent's fee is not paid in accordance with the Rules, the challenge will be granted on the basis of the Respondent's failure to pay its fee, provided the challenge is in formal compliance with the Policy and Rules. The Rules describe the circumstances under which either the Challenger or the Respondent will be entitled to a reimbursement of the fees paid.

g.   **Our Involvement in Administrative Proceedings.** We do not, and will not, participate in the administration or conduct of any proceeding before the Center under this Policy. In addition, we will not be liable as a result of any decisions rendered by the Center.

h.   **Remedies.** The remedies available to a Challenger shall be limited to requiring the cancellation of your Domain Name registration or the transfer of your Domain Name registration to the Challenger.

i.   **Notification.** The Center shall notify any decision made under this Policy with respect to a Domain Name you have registered with us in accordance with the Rules.

j.   **Implementation of the Decision.** The Center will notify its decision to the Registry for implementation. In cases where a prevailing Challenger seeks the transfer of the Domain Name, such Challenger will be provided with an authorization code generated by the Registry which will allow the Challenger to

register the Domain Name in its name, at the registrar of its choice, within 10 days of the date on which the notification of the authorization code is sent to the Challenger, in accordance with and subject to the sunrise registration conditions set forth in the Registration Agreement.

k.   **Multiple Challenges.**  In the event more than one challenge is submitted to the Center regarding the same Domain Name, the following shall apply:

(i)   All such challenges will be queued in accordance with the date and time they were received by the Center.  The first challenge to be filed will be granted priority, provided the Center is satisfied that the Challenger concerned paid the Challenger's fee in accordance with the Rules (the "Priority Challenge" and the "Priority Challenger").

(ii)   If the Center finds that you have registered the Domain Name in compliance with the sunrise registration conditions set forth in the Registration Agreement, the Center will dismiss the Priority Challenge, as well as all other challenges in the queue.

(iii)   If the Center is unable to find that you have registered the Domain Name in compliance with the sunrise registration conditions set forth in the Registration Agreement, the Priority Challenger will be granted[7].

(iv)   If a prevailing Priority Challenger sought a cancellation or if the Center is informed by the Registry that a prevailing Priority Challenger who sought a transfer has failed to register the Domain Name in its name by the end of the time period stipulated in Paragraph 4(j) of this Policy, the Center shall grant the next Challenger in the queue the opportunity to register the Domain Name in its name in accordance with and subject to the sunrise registration conditions set forth in the Registration Agreement, provided such Challenger has submitted a challenge requesting a transfer which is in formal compliance with the Policy and the Rules, and the Center is satisfied that the Challenger has paid the Challenger's fee in accordance with the Rules.

(v)   The procedure described in Paragraph (iv) will be repeated until the Domain Name has been registered in the name of a Challenger in the queue or until there are no Challengers in the queue.  If, upon the expiry of the Sunrise Challenge Period referred to in Paragraph 4(a) above, there are no Challengers in the queue, the Domain Name will be returned to the pool of available domain names in accordance with the Registry's procedures for cancelled domain name registrations.

(vi)   As soon as a Domain Name has been registered in the name of a Challenger in accordance with the previous provisions of this Paragraph, the Registry will notify the Center thereof and the Center will notify such registration to any remaining Challengers.  Any remaining Challenger may initiate a new challenge against the new registrant.  The Priority Challenger for

any such new proceeding will be determined in accordance with the originally generated queue in relation to the domain name in question, provided the challenge is submitted within thirty (30) days of the notification of the new domain name registration, and any subsequent challenges that have been added.

5.   **Maintaining the Status Quo.**  We will not cancel, transfer, activate, deactivate, or otherwise change the status of any Domain Name registration subject to this Policy, except as provided in Paragraph 3 and 4 above.

6.   **Transfers During a Dispute.**

a.   Transfers of a Domain Name to a New Holder. You may not transfer your Domain Name registration that is subject to this Policy to another holder until all challenges brought pursuant to this Policy in relation to this Domain Name have been resolved, except that a transfer may be made to the Priority Challenger in a pending administrative proceeding under this Policy (e.g., in the event of a settlement of the dispute).  Any registration pursuant to such transfer will be subject the sunrise registration conditions set forth in the Registration Agreement.

b.   Changing Registrars. You may not transfer your Domain Name registration that is subject to this Policy to another registrar until all challenges pursuant to this Policy have been resolved.

7.   **Policy Modifications.**

Afilias reserves the right to modify this Policy at any time with the permission of ICANN. We will post the revised Policy at http://www.afilias.info/ at least fifteen (15) days before it becomes effective. Unless this Policy has already been invoked by the submission of a challenge to the Center, in which event the version of the Policy in effect at the time it was invoked will apply to you until the dispute is over, all such changes will be binding upon you with respect to any Domain Name registration dispute, whether the dispute arose before, on or after the effective date of the change. In the event that you object to a change in this Policy, your sole remedy is to cancel your Domain Name registration with us, provided that you will not be entitled to a refund of any fees you paid to us. The revised Policy will apply to you until you cancel your Domain Name registration.

---

[1] A registration in the supplemental register of the United States Patent and Trademark Office does not qualify as such registration. back

[2] Identity will be deemed to exist also where there is a space between the textual or word elements of the mark (e.g., service mark) and a hyphen is used or the elements are combined in the Domain Name (e.g., service-mark.info or servicemark.info).  In all other respects, the Domain Name must be identical to the textual or word elements of the mark. back

[3] For instance, European Community Trademarks meet the condition of national effect, but United States state trademarks or service marks do not. back

[4] Reference is made to footnote 1. back

[5] Reference is made to footnote 2. back

[6] Reference is made to footnote 3. back

[7] The Center will be unable to find that you have registered the Domain Name in compliance with the sunrise registration conditions set forth in the Registration Agreement if inter alia you fail to pay the Respondent's fee referred to in Paragraph 4 (f) of this Policy.

**Appendix 12**

**Afilias Rules for Sunrise Registration Challenge Policy**

**For .info**

**July 27, 2001**

Posted July 27, 2001

# Afilias
# Rules for Sunrise Registration
# Challenge Policy
# for <.info>

## (the "Rules")

Administrative proceedings for the resolution of disputes pursuant to the Sunrise Registration Challenge Policy (at http://www.afilias.info/faq/sunrise-challenge-policy.html) adopted by Afilias shall be governed by these Rules.

1. Definitions

In these Rules:

**Center** refers to the World Intellectual Property Organization Arbitration and Mediation Center.

**Challenger** means a party which is challenging a domain name registration under the Sunrise Registration Challenge Policy.

**ICANN** refers to the Internet Corporation for Assigned Names and Numbers.

**Party** means a Challenger or a Respondent.

**Policy** means the Sunrise Registration Challenge Policy that is incorporated by reference and made a part of the Registration Agreement.

**Registrar** means the entity with which the Respondent has registered a domain name that is the subject of a challenge.

**Registration Agreement** means the agreement between a Registrar and a domain name holder.

**Registry** means the registry operator for the <.info> top-level domain.

**Respondent** means the holder of a domain name registration against which a challenge is initiated.

2.   Communications

(a)   Except as otherwise provided in these Rules, any communication required under these Rules shall be made by electronic mail via the Internet.

(b)   For the purposes of any communications to the Center, the following addresses should be used:

(i) electronic mail: see http://arbiter.wipo.int/domains/

(ii) facsimile transmission: see
http://arbiter.wipo.int/domains

(iii) postal or courier service:

>WIPO Arbitration and Mediation Center
>34 chemin des Colombettes
>1211 Geneva 20
>Switzerland

(c)   All communications shall be made in the language prescribed in
Paragraph 6.

(d)   Either Party may update its contact details by notifying the other
Party, the Center, the Registrar and the Registry.

(e)   Except as otherwise provided in these Rules, all communications
provided for under these Rules shall be deemed to have been made:

(i)   if via the Internet, on the date that the communication was
transmitted, provided that the date of transmission is verifiable; or

(ii)  · if by postal or courier service, on the date of mailing marked on
the receipt; or

(iii)   if delivered by facsimile transmission, on the date shown on the
confirmation of transmission.

(f)   Except as otherwise provided in these Rules, all time periods
calculated under these Rules shall commence on the earliest date that
the communication is deemed to have been made in accordance with
Paragraph 2(e).

(g)   Except as otherwise provided in these Rules, any
communication by

>(i)   the Center, following the commencement of an
>administrative proceeding pursuant to Paragraph 4(c), to
>any Party shall be copied to the other Party; and

>(ii)   a Party shall be copied to the other Party and the
>Center.

(h)   It shall be the responsibility of the sender to retain records of the
fact and circumstances of sending, which shall be available for
inspection by affected parties and for reporting purposes.

(i)   In the event that a Party sending a communication receives
notification of non-delivery of the communication, that Party shall
promptly notify the Center of the circumstances of the notification.

(j)   When a paper submission is to be made to the Center by a Party,
it shall be submitted in three (3) sets, including the original of such
submission.

### 3.   The Challenge

(a)     Any person or entity may initiate an administrative proceeding by submitting a challenge to the Center in accordance with the Policy and Rules.

(b)     The challenge shall be submitted in electronic form via the Internet using the Model Challenge Form made available by the Center.

(c)   The challenge shall:

> (i)     Request that the challenge be submitted for decision in accordance with the Policy and Rules and describe why the domain name registration should be considered subject to the Policy;

> (ii)     Provide the full name, postal and e-mail addresses, and the telephone and telefax numbers of the Challenger and of any representative authorized to act for the Challenger in the administrative proceeding;

> (iii)     Provide complete bank account details of the Challenger for purposes of any reimbursement of fees in accordance with Paragraph 13;

> (iv)     Provide the full name of the Respondent and, if different from the contact details available in the Whois database for the domain name, provide all information known to the Challenger regarding how to contact the Respondent or any representative of the Respondent, including contact information based on pre-challenge dealings;

> (v)     Specify the domain name that is the subject of the challenge;

> (vi)     Identify the Registrar with whom the domain name is registered at the time the challenge is filed;

> (vii)     Describe, in accordance with the Policy, the grounds on which the challenge is made including, in particular, why the domain name that is the subject of the dispute should be considered to have been registered in violation of the sunrise registration conditions set forth in the Registration Agreement with specific reference to Policy, Paragraph 4 (a):

>> (1)     at the time of the Respondent's registration of the Domain Name, no current (non-expired) trademark or service mark registration was issued in the Respondent's name; or

>> (2)     the Domain Name is not identical to the textual or word elements of the trademark or service mark registration on which the

registration of the Respondent's Domain Name
is based; or

(3)   the trademark or service mark
registration on which the registration of the
Respondent's Domain Name is based is not of
national effect; or

(4)   the trademark or service mark
registration on which the registration of the
Respondent's Domain Name was based did not
issue prior to October 2, 2000.

The above description should not exceed 2000
words;

(viii)   Specify, in accordance with the Policy, the remedies
sought, i.e. transfer or cancellation of the Domain Name
registration;

(ix)   Identify any other proceedings that have been
commenced or terminated in connection with or relating to
the domain name that is the subject of the challenge;

(x)   State that a copy of the challenge, together with the
coversheet set out in Annex A hereto, has been sent or
transmitted to the Respondent, the Registrar and the
Registry;

(xi)   Include the following statement:

"Challenger agrees that its claims and
remedies concerning the registration of the
domain name, the dispute, or the dispute's
resolution shall be solely against the domain
name holder and waives all such claims and
remedies against (a) the Center, (b) the
Registrar, (c) the Registry, and (d) ICANN, as
well as their directors, officers, employees, and
agents.

Challenger certifies that the information
contained in this challenge is to the best of
Challenger's knowledge complete and
accurate, that this challenge is not being
presented for any improper purpose, such as
to harass, and that the assertions in this
challenge are warranted under the Sunrise
Registration Challenge Policy, the Rules for
Sunrise Registration Challenge Policy and
under applicable law, as it now exists or as it
may be extended by good-faith and reasonable
argument."; and

(xii)   Specify the credit card (American Express, Visa or
MasterCard), together with the name of the cardholder as
it appears on the card, the card number and the card

expiration date for purposes of payment of the
Challenger's fee in accordance with Paragraph 13 (a).

(d)    The challenge may not relate to more than one domain name.

4.    <u>Notification of Challenge</u>

(a)    The Center shall review the priority challenge for formal
compliance with the Policy and the Rules. If the priority challenge is
found to be in compliance with the Policy and the Rules and the Center
is satisfied that the Challenger's fee has been paid in accordance with
Paragraph 13 (a), the Center shall notify the priority challenge to the
Respondent by sending it to the e-mail addresses and telefax numbers
of the administrative contact for the domain name, as shown in the
Whois database at the time of the notification of the priority challenge
by the Center to the Respondent. In addition, the Center shall notify
the priority challenge to the e-mail addresses and telefax numbers of
the Respondent, or of any representative of the Respondent, as
provided by the Priority Challenger in accordance with Paragraph 3 (c)
(iv).

(b)    If the Center finds the priority challenge to be formally deficient,
it shall promptly notify the Priority Challenger of the nature of the
deficiencies identified. The Priority Challenger shall have ten (10) days
after such notification within which to correct any such deficiencies,
after which the administrative proceeding will be deemed terminated
without prejudice to the submission of another challenge by the
Challenger.

(c)    The date of commencement of the administrative proceeding
shall be the date the priority challenge is notified by the Center to the
Respondent.

(d)    The Center shall notify the Priority Challenger, the Respondent,
the Registrar, and the Registry of the date of commencement of the
administrative proceeding.

(e)    If the Priority Challenger fails to remedy any deficiencies
identified by the Center within the time period provided for in
Paragraph 4 (b), the Center shall notify the Priority Challenger, the
Respondent, the Registrar and the Registry of the deemed termination
of the challenge and the fee of USD 295 paid by the Challenger
pursuant to Paragraph 13 (a) of the Rules shall be deemed forfeited.

5.    <u>The Response</u>

(a)    Within ten (10) days of the date of commencement of the
administrative proceeding, the Respondent shall specify the credit card
(American Express, Visa or MasterCard), together with the name of
the cardholder as it appears on the card, the card number and the
card expiration date for purposes of payment of the Respondent's fee
in accordance with Paragraph 13 (b).

(b)    Within sixty (60) days of the date of commencement of the
administrative proceeding the Respondent shall submit a response to
the Center.

(c)   The response shall be submitted in hard copy (with annexes) by postal or courier service (postage pre-paid and return receipt requested) and in electronic form (without annexes) via the Internet using the Model Response Form made available by the Center.

(d)   The response shall:

(i)   Annex the originals or certified copies of any trademark or service mark certificates required to be submitted by the Respondent under Paragraph 4(b) of the Policy and respond specifically to the statements and allegations contained in the complaint and include any and all bases for the Respondent to retain registration of the disputed domain name with specific reference to Policy, Paragraph (4) (b).  Such description should not exceed 2000 words;

(ii)   Provide the name, postal and e-mail addresses, and the telephone and telefax numbers of the Respondent and of any representative authorized to act for the Respondent in the administrative proceeding;

(iii)   Provide complete bank account details of the Respondent for purposes of any reimbursement of fees paid by the Respondent in accordance with Paragraph 13 (c);

(vi)   Identify any other proceedings that have been commenced or terminated in connection with or relating to the domain name that is the subject of the challenge;

(vii)   Include the following statement:

"Respondent certifies that the trademark or service mark forming the basis for the registration of the domain name was issued prior to October 2, 2000 and was current (non-expired) at the time of the registration of the domain name";

(viii)   Include the following statement followed by the signature of the Respondent or its authorized representative:

"Respondent certifies that the information contained in this Response is to the best of Respondent's knowledge complete and accurate, that this Response is not being presented for any improper purpose and that the assertions in this Response are warranted under the Sunrise Registration Challenge Policy, the Rules for Sunrise Registration Challenge Policy and under applicable law, as it now exists or as it may be extended by good-faith and reasonable argument."; and

(e)   At the request of the Respondent, the Center may, in exceptional

cases, extend the period of time for the filing of the response.

(f)   If a Respondent does not pay the Respondent's fee in accordance with Paragraph 13 (b) or does not submit a response, the Respondent shall be deemed to have defaulted and the challenge will be granted.

6.   Language of Proceedings

(a)   Unless otherwise agreed by the Center in exceptional circumstances, the language of the administrative proceeding shall be English.

(b)   Any trademark or service mark certificates in a language other than English, submitted by the Respondent in accordance with Paragraph 5 (d) (viii), must be accompanied by a certified translation into English.

7.   Further Statements

Unless otherwise requested or agreed by the Center in exceptional circumstances, no further statements or documents from either of the Parties are to be submitted.

8.   In-Person Hearings

There shall be no in-person hearings.

9.   Default

(a)   In the event that a Respondent does not comply with any of the time periods established by the Rules or the Center, the Center, unless it finds exceptional circumstances apply, shall proceed to a decision on the challenge.

(b)   If a Party, in the absence of exceptional circumstances, does not comply with any provision of, or requirement under, the Rules or any request from the Center, the Center may draw such inferences therefrom and may undertake such procedural steps as it considers appropriate.

10.   Center Decisions

(a)   The Center's determination of whether the response meets the conditions set forth in Paragraph 4(b) of the Policy will be based solely on a prima facie examination of any trademark or service mark certificates submitted by the Respondent.  The Center's decision is of an administrative nature and shall be final.  The Center shall not be required to state reasons for its decision.

(b)   The Center will use reasonable efforts to decide upon a challenge within twenty (20) days (as observed at the Center's place of business) of the receipt of the response or of the expiry of the deadline for the response, subject to the provisions of Paragraph 13 (b).

(c)   The Center in its sole discretion, may prior to rendering the decision, consult relevant intellectual property offices in the context of reaching its determination.

11.   **Communication of Decision**

(a)   The Center shall communicate the decision to each Party, the Registrar, and the Registry.

(b)   If a prevailing Challenger seeks the transfer of the domain name subject to the dispute, as stipulated in Paragraph 4 (j) of the Policy, such Challenger shall be provided with an authorization code generated by the Registry which will allow the Challenger to register the Domain Name in its name in accordance with the sunrise registration conditions of the Registration Agreement, at a registrar of its choice, within 10 days of the date on which the notification of the authorization code is sent to the Challenger.

(c)   In case of multiple challenges, the Center will issue the relevant notifications in accordance with Paragraph 4 (k) of the Policy.

12.   **Settlement or Other Grounds for Termination**

(a)   If the Challenger notifies the Center that the Parties have agreed on a settlement, the Center may suspend or terminate the administrative proceeding.

(b)   If it becomes unnecessary or impossible to continue the administrative proceeding for any other reason, the Center shall terminate the administrative proceeding.

(c)   In case of a termination of the administrative proceeding in accordance with (b), any fees paid by the Parties in accordance with Paragraph 13 shall be deemed forfeited.

13.   **Fees**

(a)   The filing of a challenge is subject to the payment of a Challenger's fee in the amount of USD 295, comprising of a non-refundable fee of USD 75 and a refundable fee of USD 220.  This fee is to be paid by credit card at the time of the submission of the challenge in accordance with Paragraph 3 (c) (xii).  If the Center is not satisfied that the Challenger's fee has been paid within 15 days of the filing of the challenge, the Center will dismiss the challenge on the basis of the Challenger's failure to pay the Challenger's fee.  In case of multiple challenges, Paragraph 4 (k) of the Policy shall apply and the credit card of a non-priority challenger will be debited only in the amount of the non-refundable fee of USD 75. in which case the full amount of USD 295 will be debited.

(b)   The filing of a response is subject to the payment of a Respondent's fee in the amount of USD 295.  This fee is to be paid by credit card within ten(10) days of the date of commencement of the administrative proceeding in accordance with Paragraph 5 (a).  If the Respondent fails to provide the credit card information for the payment of the Respondent's fee within ten days of the date of commencement of the administrative proceeding, the Center will send a reminder to the Respondent requiring it to submit such payment within ten (10) further days. If the Center is not satisfied that the Respondent's fee has been paid within this period, the challenge will be granted on the basis of the Respondent's failure to pay its fee.

(c)   If a Respondent pays the Respondent's fee and establishes that the domain name subject to the dispute has been registered in compliance with the sunrise registration conditions set forth in the Registration Agreement, the Center will reimburse the Respondent's fee.

(d)   If a Respondent pays the Respondent's fee but fails to establish that the domain name subject to the dispute has been registered in compliance with the sunrise registration conditions set forth in the Registration Agreement, the Center will reimburse the Challenger's fee, subject to the withholding of the non-refundable fee in the amount of USD 75.

(e)   If a challenge other than a Priority Challenge is dismissed by the Center in accordance with Paragraph 4 (k) (ii) or (vi) of the Policy, the Center shall retain only a non-refundable fee in the amount of USD 75 as referred to in (a).

(f)   Under no other circumstances will a Challenger's fee or a Respondent's fee be reimbursed by the Center.

(g)   The Center will transfer to the Registry a portion in the amount of USD 25 of each Challenger's and Respondent's fee which it has effectively received and which is not to be reimbursed to the Parties in accordance with the preceding provisions of this Paragraph.

(h)   In the event that a Party whose challenge, other than a priority challenge, is dismissed by the Center, subsequently submits a new challenge against the new registrant of the domain name pursuant to Policy, Paragraph 4(j) or 4(k)(iv), the Center shall apply the USD 75 non-refundable fee previously debited and shall debit USD 220 in relation to such new challenge.

14.   <u>Exclusion of Liability</u>

The Center and any intellectual property office consulted by the Center shall not be liable to a Party for any act or omission in connection with any administrative proceeding under the Policy and the Rules.

15.   <u>Amendments</u>

The version of these Rules in effect at the time of the submission of the challenge to the Center shall apply to the administrative proceeding commenced thereby.  The Registry reserves the right to modify the Rules at any time.

# Appendix 13

## Post of Bhavin Turakhia

## CEO, Directi

## To

## ICANN New TLD Evaluation Process Forum

## May 31, 2002

Return to New TLD Evaluation Process Forum - Message Thread - Post a Reply - Collate Replies - FAQ

**Username:** bhavin.t@directi.com
**Date/Time:** Fri, May 31, 2002 at 5:07 PM GMT
**Browser:** Microsoft Internet Explorer V5.0 using Windows 98
**Subject:** 14000+ .INFO names still with Fraudulent Registrants

**Message:**

---

Afilias released 17022 names in the .INFO Landrush 2, however the same People who registered these 17022 FRAUDULENT SUNRISE Names, continue to own another 14000+ names which have NOT been challenged by Afilias (The numbers may not be exact - check inaccuracies section on online report)

For instance lets take the LARGEST Fraudulent Domain Registrant - Plankenstein, who had fraudulently registered 4938 .INFO Domains in the Sunrise period. Plankenstein still continues to own approximately 140 Sunrise domains after the Afilias Landrush is over. Check the whois on alava.info, aragon.info, avila.info etc.

Visit http://dotinfo.directi.com for the complete research (an interesting study born out of one night of insomnia and boredom)

A far more smarter FRAUD which has gone undetected is that of domain@se.euro909.com. In the .INFO Sunrise this email address had registered 663 .INFO NAMES. After the Afilias Challenge the same email address continues to hold 646 UNCHALLENGED names. Check the whois on accelerator.info, airwear.info, findus.info. Notice that very smartly this person has put in DIFFERENT Registrants for each domain name, however the FUNNY part is that EVERY DOMAIN NAME has a trademark date of 2000-10-01 and all the Registrants share the same email address (oh yea and all of them have a funny phone number too).

Check out the Complete list at http://dotinfo.directi.com

Best Regards
Bhavin Turakhia
CEO
Directi
Email: bhavin.t@directi.com
Tel: 91-22-6370256 (4 lines)
Fax: 91-22-6370255
http://www.directi.com

---

**Link:** 14000+ .INFO names still with Fraudulent Registrants

Enter password to delete your message:          [ Delete! ]
(You can only delete your own messages)

**Appendix 14**

**Post of Afilias**

**Response to Speculation**

**To**

**ICANN New TLD Evaluation Process Forum**

**August 7, 2001**

Return to New TLD Agreements Forum - **Message Thread** - Post a Reply - Collate Replies - FAQ

**Username:** Afilias
**Date/Time:** Tue, August 7, 2001 at 5:36 AM GMT
  **Browser:** Microsoft Internet Explorer V5.5 using Windows NT 5.0
  **Subject:** AFILIAS responds to speculation

**Message:**

_____

There has been some speculation circulating over the last few days regarding Afilias WHOIS and registrations made during the Sunrise Period. Afilias would like to take this opportunity to clarify any confusion that may have occurred.

First, Afilias has successfully begun its Sunrise Period, which allows trademark and service mark holders around the world the opportunity to register their marks before the opening of registration to the general public. Many companies have already identified this window as a strategic opportunity to secure their marks in a new Internet space.

As part of the Sunrise Period, Afilias has specifically limited registration to trademark and service mark holders only by requiring specific information about the mark to be registered. This includes the mark in ASCII equivalent text that exactly matches the mark, the country and date of registration, and the registration number.

While Afilias has committed to providing the most comprehensive protection for trademark holders it can, given the number of trademark jurisdictions around the world it is simply not possible to validate all of the information in each of these restrictive fields and maintain a competitive pricing structure. This aspect of the process has been clear since Afilias submitted its application to ICANN in October 2000.

Therefore, as part of the policy developed to restrict cybersquatting in the rollout of .INFO, Afilias has also created a Sunrise Challenge policy jointly with one of the most respected dispute resolution providers around the globe the World Intellectual Property Organization (WIPO). (Note: Background on the Sunrise Period and the Sunrise Challenge Process is available at http://www.afilias.info/download/fact-sheets/sunrise-fact-sheet.html)

We feel that this challenge policy incorporates additional protection for trademark holders by providing any third party the opportunity to challenge a registration made during the Sunrise Period should it not meet the registration restrictions. This expedited process opens the battle against cybersquatting to every interested Internet user and significantly lowers the fee that a trademark holder would traditionally pay in order to obtain a domain name back through a UDRP proceeding or prevent a fraudulent registration.

This is the first time in the history of the domain name system (DNS) that

anyone has accepted and processed applications using a Sunrise mechanism to limit cybersquatting. With this in mind, no process is perfect. Afilias is committed to thoroughly examining its process to learn and evaluate the system so that it may be even more useful in the rollout of additional top-level domains (TLDs).

To address the publishing of the WHOIS - Afilias☐ WHOIS was prematurely published before the processing of the first queue was complete. In order to ensure that the system ran accurately during the first queue, Afilias closed immediate access to the WHOIS.

Afilias has now successfully processed its first two queues of Sunrise Registrations and has opened its WHOIS service which is available at http://www.afilias.info/whois/

Afilias welcomes comments and questions to be sent to info@afilias.info.

Best regards,
Afilias
The .INFO Registry
http://www.afilias.info

---

Enter password to delete your message:                    Delete!
(You can only delete your own messages)

---

# Message Thread:

- AFILIAS responds to speculation — Afilias, August 7, 2001 @ 5:36 AM (4/5)
  - Will Afilias stop aiding cybersquaters? — Elvis, August 10, 2001 @ 1:56 AM (0/0)
  - The best solution? — saskia, August 7, 2001 @ 6:38 PM (0/0)
  - .info rollout update — dtobias, August 7, 2001 @ 5:03 PM (0/0)
  - I would like to believe it but ................... — onmove, August 7, 2001 @ 6:46 AM (1/1)
    - Validation — Garry Anderson, August 7, 2001 @ 12:52 AM (0/0)

**Appendix 15**

**Post of Robert F. Connelly**

**President, PSI-Japan**

**To**

**ICANN DNSO Mailing List**

**September 8, 2001**

*ICANN/DNSO*

<u>DNSO Mailling lists archives</u>

# [registrars]

## [registrars] Re: [Registrars] Registrar access to Afilias Sunrise Abbreviated Zone Files

- *To*: Registrar Constituency <<u>registrars@dnso.org</u>>
- *Subject*: [registrars] Re: [Registrars] Registrar access to Afilias Sunrise Abbreviated Zone Files
- *From*: "Robert F. Connelly" <<u>rconnell@psi-japan.com</u>>
- *Date*: Sat, 08 Sep 2001 07:22:31 +0900
- *Cc*: Vint Cerf <<u>vcerf@mci.net</u>>, "Louis L. Touton" <<u>touton@icann.org</u>>, "Andrew McLaughlin" <<u>mclaughlin@pobox.com</u>>, Dan Halloran <<u>halloran@icann.org</u>>, "M. Stuart Lynn" <<u>lynn@icann.org</u>>, Duane Connelly <<u>duane@psi-japan.co.jp</u>>, Afilias <<u>members@afilias.info</u>>
- *Sender*: <u>owner-registrars@dnso.org</u>

```
At 03:44 PM 9/7/01 -0400, Tech Support wrote:
>Afilias is making available to all interested Afilias-Authorized
Registrars
>an abbreviated Zone file, which will provide a list of names that were
>awarded during the Sunrise period.
>
>In order to get access to this file, please sign and return to my
attention,
>as soon as possible, the Zone File Access Agreement that is attached
to this
>email.  You can fax a signed copy to +1-215-504-1758.

Dear Colleagues:

Isn't it interesting, 30 hours after I announced my intention to sell
our company, here comes the Zone file agreement, like Minerva sprung
forth full blown from the head of Apollo;-(

I was promised this agreement on 14 August 2001.  I lowered the boom 30
hours ago after waiting 23 days.  Now, here it is.

Management of Afilias is out of control.

Yesterday, Management presented a set of Resolutions to the Directors.
I did not receive the teleconference link and missed the meeting.

One of the resolutions indicated that Management has already created a
new company, Afilias USA, Inc.  As far as I know, Directors and Members
of Afilias were not informed of the formation of this new company.  I
have no idea of why it was formed.  However, the resolutions asked the
Directors to approve the list of Directors of Afilias USA, Inc.  They
were to be (perhaps already are) the CEO, CTO and CMO of Afilias
Limited.
```

It seems to me that Afilias Management is overstepping its authority under Irish Law.  I'm handicapped by not having a good Irish attorney here in Japan.

All for now.

Regards, BobC

# Appendix 16

## Post of Bhavin Turakhia

## CEO, Directi

## To

## ICANN DNSO Mailing List

## August 7, 2001

*ICANN/DNSO*

<u>DNSO Mailling lists archives</u>

# [registrars]

## [registrars] DEFECTIVE Sunrise Queue parsing by Afilias – My Observations

- *To*: <<u>info@afilias.info</u>>
- *Subject*: [registrars] DEFECTIVE Sunrise Queue parsing by Afilias - My Observations
- *From*: "Bhavin Turakhia" <<u>bhavin.t@directi.com</u>>
- *Date*: Tue, 7 Aug 2001 22:19:35 +0530
- *Cc*: <<u>trademark@afilias.info</u>>, "<u>Registrars@Dnso.</u> Org" <<u>registrars@dnso.org</u>>, "Divyank Turakhia" <<u>divyank.t@directi.com</u>>, "All. <u>Internal@Lists.</u> Directi. Com" <<u>all.internal@lists.directi.com</u>>, "Michael D Palage" <<u>michael@palage.com</u>>, "Dan Halloran" <<u>halloran@icann.org</u>>, "M. Stuart Lynn" <<u>lynn@icann.org</u>>, "Gary Korn" <<u>GaryKorn@aol.com</u>>, "Fernando Espana" <<u>Fernando.Espana@NeuLevel.com</u>>, <<u>ebrown@bulkregister.com</u>>, "Cameron Powell" <<u>CameronP@Snapnames.com</u>>, <<u>enoss@tucows.com</u>>, <<u>matt.stearn@enom.com</u>>, <<u>rick@ar.com</u>>, "<u>Jarle@Walid.</u> Com" <<u>jarle@walid.com</u>>, <<u>paul.perrett@melbourneit.com.au</u>>, <<u>jkane@cscinfo.com</u>>, "Don Mason" <<u>DMason@verisign.com</u>>, <<u>marketing@gbakel.com</u>>, <<u>atsai@gnr.com</u>>, <<u>registrars@verisign-grs.com</u>>, <<u>Registrar-finance@afilias.info</u>>, <<u>human@nameengine.com</u>>, "Antony Van Couvering" <<u>avc@nameengine.com</u>>, <<u>jais@cnet.com</u>>, <<u>robertl@cnet.com</u>>, <<u>rlaplante@afilias.info</u>>, <<u>tips@wired.com</u>>
- *Importance*: Normal

*Sender*: owner-registrars@dnso.org

In the past 24 hours I believe Afilias Staff has had little sleep thanks to thousands of calls Afilias has been inundated with and for good reason. The entire purpose of the sunrise queue, which was to protect Trademarked domain owners, has been misutilised due to gross negligence on the part of Afilias in processing these applications. Some observations that I have made in the past 24 hours having done Whois after whois on various Domain Names

===============

MY OBSERVATIONS

===============

1. Out of every RANDOM generic word i did whois queries on - more than 4/5 were OBVIOUSLY fradulent trademarks - some of these i list below

Domain Name: bank.info
Created On: 2001-07-31 20:43:58.0 GMT
Expiration Date: 2006-07-31 20:43:58.0 GMT
Trademark Name: DAvinder Singh
Trademark Date: 2001-01-01
Trademark Country: US
Trademark Number: us123456789
Sponsoring Registrar: 5027-BR
Registrant Name: David Singh


* NOTE THE TRADEMARK NAME AND DATE NUMBER ABV

Domain Name: books.info
Created On: 2001-07-31 19:46:33.0 GMT
Expiration Date: 2006-07-31 19:46:33.0 GMT
Trademark Name: pro-consul, Inc
Trademark Date: 2001-01-01
Trademark Country: US
Trademark Number: US1597351
Sponsoring Registrar: 5027-BR
Registrant Name: David Singh


* NOTE THE TRADEMARK NAME AND DATE ABV

Domain Name: analsex.info
Created On: 2001-07-30 20:22:25.0 GMT
Expiration Date: 2006-07-30 20:22:25.0 GMT
Trademark Name: Sandip Singh Sandhu
Trademark Date: 1999-11-09
Trademark Country: MA
Trademark Number: 75913
Sponsoring Registrar: 5005-OD


* NOTE THE TRADEMARK NAME ABV

Domain Name: newyork.info

Created On: 2001-07-31 20:52:23.0 GMT
Expiration Date: 2006-07-31 20:52:23.0 GMT
Trademark Name: newyork
Trademark Date: 2000-10-01
Trademark Country: US
Trademark Number: e.g. 12345
Sponsoring Registrar: 5117-NS

* NOTE THE TRADEMARK NUMBER ABV

Domain Name: family.info
Created On: 2001-07-31 21:24:50.0 GMT
Expiration Date: 2006-07-31 21:24:50.0 GMT
Trademark Name: none
Trademark Date: 2001-07-30
Trademark Country: US
Trademark Number: none

* DO I NEED TO SAY ANYTHING FOR THIS ONE??

2. I challenge anyone to achieve greater than 1/10 ratio in searching for generic names that are available. seems like EVERY generic name in the world is booked under trademarks

3. Every state i can think of and country i can think of seems to be trademarked (which i thought was not possible)

4. Afilias could have easily prevented a large percentage of these by enforcing the various rules they had set

* Trademarked name should be similar to domain name
* Trademarked date should before Oct 2000
* Trademark number should be unique in same country

5. As of right now the only solution that Afilias offers is the so called sunrise challenge process, which for some funny twisted reason involves both the challenger and the challengee paying $295 each. Which means thousands and thousands of these squatters who have gained these domains by direct fraud will actually get away with it since the cost of challenging them

itself is expensive and another revenue opportunity for WIPO/afilias rather than a resolution measure

6. I agree that Afilias cannot track down trademarks from various countries but they should atleast have had a standard enforcement preventing names with crap trademark data such as abv. all the abv could be parsed as wrong data by any simple two bit computer code

7. I want to further analyse why afilias didnt do the abv parsing and enforce the basic rules they had themselves laid out. i cannot hint of a motive, dont want to either but think of this - afilias gets 5 YEAR REG fee for each sunrise name. So what if they are fraud names. thats 5 years of revenue in their pockets. add to tht that these names will be disputed soon. that adds the dispute fee to this. now once the domain is dropped it would be picked up again by someone, which adds another 2 year reg fee to it. So by not parsing the trademarked info afilias has managed to make extra money rather than losing out

8. Lets also give Afilias a benefit of doubt when they tell me that they had decided not to ensure a check for any of the trademark info. However that is not true. incidentally the only one TRADEMARK field that is checked for validity is the COUNTRY FIELD. SO WHY DID THEY PUT A CHECK ON THE TRADEMARK country field and ensure that it was valid, but DID NOT CHECK the date validity or the trademark name validity or the trademark NUMBER validity? if one of the fields was checked so should the others have been. however the country field is theonly one that does not make a difference to those committing fraud. the other fields do and those were the exact fields not validated by the afilias registry.

9. lets also consider the difficulty of implementing the automated checks. all afilias had to do was make sure that

(a) the trademarked name was same as the domain name. so in the abv bank.info case i showed it would show up as an obvious fraud

(b) the trademark date was less than oct 2000. So it would immediately eliminate those domains which were wrongly registered with dates

(c) the trademark number was a number

(d) no two trademark numbers from the same country were same - if they were those domains would be put on special hold

All of the above could be easily achieved in less than 5 minutes of programming.

10. Lets now for a moment analyse that HAD AFILIAS done those checks, what difference would it have made to the whole process. I have a docment with me that shows 100 names which i picked totally randomly, of which over 25 are OBVIOUSLY WRONG. So what i am saying is by putting in TWO SIMPLE CHECKS afilias could have prevented 25% of the fradulent entries but chose not to

11. If they had done the duplicate trademark number check they would have elminated another 25-30% of the fraud most of the names i did a whois on show the same fradulent person trying to register various names using the same fradulent information

12. Had they done the other validity checks they would have further eliminated another 25-30% of the fraud

13. Out of those 100 domains over 33 are us registered marks. A simple HTTP GET request to TESS database hosted online shows most of them to be fradulent. So had afilias simply added this one more check to verify against the TESS query database it would elminate 33% of the fraud

14. Check this one out. Do a whois on careers, dating, divorce, entertainment and cosmetics.info. I have two of them below -

Domain Name: careers.info
Trademark Name: careers
Trademark Country: IL
Trademark Number: 153278563

Domain Name: dating.info
Trademark Name: dating
Trademark Country: IL
Trademark Number: 153278563

Notice that the trademark number, country, and person are same for the different trademarks. Isnt that a wonderful coincidence. I found all these names randomly - think of how many more the same person or others with this trick would have registered that i havent yet found.

15. Afilias never really publicised a system that would ward of fraudulent perpetrators. Infact their system encouraged fraud. Think of me as a fradulent registrant. What hav i got to lose. Afailias allows me to put any junk in the trademark info so i can go ahead and do that without any loss. If someone wants to challenge me they must fork out $295, so for a generic term which is noones company etc there would be few willing to fork out $295. at the end of it i could probably challenge myself and get the domain myself

==========================
MY PROPOSAL FOR RESOLUTION
==========================

* Afilias should stop processing any further queues

* Afilias should immediately remove all domains which have been fraudulently registered, and as a lesson probably not refund that amount so the end customer pays the price by trying the fraud

* Afilias should publicise the fact that fradulent registrants will pay dearly by losing their money. This infact was a less publicised fact. Infact what was more publicised, and which is what caused this issue in the first place was the fact that anyone can go ahead and get ANY domain with ANY CRAP info and noone can stop you and if someone does want to stop you THEY HAVE TO PAY $295 to do that.

* Afilias should make a easier zero cost system for reporting obvious fraud where trademark info is fraudulent

* Afilias should delay the Landrush until the above is resolved

Best Regards
Bhavin Turakhia
CEO
Directi
----------------------------
91-22-6372982/3276/0256/3332
http://www.directi.com

**Appendix 17**

**Copy of 'Trademark Certificate'**

**Issued by the 'Republic of Anodyne'**

**On March 8, 2000**

**In respect of**

**"Medical"**

# REPUBLIC OF ANODYNE

## DEPARTMENT OF INTELLECTUAL PROPERTY
## DIVISION OF TRADEMARKS

### Certificate of Trademark Registration

WORDMARK : **MEDICAL**

DATE FILED : March 3, 2000

TRADEMARK
REGISTRATION NUMBER : 113099

In accordance with international laws of the Republic Of Anodyne, the above mentioned mark is registered to the following entity for use in commerce.

REGISTERED TO : Greg Crane

         ... #116

         Scottsdale AZ 85254

         USA

GOODS OR
SERVICES : IC 42. Computer services, specifically providing a global computer network(s) information and advertising target users for specific interest to specific persons.

RESTRICTIONS : No claim is made ... of the marked word outside of the intended or actual use. Note that the marked word is not case sensitive ... specifically described.

IN WITNESS whereof the Division Of Trademarks has caused this Certificate to be signed by its duly authorized officer.

_____
Registrar

The information appearing on this certificate is exactly transcribed from information contained in the official records of the Division of Trademarks. If there is a mistake about any information herein, contact Republic Of Anodyne Embassy to North America, 8575 ... Fort Lauderdale FL 33356.