UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NUMBER  6:02-CV-1321-ORL-31KRS

JEFF DAVIES,

     Plaintiff,

vs.

INTERNET CORPORATION FOR
ASSIGNED NAMES AND NUMBERS
and AFILIAS LIMITED,

     Defendants.



---

## DEFENDANT'S MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12 OF THE FEDERAL RULES OF CIVIL PROCEDURE AND MEMORANDUM OF LAW

### INTRODUCTION

Plaintiff has sued the wrong defendant in the wrong jurisdiction, and all of his claims should be dismissed.  Plaintiff's Complaint alleges that he was improperly denied the right to register certain domain names and that the administrative proceedings he initiated to resolve his domain name disputes were unconstitutional.  Even if all this were true, which ICANN disputes, this Court does not have personal jurisdiction over ICANN, and ICANN is not properly a defendant in this case in all events.

In this Court, an assertion of personal jurisdiction over a non-resident must comport with Florida's long-arm statute as well as constitutional due process.  But in his 70 page, 136 paragraph thesis challenging the social and commercial value of trademark law, Plaintiff fails

to allege any material facts regarding ICANN's contacts with Florida.  In fact, ICANN's concurrently-filed affidavit shows that ICANN has no contacts with Florida that would justify the assertion of personal jurisdiction here.  The Complaint is further deficient in that venue in Florida is improper, Plaintiff has failed to allege any injury that is fairly traceable to ICANN, and Plaintiff fails to state a claim against ICANN.  For all these reasons, Plaintiff's entire Complaint should be dismissed.

### FACTUAL BACKGROUND[1]

<u>Background on ICANN</u>.  ICANN is a not-for-profit corporation that was formed under the laws of the State of California.  ICANN's principal office is located in Marina del Rey, California.  ICANN has no assets or real estate in Florida, is not registered to do business in Florida, does not solicit business in Florida, does not sell any goods or services in Florida, does not have a bank account in Florida, and does not have any employees in Florida.

The only plausible ICANN-Florida contact, Florida shares with the rest of the world. ICANN maintains several websites on the Internet that provide information regarding is Internet-coordination activities including the websites at http://www.icann.org, http://www.iana.org, and http://www.internic.net.  All of these websites are operated from web servers physically located in Los Angeles County, California.  The websites contain a wealth of information about ICANN, about the people who work for ICANN, and about the projects that ICANN has undertaken in connection with the Internet.  The websites also contain "links" to other information that is related to ICANN's activities.  ICANN does not offer anything for sale on its website; in fact, ICANN does not sell anything.

---

[1]  Unless otherwise indicated, the facts underlying this motion are set forth in the concurrently-filed affidavit of ICANN's Vice President, Secretary and General Counsel, Louis Touton ("Touton Aff.").

Background on the Domain Name System.  For the Internet to function effectively, each computer connected to the Internet must have a unique identifier, or address, so that information can be routed to and from that computer.  The unique identifiers used by Internet computers to route traffic and establish connections among themselves are lengthy numerical codes known as Internet Protocol (IP) numbers or addresses.  For example, the IP number for the computer that hosts the Middle District of Florida's Internet web site is 207.41.16.162.

Because Internet users cannot easily remember IP numbers, most commonly accessed Internet computers also have a unique, user-friendly address, called a "domain name," which corresponds to the computer's IP number.  As an example, the domain name for the Court's web-site computer is "www.flmd.uscourts.gov."  User-friendly domain names would be useless without an effective way to translate domain names to the IP numbers that computers use to communicate among themselves.  Such translation enables a user to access a website by typing the domain name rather than the IP number into a web browser.

Internet computers translate domain names to IP numbers by using the Domain Name System (DNS), which the Internet engineering community devised in the early 1980s.  By registering a domain name (which is done through registrars, not ICANN), one can obtain a contractual right for a period of time to have the DNS provide a given IP address in response to queries about the name.

Because the Internet arose primarily through research conducted or funded by the U.S. government, much of the DNS (including operation of the root–server system) historically was operated by government agencies or under agreements with them.  In 1997, however, the President directed the Secretary of Commerce to privatize the DNS.  ICANN has been recognized by the U.S. and other governments, as well as by technical standards-development bodies and other private-sector entities involved in the Internet's operation, as

Steel Hector & Davis LLP

the global consensus entity to coordinate technical management of the DNS. ICANN's mission is to coordinate the operation of the DNS based on policies that are developed by the diverse stakeholder communities of the global Internet through a broadly representative, bottom-up, consensus-based process. In November 1998, ICANN and the DOC entered into a Memorandum of Understanding (MOU) in which they agreed to work together to manage the transition from government control to private-sector control of the DNS.

The DNS uses a hierarchical naming system, with every domain name ending with a suffix, known as a "top-level domain" (TLD), appearing to the right of the last dot. Each TLD has a "registry" of so-called "second-level domain names" within it (for example, the .gov registry contains the name "uscourts"). Most of the TLDs correspond to the nations of the world, such as ".us" and ".uk", and are known as country-code top-level domains (ccTLDs). Other TLDs, such as ".com" and ".org", are known as generic or global top-level domains (gTLDs). Until recently, there were only seven gTLDs, and only three of these (.com, .net, and .org) were generally available to public registrations. After a lengthy process (described in more detail in the concurrently-filed Touton Affidavit), and based on input received from the Internet community, the ICANN Board of Directors voted on November 16, 2000 to select seven proposals for the creation of new TLDs: .aero; .biz; .coop; .info; .museum; .name; and .pro.

Registry Agreement Between ICANN and Afilias. After selecting the new TLDs, ICANN entered into negotiations with Afilias Limited ("Afilias") for the management of the .info TLD. On May 11, 2001, ICANN and Afilias entered into a registry agreement (the "Registry Agreement") under which Afilias would operate the .info TLD. Pursuant to a recommendation from the ICANN Governmental Advisory Committee (a committee of governments, of which the United States is a member, responsible for advising on the

activities of ICANN as they relate to laws and international agreements or where they may affect public policy issues), in its selection of new TLDs ICANN considered the extent to which the procedures proposed by the applicants would adequately protect existing intellectual property rights. The selected TLD applications protected intellectual property rights through various means.

Afilias' initial registration phase to address trademark and other intellectual property claims with respect to specific .info domain names was called a "Sunrise Period." (Other TLDs used different mechanisms.) During the Afilias Sunrise Period, owners of any current (non-expired) trademark or service mark registration having national effect that issued prior to October 2, 2000, were eligible to register a domain name that was identical to the textual or word elements of such trademark or service mark. By recognizing intellectual property rights in this manner, the Afilias Sunrise Period was designed to avoid the disruption that would result from registered trademark owners being required to bring a potentially large number of legal proceedings about registered trademarks that were abusively registered by cybersquatters in an initial "landrush" for domain names. Afilias, in partnership with the dispute-resolution provider World Intellectual Property Organization (WIPO), also implemented a "Sunrise Challenge" process to challenge Sunrise Registrations made without a qualifying trademark registration.

It was not ICANN's role to implement the Sunrise Period or Sunrise Challenge Rules or Policy (collectively referred to herein as the "Sunrise Policy"); that implementation was done by Afilias, the registrars with which it contracted, and WIPO. Afilias incorporated the Sunrise Challenge Rules and Policy into its contracts with its registrars; its registrars have incorporated the Sunrise Challenge Rules and Policy into their contracts with domain name

registrants, such as Plaintiff; and WIPO followed the Sunrise Challenge Rules and Policy in its administration of Sunrise Challenge disputes.

Plaintiff's Complaint.  While it is extremely difficult to summarize Plaintiff's 70 page Complaint, Plaintiff complains about the use of this "Sunrise Policy" during the registration of domain names for the .info TLD.  Plaintiff alleges that under the Sunrise Policy, trademark holders were given a period of 30 days within which to submit their requests for domain names in the .info TLD before applications for the domain names were accepted from the general public.  (Complaint ("Comp.") at ¶ 56.)  Sunrise registrations could be challenged during a subsequent 120-day challenge period.  (*Id.*).  Plaintiff further alleges that upon a successful challenge to a domain name, the challenger could request the transfer of the domain name.  (*Id.*).

Plaintiff also alleges that he did not own any trademarks.  (*Id.* at ¶ 59.)  For this reason, he did not request any domain names until after the Sunrise period.  (*Id.*)  Plaintiff later applied for certain domain names on the .info TLD, but he learned that the names had already been selected by others during the Sunrise period.  Nevertheless, Plaintiff challenged the names registered during the Sunrise period through an administrative process set up by the World Intellectual Property Organization ("WIPO") pursuant to Afilias' rules.  (*Id.* at ¶ 61.)  Plaintiff alleges that he was successful in all of his challenges and was provided with transfer authorizations for the domain names.  (*Id.* at ¶ 62.)

In his Complaint, Plaintiff has identified four injuries he allegedly suffered.  First, Plaintiff has alleged that as a result of the Sunrise Policy, "he was not able to register any of the names he had applied for."  (*Id.* at ¶ 59.)  Second, Plaintiff has alleged that he was then "forced" to "pay in excess of $8,000 in order to challenge improperly registered domain names that Afilias, in full knowledge that they were invalid, first accepted for registration

and then refused to take proper action under its own policies to cancel." (*Id.* at ¶ 101.)

Third, despite the fact that Afilias did not question any of Plaintiff's domain name registrations, Afilias has not "unlocked" any of Plaintiff's registrations, which means the registrations cannot be used by Plaintiff. (*Id.* at ¶¶ 69-70.) Fourth, Plaintiff alleges that his "inability—under Afilias' policy—to challenge WIPO's jurisdiction and represent his interests or be represented by legal counsel is a denial of due process." (*Id.* at ¶ 115.)

It is on these allegations that Plaintiff sued ICANN in the Middle District of Florida.

**I.**     **PLAINTIFF'S COMPLAINT AGAINST ICANN SHOULD BE DISMISSED UNDER RULE 12(b)(2) FOR A LACK OF PERSONAL JURISDICTION.**

In order to determine whether personal jurisdiction over ICANN exists in Florida, this Court must undertake a two-part analysis. First, this Court must determine whether the Florida long-arm statute provides a basis for personal jurisdiction. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996). If Florida's long-arm statute is satisfied, then this Court must determine whether sufficient minimum contacts exist between ICANN and Florida so as to satisfy "traditional notions of fair play and substantial justice" under the Due Process Clause. *Id. quoting International Shoe v. Washington*, 326 U.S. 310, 316 (1945). It is Plaintiff's burden to plead sufficient material facts in its Complaint to establish a basis for the exercise of personal jurisdiction. *See Future Technology Today, Inc. v. OSF Healthcare Systems*, 218 F.3d 1247, 1249 (11th Cir. 2000). Defendant may challenge personal jurisdiction through affidavits, testimony or documents. *Jet Charter Service, Inc. v. Koeck*, 907 F.2d 1110, 1112 (11th Cir. 1990); *see Sculptchair*, 94 F.3d at 627.

Here, Plaintiff has not alleged sufficient material facts to support personal jurisdiction over ICANN in Florida under either the long-arm statute or the Due Process Clause. Indeed,

7

Plaintiff has made *no* specific factual allegations regarding personal jurisdiction. (Comp. at ¶4).

### A.    Plaintiff Has Not Satisfied Florida's Long-Arm Statute And ICANN Has Established That He Cannot.

"Since the extent of the long-arm statute is governed by state law, federal courts are required to construe it as would the Florida Supreme Court." *Cable/Home Communication v. Network Products*, 795 F.2d 968, 970 (11th Cir. 1986). And Florida courts have held that "Florida's long-arm statute is to be strictly construed." *Sculptchair*, 94 F.3d at 627; *see also Thomas Jefferson University v. Romer*, 710 So. 2d 67, 71 (Fla. Ct. App. 1998).

Plaintiff's Complaint fails to invoke any provision of Florida's long-arm statute. What is more, the statute *cannot* be satisfied because ICANN has not undertaken any of the activities enumerated in the statute. At best, the activities alleged in Plaintiff's Complaint may (but actually do not) implicate only three provisions of Florida's long-arm statute. These three provisions of the long-arm statute may subject a nonresident defendant to Florida jurisdiction if the plaintiff's cause of action arises from the defendant's: (1) operation of a business within the state; (2) tortious acts within the state; or (3) causing of injury to person or property within the state. Fla. Stat. § 48.193(1)(a), (b), and (f).

### 1.    ICANN Does Not "Carry On" Business In Florida.

Section (1)(a) of Florida's long-arm statute subjects a defendant to jurisdiction if it carries on business in Florida. Fla. Stat. §48.193(1)(a). "In order to establish that a defendant is 'carrying on business' for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the State for pecuniary benefit." *Future Technology Today*, 219 F.3d at 1249.

8

Plaintiff has failed to allege that ICANN has conducted any such business activity in Florida, and ICANN's evidence establishes the exact opposite.  ICANN is a not-for-profit California corporation with its principal place of business in California.  (Touton Aff. at ¶ 3.) ICANN has no employees, offices or agents in Florida.  (*Id.* at ¶ 4.)  ICANN holds no business licenses in Florida.  (*Id.*)  ICANN does not service any customers or clients in Florida.  (*Id.*)  On similar facts, the Eleventh Circuit found that it lacked personal jurisdiction over a group of defendants under Florida's long-arm statute because the defendants did not manufacture, sell or solicit orders for products in Florida and they did not maintain offices or agents in the State.  *See Sculptchair,* 94 F.3d at 627-28; *see also Response Reward Systems, L.C. v. Meijer Inc.,* 189 F. Supp.2d 1332, 1336 (M.D. Fla. 2002) (ruling that the defendant did not operate a business in Florida because it "has no employees, officers, property, telephone number of mailing address in Florida.").  The result should be no different here.

Plaintiff may argue that ICANN conducts business in Florida because it maintains a passive Internet website that can be viewed by Florida residents if they so chose.  But the Middle District of Florida has already held that the maintenance of a passive website, such as ICANN's, does not constitute operating a business for the purposes of the long-arm statute. *See Precision Software Services v. Fortune Financial Systems, Inc.,* 1998 U.S. Dist. LEXIS 22068, *15 (M.D. Fla. 1998) (posting advertisements on the internet that are viewed by Florida residents is "too tangential to support an assertion of personal jurisdiction" and does not constitute the operation of a business in Florida); *see also Economic Solutions, Inc. v. ICANN,* Case No. 4:00CV01785DJS (E.D. Miss. 2001) (attached as Ex. A to Touton Aff.).

    **2.**    **ICANN Has Not Committed A Tort Within The State.**

Steel Hector & Davis LLP

Section (1)(b) of Florida's long-arm statute subjects a nonresident defendant to jurisdiction if the defendant has committed "a tortious act within this State." Fla. Stat. §48.193(1)(b). Section (1)(b) is not applicable here.

To utilize the tort prong of Florida's long-arm statute, not only must Plaintiff sufficiently state a tort claim against ICANN, but Plaintiff must establish that the alleged tort arose from ICANN's contacts with Florida. *See Wendt v. Horowitz*, 822 So.2d 1252, 1260 (S. Ct. Fla. 2002); *see also Miami Breakers Soccer Club, Inc. v. Women's United Soccer Assoc.*, 140 F. Supp. 2d 1325, 1329-30 (S.D. Fla. 2001). Plaintiff has done neither. First, Plaintiff has not alleged that ICANN committed a tort. Second, Plaintiff has failed to state any claim against ICANN because ICANN has caused no injury to Plaintiff. *See supra* Section III. Third, as to ICANN's California website, Plaintiff has not alleged, and cannot allege, that any of his purported causes of action arose out of ICANN's website. As such, Plaintiff cannot utilize Section (1)(b) of Florida's long-arm statute to secure Florida jurisdiction over ICANN. *See Miami Breakers Soccer Club*, 140 F. Supp. 2d at 1329-30 (ruling that section (1)(b) was inapplicable because plaintiffs' tort claims did not arise from the defendants' passive website accessible in Florida).

### 3.     ICANN Has Not Caused Injury to Persons or Property in Florida.

Section (1)(f) of Florida's long-arm statute subjects a nonresident defendant to jurisdiction in Florida if the defendant caused injury to persons or property in Florida. *See* Fla. Stat. § 48.193(1)(f). But, here too, it is clear that the section is inapplicable.

It is well-settled in Florida that Section (1)(f) "does not permit jurisdiction over nonresidents for acts arising outside the State that cause financial injury within the State, in the absence of ***personal injury or property damage***." *Response Reward Systems*, 189 F. Supp. 2d at 1337 (ruling that Section (1)(f) was inapplicable because the plaintiff alleged

only patent infringement, not personal injury or property damage) (emphasis added); *see Aetna Life & Casualty Co. v. Therm-o-Disc, Inc.*, 511 So.2d 992, 994 (S. Ct. Fla. 1987) ("We hold that the provisions of Section 48.193(1)(f) contemplate personal injury or physical property damage."); *Sculptchair*, 94 F.3d at 629 ("It is well-established, however, that mere economic injury without accompanying personal injury or property injury does not confer personal jurisdiction over nonresident defendants under Section 48.193(1)(f)."). Because Plaintiff has not alleged that ICANN caused him any physical injury or that ICANN damaged his physical property, Section (1)(f) is inapplicable.

In sum, Plaintiff has not alleged facts sufficient to satisfy Florida's long-arm statute. Indeed, Plaintiff has not even identified which subsection of Florida's long-arm statute allegedly confers jurisdiction over ICANN, and, in fact, no subsection does. Without going any further, this Court therefore has sufficient justification to dismiss Plaintiff's entire Complaint against ICANN for want of personal jurisdiction under Florida's long-arm statute.

**B.      Plaintiff Has Not Satisfied The Due Process Clause And ICANN Has Established That He Cannot.**

If the Court finds it necessary to go beyond analysis of Florida's long-arm statute, the Due Process Clause of the Fourteenth Amendment provides further justification to dismiss Plaintiff's claims against ICANN.  Plaintiff has not alleged sufficient material facts to establish that Florida jurisdiction over ICANN comports with due process and ICANN has shown that Plaintiff cannot.

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985).  Due process requires two elements be established: (1) the defendant must have certain "minimum

contacts" with the forum-state; and (2) the maintenance of the suit must not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"Minimum Contacts within the forum may give rise to two types of personal jurisdiction:  specific or general jurisdiction." *Response Reward Systems*, 189 F. Supp. at 1338; *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). To assert general jurisdiction, Plaintiff must establish that ICANN has "continuous and systematic" contacts with Florida. *Sea Lift, Inc. v. Retinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 992 (11th Cir. 1986).  Specific jurisdiction, on the other hand, can be exercised when the suit arises out of a party's contacts with the forum-state. *See Helicopteros*, 466 U.S. at 414.

The Eleventh Circuit employs a three-part test for determining whether "minimum contacts" sufficient to support specific personal jurisdiction exist:  (1) the defendant's contacts with Florida must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the State; (2) the defendant's contacts with the State must give rise to the plaintiff's cause of action; and (3) the defendant's contacts with the State must be such that the defendant should reasonably anticipate being haled into court there.  *See Future Technology Today*, 218 F.3d at 1250-51; *Miami Breakers Soccer Club*, 140 F. Supp. 2d at 1330.  "The touchstone of sufficient contacts is that the defendant 'purposefully directed' its activities at residents of the forum-state." *JB Oxford Holdings, Inc. v. Net Trade, Inc.*, 76 F. Supp. 2d 1363, 1366 (M.D. Fla. 1999); *see Burger King*, 471 U.S. at 472-73; *Response Reward Systems*, 189 F. Supp. 2d at 1338 (finding no specific personal jurisdiction because the defendant's activities could not be considered to be "purposefully directed to the State of Florida.").

Plaintiff has not alleged, and cannot offer material facts establishing, that ICANN has sufficient contacts with Florida to support either general or specific personal jurisdiction. Moreover, any exercise of jurisdiction over ICANN offends traditional notions of fair play and substantial justice.

### 1.   General Jurisdiction Over ICANN Does Not Exist.

Plaintiff has failed to allege, and simply cannot establish in the face of ICANN's evidence, that ICANN has "continuous and systematic" contacts with Florida. (Touton Aff. at ¶¶ 3, 4.) The only arguable Florida contact attributable to ICANN is its maintenance (in California) of a passive website. But the Circuits that have addressed this issue have all held that a nonresident defendant's maintenance of a passive website is not sufficient to justify general jurisdiction. *See Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir. 2002) (ruling that the fact that the defendant "maintains a website that is accessible to anyone over the Internet is insufficient to justify general jurisdiction); *see also Soma Medical International v. Standard Chartered Bank*, 196 F.3d 1292, 1297 (10th Cir. 1999); *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 715 (4th Cir. 2002).

### 2.   Specific Jurisdiction Over ICANN Does Not Exist.

Plaintiff states, in the venue portion of his Complaint, that he "has been damaged by actions taken by the defendants specifically aimed at the Plaintiff in Florida such that they should have reasonably expected to be held accountable in the Florida Courts." (Comp. at ¶5(d).) It appears that Plaintiff is attempting to allege that ICANN undertook some policy—presumably, the Sunrise Policy—for the purpose of injuring Plaintiff. This conclusory allegation, unsupported by any factual allegations, is not sufficient to support a finding of purposeful availment.

First, to claim that ICANN targeted Plaintiff by implementing the Sunrise Policy, Plaintiff must at least allege that ICANN knew Plaintiff existed. But the Complaint does not speak of any relationship between ICANN and Plaintiff. It is therefore hard to imagine how ICANN could have targeted Plaintiff.[2] Second, Plaintiff must at least allege that ICANN is the entity that actually implemented the policy, but he has not. The Complaint is replete with occasions on which Plaintiff alleges that Afilias, not ICANN, is the entity that implemented the Sunrise Policy. Third, it is clear from the Complaint that Plaintiff became involved with the Sunrise Policy long after it was established. Thus, it is extremely difficult to understand how ICANN could have targeted Plaintiff with a policy that was in effect long before Plaintiff appeared on the radar screen.[3]

### 3.    An Exercise of Jurisdiction Over ICANN Offends Traditional Notions of Fair Play and Substantial Justice.

Even if Plaintiff could somehow establish that ICANN has minimum contacts with Florida, Plaintiff's Complaint should nevertheless be dismissed because the exercise of

---

[2] And, in any event, virtually every jurisdiction has held the mere knowledge that a plaintiff would be injured in the forum-state is not sufficient to establish the requisite express aiming or targeting for personal jurisdiction. *See Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999) ("Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts towards the forum."); *see also Noonan v. Winston Co.*, 135 F.3d 85, 91 (1st Cir. 1998); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir.); *Hicklin Engineering, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir. 1992); *Bancroft & Masters, Inc. v. Augusta National, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000); *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995). Thus, even if Plaintiff could establish that ICANN knew Plaintiff would suffer an injury from the Sunrise Policy, this would not establish that he was "targeted" by that Policy or by ICANN in particular.

[3] Again, plaintiff has not alleged that ICANN's maintenance of a passive internet website confers specific jurisdiction over ICANN, perhaps because courts have held otherwise. *See JB Oxford Holdings*, 76 F. Supp. 2d at 1367 (ruling that specific personal jurisdiction requires "contacts that tie the defendant to a particular state, not those that merely link with equal strength the defendant to all states."); *see also Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419-20 (9th Cir. 1997).

jurisdiction in Florida does not comport with traditional notions of "fair play and substantial justice." The factors considered in this fairness inquiry include: (1) the burden on ICANN; (2) Florida's interest in adjudicating the dispute; (3) Plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Future Technology Today*, 218 F.3d at 1251. On balance, these factors demand dismissal of this action.

First, the broad policy and burden considerations suggest that the burden on ICANN in defending a lawsuit in Florida would be great. ICANN is a not-for-profit California corporation with its principal place of business in California. ICANN has no offices or employees in Florida; it would therefore have to travel to Florida and bear the cost of transporting its documents and witnesses to Florida in order to defend this lawsuit. *See Miami Breakers Soccer Club*, 140 F. Supp. at 1331 (finding the exercise of jurisdiction in Florida to be unreasonable because "the burden is greater on Defendants who are located in New York and Boston than on the Plaintiff who is located in Florida for adjudication of this case."). Second, any interest Plaintiff may have "in obtaining convenient and effective relief is always present" and should not be given great weight by this Court. *See Future Technology Today*, 218 F.3d at 1251 (dismissing an action despite the Florida-Plaintiff's interests because the due process considerations of "fair play prevent the action from going forward in this court.") Finally, ICANN's passive website is not enough to give Florida a significant interest in adjudicating this matter. "If that were the case, the State of Florida would have interest in virtually every lawsuit that arose from an internet site, a fact that would go against the interests of the interstate judicial system and the fundamental

substantive social policies of the states." *Response Reward Systems*, 189 F. Supp. 2d at 1339
(dismissing an action because due process was not satisfied).

Plaintiff has not alleged any facts sufficient to satisfy the Due Process Clause.
ICANN has established that it has no meaningful contacts with Florida and that the exercise
of Florida jurisdiction over ICANN would be unreasonable. This Court therefore has more
than ample justification to dismiss Plaintiff's Complaint against ICANN for want of personal
jurisdiction under the Due Process Clause.

## II.   PLAINTIFF'S COMPLAINT AGAINST ICANN SHOULD BE DISMISSED UNDER RULE 12(b)(3) FOR IMPROPER VENUE.

The Court should dismiss Plaintiff's Complaint against ICANN on the additional,
independent ground that venue is improper under Rule 12(b)(3) of the Federal Rules of Civil
Procedure. *See* Fed. R. Civ. P. 12(b)(3); 28 U.S.C. § 1406(a). Like jurisdiction, Plaintiff
bears the burden of establishing that his claims are brought in the proper judicial district. *See*
*Burger King Corp. v. Thomas*, 755 F. Supp. 1026, 1028 (S.D. Fla. 1991). Plaintiff's attempt
at meeting this burden fails.

Plaintiff asserts that a "substantial portion" of the "events giving rise to this action"
occurred in this District and "material contracts that form the basis of this action" were
entered into in this district. (Comp. ¶ 5 (b), (c)). The allegations of the Complaint make
clear, however, that a substantial part of the events giving rise to Plaintiff's claims—the
creation of the Sunrise Policy—did not occur in Florida, but occurred at least in part in
California, where the Plaintiff alleges the policy was discussed and debated. Moreover,
ICANN has not entered into any contract with Plaintiff, much less a contract in this District.

Other than Plaintiff's residence, this case has nothing to do with this District and should therefore be dismissed for a lack of venue under Rule 12(b)(3).[4]

In the alternative, if the Court declines to dismiss this action, ICANN moves for a change of venue and requests that the Court transfer this case to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a), which provides: "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court or division where it might have been brought." 28 U.S.C. § 1404(a). The purpose of § 1404(a) is "to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

Here, the convenience of the parties and witnesses favors transfer to the Central District of California. ICANN resides in the Central District of California. Plaintiff's allegations suggest that he may wish to depose ICANN employees. These employees work in Marina del Rey, California. No foreseeable witnesses reside in Florida, other than Plaintiff. Further, the interests of justice would be served by transferring this action to

---

[4] Plaintiff also claims that ICANN has consented to venue in the Middle District of Florida under the Uniform Dispute Resolution Policy ("UDRP"). (Comp. at ¶ 5 (e)). This is wrong. First, as plaintiff admits, the UDRP, a dispute resolution mechanism, is only applicable to claims brought by trademark holders against domain name registrants, not claims brought by registrants against ICANN. (Comp. at ¶ 11) (The UDRP "was adopted and made a condition of all domain name registrations. It provided that a trademark holder could bring proceedings before an administrative tribunal to resolve allegations that the registration and use of a domain name infringed upon the trademark rights of the complainant."). It is also clear from the face of the UDRP, which is attached to the Affidavit of Kathy Klock as Exhibit A, that the mutual jurisdiction provision is only applicable to judicial review of UDRP administrative proceedings (of which this case is not), not other actions in United States District Court.

California where ICANN, other material witnesses, and many of the sources of proof are located.

### III.    PLAINTIFF'S COMPLAINT AGAINST ICANN SHOULD BE DISMISSED UNDER RULE 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION.

Before a federal court can hear any matter, the court must not only have jurisdiction over the parties, but it must also have jurisdiction over the subject matter of the suit.[5] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). One of the aspects of a federal court's subject matter jurisdiction is Article III's case-or-controversy requirement. *Allen v. Wright*, 468 U.S. 737, 750 (1984). Standing is a core element of the case-or-controversy requirement of Article III. *Id.* at 750-51.

The Supreme Court has articulated three components that form the "irreducible constitutional minimum of standing" that plaintiff must show:  (1) plaintiff has suffered an "injury in fact" that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a decision against the defendant. *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180-81 (2000). "[T]he party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992). The absence of any one element of the case-or-controversy requirement deprives a plaintiff of Article III standing and requires dismissal under Rule

---

[5] Plaintiff's failure to allege, in his 70-page Complaint, a short and plain statement of the Court's subject matter jurisdiction is an independent basis for dismissal of Plaintiff's Complaint. *See* Fed. R. Civ. Proc. 8(a) ("A pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the grounds upon which the court's jurisdiction depends.").

12(b)(1) of the Federal Rules of Civil Procedure. *See Cone Corp. v. Florida Department of Transportation*, 921 F.2d 1190, 1203 (11th Cir. 1991).

**A.      Plaintiff Has Not Established That His Alleged Injuries Are "Fairly Traceable" To ICANN.**

Assuming Plaintiff has properly alleged an injury in fact, which is a gracious assumption given the fact that Plaintiff cannot establish that he has a right to register a .info domain name, Plaintiff nevertheless lacks standing to sue ICANN because Plaintiff's alleged injuries are not "fairly traceable" to ICANN. Plaintiff's alleged injuries spring not from any ICANN action, but from alleged problems arising from false registrations by third parties under the Sunrise Policy, Plaintiff's efforts to resolve his domain name disputes through WIPO administrative proceedings, and plaintiff's efforts to implement the rulings from those proceedings with Afilias. None of these alleged injuries was caused by ICANN.

It appears that Plaintiff has alleged four injuries in his Complaint. First, Plaintiff has alleged that, as a result of the Sunrise Policy and the fact that he does not own any trademark rights, "he was not able to register any of the names he had applied for." (Comp. at ¶ 59.) It is unclear what right plaintiff is alleging ICANN or anyone else violated. There is simply no basis for plaintiff's apparent claim that either ICANN or Afilias had a legal obligation to offer plaintiff the .info names he wanted, or any other names for that matter. Indeed, Plaintiff's Complaint does not allege any relationship between ICANN and Plaintiff. There is no such relationship: Afilias implemented the Sunrise Policy[6] and the Policy is made applicable to

---

[6] Pursuant to a recommendation from the ICANN Governmental Advisory Committee (a committee of governments, of which the United States is a member, responsible for advising on the activities of ICANN as they relate to laws and international agreements or where they may affect public policy issues), in its selection of new TLDs ICANN considered the extent to which the procedures proposed by the applicants would adequately protect existing intellectual property rights. (Touton Aff. at ¶ 26.) The selected TLD applications protected intellectual property rights through various means. (*Id.* at ¶ 27.)

Plaintiff in his contract with his registrar, whom Plaintiff elected not to sue.  (Touton Aff. at ¶ 35.)  Thus, any injury suffered by way of the Sunrise Policy was caused by entities other than ICANN.

Second, Plaintiff alleges that his "inability—under Afilias' policy—to challenge WIPO's jurisdiction and represent his interests or be represented by legal counsel is a denial of due process."  (Comp. at ¶ 115.)  Plaintiff's Complaint does not set forth the portion or portions of the Sunrise Policy that prevented him from challenging WIPO's jurisdiction or from being represented by legal counsel.  In addition, Plaintiff has not alleged, and cannot show, that ICANN implemented the Sunrise Policy or applied that Policy to plaintiff.  Plaintiff specifically alleges that this is an "Afilias" policy, not an ICANN, policy.  (Comp. at ¶ 115.)

Third, Plaintiff has alleged that he was "forced" to "pay in excess of $8,000 in order to challenge improperly registered domain names that Afilias, in full knowledge that they were invalid, first accepted for registration and then refused to take proper action under its own policies to cancel."  (Comp. at ¶ 101.)  Plaintiff does not allege, nor could he allege, that ICANN had any role in "forcing" plaintiff to pay money to Afilias.  As set forth in the Sunrise Challenge Rules (Original), which are attached to the Touton Affidavit as Exhibit C, ICANN has no role in domain name disputes arising under the Sunrise Challenge procedure and Plaintiff has specifically waived any claim against ICANN relating to domain name disputes.

Fourth, Plaintiff alleges that, although he successfully challenged all of the domain names he sought, (Comp. at ¶ 62), "Affilias has not, however, removed the 'lock' from any of Plaintiff's registrations as it was bound to do by its own policy."  (Comp. at ¶ 69.)  This alleged injury has nothing to do with ICANN—it is a dispute between Plaintiff and Afilias.

Moreover, Plaintiff's Complaint does not make clear how Plaintiff, who admits that he owns

no trademarks, has a proper legal basis to support the transfer of the domain names he seeks.

**B.      Plaintiff Has Not Established That His Alleged Injuries Can Be
          Redressed By ICANN.**

Plaintiff further lacks standing against ICANN because, as is plain from the nature of

the injuries alleged, Plaintiff has not alleged and cannot show that his injuries would be

redressed by a favorable decision against ICANN.  The Sunrise Policy and WIPO procedures

of which plaintiff complains were implemented by Afilias, not ICANN, and are incorporated

into his contract with his registrar, not ICANN.  (Touton Aff. at ¶ 35.)  Finally, it is Afilias'

decision, not ICANN's, whether Afilias will "unlock" specific domain names.

**IV.     PLAINTIFF'S COMPLAINT AGAINST ICANN SHOULD BE DISMISSED
         UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM.**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court should dismiss a

Complaint when the plaintiff can prove no set of facts which would entitle it to relief.  *See*

*Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992).  Plaintiff attempts to tie his

numerous allegations together in support of four causes of action: (1) a violation of his First

Amendment right to free speech; (2) a violation of his right to due process; (3) a violation of

Section 1 of the Sherman Act; and (4) a violation of Section 2 of the Sherman Act.  Plaintiff,

however, cannot succeed on his constitutional claims because the prohibitions found in the

First Amendment and the Due Process Clause do not apply to a private-actor like ICANN.

And Plaintiff does not have "antitrust standing" to bring his Sherman Act claims.

**A.      ICANN Cannot Violate Plaintiff's Right To Free Speech Or Due Process.**

For constitutional due process and the First Amendment to be implicated, there must

be state action.  *Davis v. Prudential Securities, Inc.*, 59 F.3d 1186, 1190-91 (11th Cir. 1995)

("it is axiomatic that constitutional due process protections 'do not extend to private conduct

abridging individual rights' . . .only state action is subject to scrutiny under the Due Process

Clause" (citations omitted)). State action is present when the State is sufficiently involved in some activity to "treat that decisive conduct as state action." *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

Plaintiff has not alleged that ICANN is a governmental entity in his Complaint. In fact, Plaintiff has affirmatively alleged that ICANN is a "private entity." (Comp. at ¶ 13.) And, irrespective of what Plaintiff may or may not allege, "ICANN is not a government body." *Register.com, Inc. v. Verio, Inc.*, 126 F.Supp.2d 238, 247 (S.D.N.Y. 2000). Thus, Plaintiff does not have a valid due process or free speech claim against ICANN and these claims should both be dismissed under Rule 12(b)(6).

**B. Plaintiff Does Not Have Antitrust Standing To Bring Sherman Act Claims And The Claims Should Therefore Be Dismissed.**

Plaintiff alleges that ICANN and Afilias' "incorporation of the 'Sunrise Policy'" into their Registry Agreement violate Sections 1 and 2 of the Sherman Act as a "combination in restraint of trade and a conspiracy to monopolize the namespace of the new .info TLD for the benefit of minority interests not entitled to such preference by any legal principle or statutory provision and against the interests of general internet users." (Comp. at ¶ 129.) Plaintiff's Sherman Act claims are flawed in that Plaintiff does not have "antitrust standing" to bring them.

Standing in an antitrust case involves more than the case-or-controversy requirement that drives constitutional standing (which, as stated above, Plaintiff is also lacking). *See Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1448 (11th Cir. 1991). "Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Id.* To possess antitrust standing, a plaintiff must establish that: (1) it has suffered an "antitrust injury"; and (2) it is an "efficient enforcer of antitrust laws." *Cargill,*

*Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 (1986). Plaintiff cannot make either of these showings.

### 1. Plaintiff Has Not Suffered an Antitrust Injury.

To establish an antitrust injury, "plaintiffs must plead and prove that the injury they have suffered derives from some anticompetitive conduct and is the type the antitrust laws were intended to prevent." *Todorov*, 921 F.2d at 1450; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Plaintiff has not made this showing.

Plaintiff's alleged injury is that he was excluded from being able to register a domain name during the Sunrise Period because he does not own a trademark. (Comp. at ¶¶ 59, 129). Such an injury is not of the type the antitrust laws were designed to prevent. The antitrust laws were drafted to "protect competition" by limiting how a market participant acts vis-à-vis its competitors. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962); *see Todorov*, 921 F.2d at 1450. They were drafted to ensure robust competition. While plaintiff alleges that the Sunrise Policy prevents equal access to every product, he does not allege that consumers' alleged lack of equal access is derived from a lack of competition between market participants, as would be required to establish an antitrust injury.

### 2. Plaintiff is Not an Efficient Enforcer of Antitrust Laws.

To determine whether a plaintiff is an "efficient enforcer" of antitrust laws, the Court must consider the "directness or indirectness of the asserted injury" and whether the asserted injury is highly speculative. *Todorov*, 921 F.2d at 1451. Plaintiff is not an efficient enforcer of the Sherman Act. He is unable to assert an antitrust injury in the first place. Moreover, plaintiff's ability to show that he suffered direct harm from a mechanism designed to more efficiently address inevitable lawsuits by existing trademark holders is highly speculative.

### CONCLUSION

Plaintiff's Complaint is deficient on a number of grounds. Principally, however, Plaintiff has sued the wrong defendant in the wrong court—ICANN has no meaningful, or relevant, contacts with Florida and there is no link between ICANN and Plaintiffs' alleged injuries. For these reasons, and the futility of Plaintiff's substantive causes of action, Plaintiff's entire Complaint should be dismissed with respect to ICANN.

STEEL HECTOR & DAVIS LLP
Attorneys for Defendant
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL  33401-6198
Telephone:  (561)650-7200
Facsimile:  (561)655-1509

By: _____
Gerry S. Gibson (Fl. Bar No. 261998)
Kathy M. Klock (FL. Bar No. 348171)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. mail upon JEFF DAVIES, 5452 Coral Way, Orlando, FL 32839, on this 10th day of December, 2002.

_____
Kathy M. Klock

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

FEB 2 2 2001

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

ECONOMIC SOLUTIONS, INC.,          )
                                   )
            Plaintiff,             )
                                   )
    vs.                            )       No. 4:00CV1785-DJS
                                   )
INTERNET CORPORATION FOR           )
ASSIGNED NAMES AND NUMBERS,        )
                                   )
            Defendant.             )

ORDER

    This matter is before the Court on defendant's motion to
dismiss or transfer, urging that this Court lacks personal
jurisdiction over defendant.  The Court notes that since the filing
of the motion package, plaintiff has filed a first amended
complaint.  The Court's usual practice in such circumstances is to
deny without prejudice a potentially dispositive motion directed to
the now-superseded complaint, and leave to the movant to determine
whether the motion should be refiled, with or without amendments,
in light of the changes made to the pleading it attacks.  In this
instance, however, the Court has reviewed the two complaints, and
finds that the first amended complaint merely omits two of the
three original causes of action.  Accordingly, the Court is willing
to construe the earlier-filed motion as directed to the first
amended complaint, and to disregard those portions of the briefing
which focus on the claims which have been omitted on amendment.



Defendant Internet Corporation for Assigned Names and Numbers ("ICANN") is a California non-profit corporation with certain administrative responsibilities for technical management of the Internet, derivative of the U.S. Department of Commerce. Plaintiff Economic Solutions, Inc. has entered into a contract with the Central American country of Belize to attempt to commercially market Internet domain names ending with ".bz," Belize's country code top level domain suffix. In the first amended complaint, plaintiff asserts a claim of tortious interference with business expectancy based on its allegations that defendant has refused to take administrative and technical steps authorized by plaintiff's contract with Belize and necessary for plaintiff to begin registering .bz domain names.

The following undisputed facts are pertinent to the personal jurisdiction determination. Defendant, a California not-for-profit corporation, has its sole office in Marina del Rey, California. Defendant has no assets or real estate in Missouri, is not registered to do business in Missouri, does not solicit in Missouri and has no employees in Missouri. Defendant's website at www.icann.org is operated from a single web server located in Marina del Rey. The only function of the website which is interactive in any sense is its public comment forum where visitors to the website may "post" comments concerning Internet technical management issues.

2

In passing on a motion to dismiss for lack of personal jurisdiction in a diversity action, the Court must engage in a two-pronged analysis as to whether there is personal jurisdiction over the non-resident defendant under the state long-arm statute and whether the exercise of personal jurisdiction over the defendant would violate the due process clause of the Fourteenth Amendment. Precision Construction Co. v. J.A. Slattery Co., 756 F.2d 114, 115 (8th Cir. 1985). The party seeking to invoke federal jurisdiction has the burden of establishing that jurisdiction exists. Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 653 (8th Cir. 1982).

As to the former inquiry, the Missouri long-arm statute provides in pertinent part:

> 1.      Any person or firm, . . . or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits . . . to the jurisdiction of courts of this state as to any cause of action arising from the doing of any such acts:

>> (1)   The transaction of any business within this state;

>> (2)   The making of any contract within this state;

>> (3)   The commission of a tortious act within this state; . . . .

§506.500 R.S.Mo. With respect to the second inquiry, the due process clause of the Fourteenth Amendment requires that a non-resident defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

3

International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945);
accord World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291
(1980). "In judging minimum contacts, a court properly focuses on
'the relationship among the defendant, the forum and the
litigation'." Calder v. Helicopteros Nacionales de Colombia S.A.
v. Hall, 466 U.S. 408, 414 (1984). The defendant's contacts with
the forum state must be purposeful and such that defendant "should
reasonably anticipate being haled into court there." World Wide
Volkswagen, 444 U.S. at 297. Consistent with these principles, the
Court must evaluate:  (1) the nature and quality of the contacts
with the forum state; (2) the quantity of contacts with the forum
state; (3) the relationship of the cause of action to the contacts;
(4) the interest of the forum state in providing a forum for its
residents; and (5) the convenience of the parties. Aaron Ferer &
Sons Co. v. Diversified Metals Corp., 564 F.2d 1211, 1215 (8th Cir.
1977).

The Court finds plaintiff's showing as to personal
jurisdiction inadequate on each level of the inquiry. Plaintiff
argues that the Missouri long-arm statute is satisfied by
defendant's commission of a tortious act within the state of
Missouri, citing case law holding that a tortious act committed
outside the state which causes harm in Missouri is sufficient. A
*prima facie* showing of the commission of the tort is required to
support a finding of personal jurisdiction:

4

_Institutional Food Marketing Associates, Ltd. v. Golden State Strawberries, Inc._, 747 F.2d 448, 453 (8th Cir. 1984). The mere allegation that there has been tortious conduct causing in-state harm is inadequate. _Id._ at 454.

In response to the motion to dismiss plaintiff has not so much as attempted a _prima facie_ showing, even after defendant has specifically argued plaintiff's inability to make a showing of one indispensible element of its tortious interference claim -- lack of justification for defendant's refusal to comply with plaintiff's request to change Belize's administrative and technical contacts for the .bz domain. _See, e.g., The Vikings, USA Bootheel MO v. Modern Day Veterans_, 33 S.W.3d 709, 711 (Mo.App. 2000).

> The establishment of a prima facie case requires more than the allegation that the defendant acted without justification. In order to state a cause of action, it is necessary that facts be alleged from which it could be found that the interference was not justified.

_Institutional Food Marketing_, 747 F.2d at 454. The first amended complaint does not allege any such facts. Plaintiff's opposition to the instant motion does not address defendant's assertion that there exists a dispute as to the legitimacy of plaintiff's request to change the contacts, citing the fact that the original technical and administrative contacts for the .bz domain have not signed the resignation letters plaintiff has provided them. Plaintiff has therefore failed to make a _prima facie_ showing of the commission of the tort relied upon for jurisdictional purposes.

5

resignation letters plaintiff has provided them. Plaintiff has therefore failed to make a *prima facie* showing of the commission of the tort relied upon for jurisdictional purposes.

     Plaintiff contends that defendant's website is a sufficient Missouri contact to satisfy due process standards. The Court disagrees. The bulletin board function of the website is not so fully interactive in the Court's view as to expose defendant to universal personal jurisdiction anywhere from which a posting might be made. Defendant's website does not constitute purposeful contact with Missouri or any particular location. Furthermore, the website in general, and its bulletin board function in particular, bear no relation to the tortious interference claim. In one or more of these respects, the facts at bar are distinguishable from each of the website cases cited by plaintiff in support of personal jurisdiction.

     Defendant's contacts with plaintiff have been at the instance of plaintiff, who initiated contact to request that defendant take action to transfer the administrative and technical contacts for the .bz domain. Perhaps in recognition of this fact, plaintiff does not urge that personal jurisdiction can be predicated on the actual contacts between the parties. Having considered all the foregoing, the Court is firmly persuaded that the nature, quality and quantity of defendant's contacts with Missouri fall far short of supporting this Court's exercise of

6

personal jurisdiction over the defendant under either state law or federal constitutional standards.

Accordingly,

IT IS HEREBY ORDERED that defendant's motion to dismiss [Doc. #24-1] is granted, and the motion in the alternative to transfer [Doc. #24-2] is denied as moot.


Dated this ___22nd___ day of February, 2001.


_____
United States District Judge


7

UNITED STATES DISTRICT COURT -- EASTERN MISSOURI
INTERNAL RECORD KEEPING


AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 02/22/01 by lkresko
        4:00cv1705     Economic Solutions vs Internet Corporation

15:1125 Trademark Infringement (Lanham Act)

IF THIS IS A FINAL JUDGMENT YOU MUST SEND THE AO120
PATENT/TRADEMARK FORM TO:
                  COMMISSIONER OF PATENTS & TRADEMARKS
                  WASHINGTON, DC  20231

J. Clark - 17440            Fax: 314-231-4342
Jeffrey LeVee -             Fax: 213-243-2539
Laura Polcyn - 79059        Fax: 314-231-4342
Keith Rabenberg  4113       Fax: 314-231-4342


SCANNED & FAXED BY:

FEB 2 2 2001

MJM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ECONOMIC SOLUTIONS, INC.,            )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             )
                                     )
INTERNET CORPORATION FOR             )
ASSIGNED NAMES AND NUMBERS,          )
                                     )
          Defendant.                 )

FILED

FEB 2 2 2001

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS
No. 4:00CV1785-DJS

## JUDGMENT

Pursuant to the order entered herein this day,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiff's first amended complaint is dismissed for this Court's lack of personal jurisdiction over the defendant.

Dated this ___22nd___ day of February, 2001.

_____
United States District Judge

## UNITED STATES DISTRICT COURT -- EASTERN MISSOURI
### INTERNAL RECORD KEEPING

AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 02/22/01 by lkresko
      4:00cv1785    Economic Solutions vs Internet Corporation

15:1125 Trademark Infringement (Lanham Act)

IF THIS IS A FINAL JUDGMENT YOU MUST SEND THE AO120
PATENT/TRADEMARK FORM TO:
                    COMMISSIONER OF PATENTS & TRADEMARKS
                    WASHINGTON, DC  20231

J. Clark -  17440              Fax: 314-231-4342
Jeffrey LeVee -                Fax: 213-243-2539
Laura Polcyn -  79059          Fax: 314-231-4342
Keith Rabenberg -  4113        Fax: 314-231-4342

SCANNED & FAXED BY:

FEB 2 2 2001

MJM



# Proposed Unsponsored TLD Agreement

## (11 May 2001)

# ICANN

---

# Registry Agreement

his REGISTRY AGREEMENT ("Agreement") is by and between the Internet Corporation for ssigned Names and Numbers, a not-for-profit corporation, and [insert Registry Operator's name], a 1sert jurisdiction and type of organization].

**DEFINITIONS.** For purposes of this Agreement, the following definitions shall apply:

1.1. The "Authoritative Root-Server System" means the constellation of DNS root-nameservers specified, from time to time, in the file <ftp://ftp.internic.net/domain/named.root>.

1.2. The "Base Period," in the case of a TLD delegated within the Authoritative Root-Server System on the Effective Date, means a period beginning on the Commencement-of-Service Date and extending until the Expiration Date. In the case of a TLD not delegated within the Authoritative Root-Server System, the "Base Period" means a period beginning at the conclusion of the Ramp-Up Period and extending until the Expiration Date.

1.3. The "Commencement-of-Service Date" means the Effective Date, except that, in the case of a TLD not delegated within the Authoritative Root-Server System on the Effective Date, the Commencement-of-Service Date shall be the date on which the Registry TLD is first delegated within the Authoritative Root-Server System to nameservers designated by Registry Operator.

1.4. The "DNS" refers to the Internet domain-name system.

1.5. The "Effective Date" is the date on which this Agreement is first signed on behalf of both parties.

1.6. The "Expiration Date" is the date specified in Subsection 5.1.1, as it may be extended according to Subsection 5.1.2.

1.7. "ICANN" refers to the Internet Corporation for Assigned Names and Numbers, a party to this Agreement.

1.8. An "ICANN-Accredited Registrar" is an entity or person accredited by ICANN to act as a registrar for domain names within the domain of the Registry TLD.

1.9. "Personal Data" refers to data about any identified or identifiable natural person.

1.10. The "Ramp-Up Period," in the case of a TLD not delegated within the Authoritative Root-Server System on the Effective Date, is the period beginning on the Commencement-of-Service Date and extending for one year.

1.11. "Registered Name" refers to a domain name within the domain of the Registry TLD, whether consisting of two or more (e.g., john.smith.name) levels, about which Registry Operator (or an affiliate engaged in providing Registry Services) maintains data in a Registry Database, arranges for such maintenance, or derives revenue from such maintenance. A name in a Registry Database may be a Registered Name even though it does not appear in a zone file (e.g., a registered but inactive name).

1.12. "Registry Data" means all Registry Database data maintained in electronic form, and shall include TLD Zone-File Data, all data used to provide Registry Services submitted by registrars in electronic form, and all other data used to provide Registry Services concerning particular domain name registrations or nameservers maintained in electronic form in the Registry Database.

1.13. "Registry Database" means a database comprised of data about one or more DNS domain names within the domain of the Registry TLD that is used to generate either DNS resource records that are published authoritatively or responses to domain-name availability lookup requests or Whois queries, for some or all of those names.

1.14. "Registry Operator" refers to [insert Registry Operator's name], a party to this Agreement, or any assignee of it under Subsection 5.11.

1.15. "Registry-Registrar Agreement" means an agreement between Registry Operator and an ICANN-Accredited Registrar with the provisions specified by Subsection 3.4.

1.16. "Registry Services" means services provided as an integral part of the operation of the Registry TLD, including all subdomains in which Registered Names are registered. In determining whether a service is integral to the operation of the Registry TLD, consideration will be given to the extent to which the Registry Operator has been materially advantaged in providing the service by its designation as such under this Agreement. The development of technology, expertise, systems, efficient operations, reputation (including identification as Registry Operator), financial strength, or relationships with registrars and third parties shall not be deemed an advantage arising from the designation. Registry Services include: receipt of data concerning registration of domain names and nameservers from registrars, provision to registrars of status information relating to the Registry TLD, dissemination of TLD zone files, operation of the Registry TLD zone servers, dissemination of contact and other information concerning domain-name and nameserver registrations in the Registry TLD, and such other services required by ICANN in the manner provided in Subsections 4.3 through 4.6. Registry Services shall not include the provision of nameservice for a domain used by a single entity under a Registered Name registered through an ICANN-Accredited Registrar.

1.17. "Registry TLD" refers to the [insert TLD label] TLD.

1.18. "Service Term" means that portion of the Term of this Agreement commencing on the

Commencement-of-Service Date.

1.19. "Term of this Agreement" begins on the Effective Date and continues until the earlier of (a) the Expiration Date, or (b) termination of this Agreement.

1.20. "TLD" refers to a top-level domain in the DNS.

1.21. "TLD Zone-File Data" means all data contained in a DNS zone file for the Registry TLD, or for any subdomain for which Registry Services are provided and that contains Registered Names, as provided to nameservers on the Internet.

## ICANN OBLIGATIONS.

2.1. <u>General Obligations of ICANN</u>. With respect to all matters that affect the rights, obligations, or role of Registry Operator, ICANN shall during the Term of this Agreement:

    2.1.1. exercise its responsibilities in an open and transparent manner;

    2.1.2. not unreasonably restrain competition and, to the extent feasible, promote and encourage robust competition;

    2.1.3. not apply standards, policies, procedures or practices arbitrarily, unjustifiably, or inequitably and not single out Registry Operator for disparate treatment unless justified by substantial and reasonable cause; and

    2.1.4. ensure, through its reconsideration and independent review policies, adequate appeal procedures for Registry Operator, to the extent it is adversely affected by ICANN standards, policies, procedures or practices.

2.2. <u>Designation of Registry Operator</u>. ICANN hereby designates Registry Operator as the sole operator for the Registry TLD during the Term of this Agreement.

2.3. <u>Recognition in Authoritative Root-Server System</u>. During the Term of this Agreement, Registry Operator may, by notifying ICANN, request (a) delegation of the Registry TLD to specified DNS nameservers and (b) changes in that delegation. Any such request must be made in a format, and otherwise meet technical requirements, specified from time to time by ICANN. The initial format and technical requirements are set forth in Appendix A. Changes to the format and technical requirements may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6. ICANN will use commercially reasonable efforts to have such requests implemented in the Authoritative Root-Server System within five business days of the submission.

2.4. <u>Recognition in the Root-Zone Contact Database</u>. To the extent ICANN publishes contact data regarding TLDs, during the Term of this Agreement it will show the Registry TLD's operator as Registry Operator and the Registry TLD's administrative and technical contacts as requested from time to time by Registry Operator. Any such request must be made in a format, include the elements of contact data, and otherwise meet technical requirements, specified from time to time by ICANN. The initial requirements for these requests are set forth in Appendix B. Changes to the requirements for requests may be

made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

2.5. <u>Other Obligations of ICANN</u>. During the Term of this Agreement, ICANN shall use commercially reasonable efforts to:

    2.5.1. maintain, or cause to be maintained, a stable, secure, authoritative and publicly available database of relevant information regarding the delegation of the Registry TLD;

    2.5.2. generate, or cause to be generated, authoritative and accurate root zone information from such database and operate, or cause to be operated, the Authoritative Root-Server System in a stable and secure manner;

    2.5.3. maintain, or cause to be maintained, authoritative records and an audit trail regarding delegations of the Registry TLD and records related to these delegations; and

    2.5.4. inform Registry Operator in a timely manner of any changes to ICANN's contact information.

2.6. <u>Use of ICANN Name, Logo, and Website</u>. ICANN hereby grants to Registry Operator a non-exclusive, worldwide, royalty-free license during the Term of this Agreement (a) to state that it is designated by ICANN as the registry operator for the Registry TLD, (b) to use a logo specified by ICANN to signify that Registry Operator is an ICANN-designated registry operator, and (c) to link to pages and documents within the ICANN web site. No other use of ICANN's name or logo is licensed hereby. This license may not be assigned or sublicensed by Registry Operator.

## REGISTRY OPERATOR OBLIGATIONS.

3.1. <u>Obligation to Provide Registry Services</u>. During the Service Term, Registry Operator shall operate, or cause to be operated, a registry of Registered Names that meets the functional specifications described by Subsection 3.2 and the performance specifications described by Subsection 3.3. Throughout the Term of this Agreement, Registry Operator shall be obligated to enter into a Registry-Registrar Agreement with any ICANN-Accredited Registrar seeking such an agreement on the terms specified by Subsection 3.4. Registry Operator shall commence providing Registry Services in the Registry TLD according to the registry start-up plan specified in Subsection 3.7 and, on the conclusion of that plan and throughout the remainder of the Term of this Agreement, shall continue providing Registry Services. Throughout the Service Term, Registry Operator shall provide Registry Services in compliance with any Registry-Registrar Agreement as provided in Subsection 3.4 that is then in effect.

3.2. <u>Functional Specifications for Registry Services</u>. All Registry Services provided by Registry Operator shall be provided under this Agreement and shall meet the functional specifications established by ICANN. The initial functional specifications are set forth in Appendix C. Non-material changes and additions to the functional specifications may be made by Registry Operator with prior written notice to ICANN and any affected ICANN-

Accredited Registrars. All other changes and additions to the functional specifications may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.3. <u>Performance Specifications for Registry Services</u>. All Registry Services provided by Registry Operator shall meet the performance specifications and comply with the registrar service level agreement established by ICANN. The initial performance specifications are set forth in Appendix D and the initial service level agreement is set forth in Appendix E. Changes to the performance specifications or service level agreement may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.4. <u>Registry-Registrar Agreements</u>. During the Term of this Agreement, Registry Operator shall enter a Registry-Registrar Agreement with any ICANN-Accredited Registrar desiring to enter such an agreement. All Registry Services provided by Registry Operator for the Registry TLD shall be provided strictly in accordance with that Registry-Registrar Agreement:

    3.4.1. Initially, the form of the Registry-Registrar Agreement shall be that attached as Appendix F.

    3.4.2. The form of the Registry-Registrar Agreement may be revised (a) by Registry Operator with the written consent of ICANN, (b) by ICANN in the manner provided in Subsections 4.3 through 4.6, provided that any additional terms are within the topics set forth in Subsection 4.2, or, (c) with respect to the price charged registrars by Registry Operator for Registry Services, according to Subsection 3.4.3.

    3.4.3. Registry Operator may, at its option and with thirty days written notice to ICANN and to all ICANN-Accredited Registrars, revise the prices charged to registrars under the Registry-Registrar Agreement, provided that (a) the same price shall be charged for services charged to all ICANN-Accredited Registrars (provided that volume adjustments may be made if the same opportunity to qualify for those adjustments is available to all ICANN-Accredited Registrars) and (b) the prices shall not exceed those set forth in Appendix G, as adjusted according to Subsections 3.14.5 and 4.4. Registry Operator shall charge no fee to anyone for Registry Services if such fee is not listed on Appendix G. For Registry Services (a) listed on Appendix G without a stated price or (b) introduced more than six months after the Commencement-of-Service Date, Registry Operator may propose to ICANN, no later than thirty days before the commencement of that service, the inclusion in Appendix G of an offering price for the Registry Service. The offering price for the Registry Service shall be included in Appendix G only upon the written consent of ICANN, which shall not be unreasonably withheld or delayed (ordinarily 30 days or less).

3.5. <u>Fair Treatment of ICANN-Accredited Registrars</u>.

    3.5.1. Registry Operator shall provide all ICANN-Accredited Registrars that have Registry-Registrar Agreements in effect, and that are in compliance with

the terms of such agreements, equivalent access to Registry Operator's Registry Services, including to its shared registration system.

3.5.2. Registry Operator shall certify to ICANN every six months, using the objective criteria set forth in Appendix H, that Registry Operator is providing all such ICANN-Accredited Registrars with equivalent access to its Registry Services, including to its shared registration system.

3.5.3. Registry Operator shall not act as a registrar with respect to the Registry TLD. This shall not preclude Registry Operator from registering names within the domain of the Registry TLD in compliance with Subsection 3.6. This also shall not preclude an affiliate of Registry Operator from acting as a registrar with respect to the Registry TLD, provided that Registry Operator complies with the provisions of Subsections 3.5.4 and 3.5.5.

3.5.4. Registry Operator shall comply with its Code of Conduct attached as Appendix I. Any changes to that Code of Conduct will require ICANN's written approval.

3.5.5. Registry Operator will ensure, in a form and through ways described in Appendix H, that the revenues and assets of Registry Operator are not utilized to advantage registrars that are affiliated with Registry Operator to the detriment of other ICANN-Accredited Registrars. The distribution of funds by Registry Operator to its debt or equity participants in accordance with their debt or equity participation shall not violate this Subsection 3.5.5.

3.5.6. With respect to its obligations under Subsections 3.5.1 through 3.5.5 and Appendices H and I, Registry Operator agrees to participate in and comply with the sanctions program described in Appendix Y, provided that all other registry operators having registry agreements with ICANN for the operation of unsponsored top-level domains (i.e. top-level domains, other than country-code and infrastructure domains, not having a sponsoring organization) are obligated to participate in and comply with a sanctions program with substantially the same provisions as Appendix Y. Registry Operator agrees that the sanctions program described in Appendix Y shall be a non-exclusive and additional option for ICANN to promote compliance with Subsections 3.5.1 through 3.5.5 and Appendices H and I, and that the availability of that option does not limit or affect in any way ICANN's ability to employ any other compliance measures or remedies available under this Agreement. In the event that the gTLD Constituency of the Domain Name Supporting Organization proposes a substitute Appendix Y at any time prior to 1 May 2002, and ICANN determines (following an appropriate process of public notice and comment) that substitution by that Appendix Y would serve the interests of the Internet community, the substitution shall be made.

3.6. Registrations Not Sponsored by Registrars Under Registry-Registrar Agreements. Registry Operator shall register domain names within the domain of the Registry TLD, other than on a request submitted by a registrar pursuant to that registrar's Registry-Registrar Agreement, only as follows:

3.6.1. Registry Operator may register the domain names listed on Appendix X (Part A) for its own use in operating the registry and providing Registry Services under this Agreement, provided the total number of domain names listed on Appendix X at any time does not exceed 5000. At the conclusion of its designation by ICANN as the operator for the Registry TLD, Registry Operator shall transfer all such domain-name registrations to the entity or person specified by ICANN. Appendix X may be revised upon the written notice by Registry Operator to ICANN and written consent by ICANN, which shall not be unreasonably withheld.

3.6.2. Registry Operator may register the domain names listed on Appendix X (Part B) for its own use, provided that the total number of domain names listed on Appendix X at any time does not exceed 5,000. Registry Operator may retain registration of those names at the conclusion of its designation by ICANN as the operator for the Registry TLD, provided registration fees are paid and all other requirements for registration by third parties are met. Appendix X may be revised upon written notice by Registry Operator to ICANN and written consent by ICANN, which shall not be unreasonably withheld.

3.6.3. As instructed from time to time by ICANN, Registry Operator shall maintain the registration of up to 5000 domain names within the domain of the Registry TLD for use by ICANN and other organizations responsible for coordination of the Internet's infrastructure.

3.6.4. Subsection 3.6 shall not preclude Registry Operator from registering domain names within the domain of the Registry TLD through an ICANN-Accredited Registrar pursuant to that registrar's Registry-Registrar Agreement.

3.7. Registration Start-Up Plan. Registry Operator shall commence provision of Registry Services for the Registry TLD, including the provision of nameservice for the Registry TLD, according to the schedule and procedures set forth in the registration start-up plan in Appendix J to this Agreement.

3.8. Registration Restrictions Within Registry TLD.

3.8.1. Except to the extent that ICANN otherwise expressly authorizes in writing, Registry Operator shall reserve from registration the domain names specified by a schedule established by ICANN. The initial schedule is attached as Appendix K. Changes to the schedule may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.8.2. Registry Operator shall apply, monitor, and enforce the restrictions on registration in the Registry TLD established by ICANN in the manner established by ICANN. Appendix L sets forth the restrictions to be applied initially and Appendix M sets forth the manner by which these restrictions shall be applied, monitored, and enforced. Changes to the restrictions and the manner of their application, monitoring, and enforcement may be made only with the mutual written consent of ICANN and Registry Operator (which neither

party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6. [This Subsection applies to restricted TLDs only]

3.9. <u>Bulk Access to TLD Zone Files</u>. Registry Operator shall provide bulk access to the zone files for the Registry TLD as follows:

3.9.1. to third parties—on the terms set forth in the TLD zone file access agreement established by ICANN. The initial terms of the agreement are set forth as Appendix N to this Agreement. Changes to the terms of the TLD zone file access agreement may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.9.2. to ICANN—on a continuous basis in the manner which ICANN may from time to time specify.

3.10. <u>Publication by Registry Operator of Registry Data</u>.

3.10.1. At its expense, Registry Operator shall provide free public query-based access to up-to-date data concerning domain-name and nameserver registrations maintained by Registry Operator in connection with the Registry TLD. The data elements reported, format of responses to queries, data update frequency, query types supported, and protocols through which access is provided shall be as established by ICANN. The initial specification of the data elements reported, format of responses to queries, minimum data update frequency, query types supported, and protocols through which access is provided are set forth in Appendix O. Registry Operator may request supplementation of the specification to include additional data elements reported or query types supported, in which event ICANN shall act to supplement the specification in a reasonable manner within a reasonable time. Other changes to the specification may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.10.2. To ensure operational stability of the registry, Registry Operator may temporarily limit access under Subsection 3.10.1 in which case Registry Operator shall immediately notify ICANN of the nature of and reason for the limitation. Registry Operator shall not continue the limitation longer than a period established by ICANN if ICANN objects in writing, which objection shall not be unreasonably made. The period shall initially be five business days; changes to that period may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6. Such temporary limitations shall be applied in a non-arbitrary manner and shall apply fairly to all ICANN-Accredited Registrars.

3.10.3. In providing query-based public access to registration data as required by this Subsection 3.10, Registry Operator shall not impose terms and conditions on the use of the data provided, except as permitted by policy established by ICANN. Unless and until ICANN establishes a different policy,

Registry Operator shall permit use of data it provides in response to queries for any lawful purposes except to: (a) allow, enable, or otherwise support the transmission by e-mail, telephone, or facsimile of mass unsolicited, commercial advertising or solicitations to entities other than the data recipient's own existing customers; or (b) enable high volume, automated, electronic processes that send queries or data to the systems of Registry Operator or any ICANN-Accredited Registrar, except as reasonably necessary to register domain names or modify existing registrations. Changes to that policy may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.10.4. To comply with applicable statutes and regulations and for other reasons, ICANN may from time to time establish policies in the manner described by Subsections 4.3 through 4.6 establishing limits on the data concerning registrations that Registry Operator may make available to the public through a public-access service described in this Subsection 3.10 and on the manner in which Registry Operator may make them available. In the event ICANN establishes any such policy, Registry Operator shall abide by it within the time allowed by Subsection 4.5.

3.10.5. At its expense, Registry Operator shall provide bulk access to up-to-date data concerning domain-name and nameserver registrations maintained by Registry Operator in connection with the Registry TLD in the following two ways:

3.10.5.1. on a daily schedule, only for purposes of providing free public query-based access to up-to-date data concerning domain-name and nameserver registrations in multiple TLDs, to a party designated from time to time in writing by ICANN. The content and format of this data, and the procedures for providing access, shall be as established by ICANN. The initial content, format, and procedures are set forth in Appendix P. Changes to that content and format and those procedures may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.10.5.2. on a continuous basis, to ICANN in the manner which ICANN may from time to time reasonably specify, only for purposes of verifying and ensuring the operational stability of Registry Services, the DNS, and the Internet. The content and format of this data, and the procedures for providing access, shall be as established by ICANN. The initial content, format, and procedures are set forth in Appendix Q. Changes to that content and format and those procedures may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.11. Data Escrow. Registry Operator shall periodically deposit into escrow all Registry Data in an electronic format. The escrow shall be maintained, at Registry Operator's expense, by a reputable escrow agent mutually approved by Registry Operator and ICANN, such approval also not to be unreasonably withheld by either party. The schedule, content, format, and procedure for escrow deposits shall be as established by ICANN from time to time. The initial schedule, content, format, and procedure shall be as set forth in Appendix R. Changes to the schedule, content, format, and procedure may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6. The escrow shall be held under an agreement, substantially in the form of Appendix S, among ICANN, Registry Operator, and the escrow agent. In the event that, after a good-faith search by ICANN and Registry Operator, no mutually approved escrow agent agrees to the terms of Appendix S, ICANN and Registry Operator shall, in conjunction with a mutually approved escrow agent, negotiate in good faith for a substitute escrow agreement.

3.12. Registry Operator's Handling of Personal Data. Registry Operator shall notify registrars sponsoring registrations in the registry for the Registry TLD of the purposes for which Personal Data submitted to Registry Operator by registrars is collected, the intended recipients (or categories of recipients) of such Personal Data, and the mechanism for access to and correction of such Personal Data. Registry Operator shall take reasonable steps to protect Personal Data from loss, misuse, unauthorized disclosure, alteration or destruction. Registry Operator shall not use or authorize the use of Personal Data in a way that is incompatible with the notice provided to registrars.

3.13. Rights in Data. Except as permitted by the Registry-Registrar Agreement, Registry Operator shall not be entitled to claim any intellectual property rights in data supplied by or through registrars. In the event that Registry Data is released from escrow under Subsection 3.11, any rights held by Registry Operator in the data shall automatically be transferred on a non-exclusive, irrevocable, royalty-free, paid-up basis to ICANN or to a party designated in writing by ICANN.

3.14. Registry-Level Financial Support of ICANN. During the Term of this Agreement, Registry Operator shall pay to ICANN the following fees:

   3.14.1. Fixed Registry-Level Fee. Registry Operator shall pay ICANN a quarterly Fixed Registry-Level Fee in an amount established by the ICANN Board of Directors, in conformity with the ICANN bylaws and articles of incorporation, not to exceed one quarter of the annual Fixed Registry-Level Fee Cap described in Subsection 3.14.4.

   3.14.2. Variable Registry-Level Fee. Registry Operator shall pay ICANN a quarterly Variable Registry-Level Fee in an amount calculated according to a formula and method established from time to time by the ICANN Board of Directors, in conformity with the ICANN bylaws and articles of incorporation. The formula and method shall allocate the total variable fee among all TLDs sponsored or operated under a sponsorship or registry agreement with ICANN (whether the fee is collected at the registry or registrar level) based on the relative size of the registries for those TLDs. It shall be permissible for the formula and method so established to do any of the following: (a) to measure the size of a TLD's registry, at least once per year where feasible, by the

number of names under administration within the TLD by the registry's operator, (b) to deem the number of domain names under administration within the Registry TLD to be the number of Registered Names, (c) to provide for a deduction in computing a sponsor's or operator's Variable Registry-Level Fee of some or all of that sponsor's or registry operator's Fixed Registry-Level Fee, and (d) to provide that the number of domain names under administration for the .com, .net, and .org TLDs is the number of second-level domains within those TLDs. It shall also be permissible for the formula and method to consider accreditation fees collected from registrars as a credit applied to the Variable Registry-Level Fee for the TLD to which the fees pertain. Groups of registries for two or more TLDs may, with the agreement of their sponsors or operators and ICANN, agree to allocate the variable fee collected from them in a manner not based on the relative size of the registries within the group, provided that the combined variable fees collected for all TLDs within the group is based on the combined size of the registries in the group.

3.14.3. Payments Must Be Timely. Registry Operator shall pay the quarterly Fixed and Variable Registry-Level Fees within thirty days after the date of ICANN's invoice for those fees. These payments shall be made in a timely manner throughout the Term of this Agreement and notwithstanding the pendency of any dispute between Registry Operator and ICANN. Registry Operator shall pay interest on payments not timely made at the rate of 1% per month or, if less, the maximum rate permitted by California law.

3.14.4. Fee Caps. The Fixed Registry-Level Fee Cap shall be [depends on TLD type: US$100,000 for unrestricted and US$80,000 for restricted] per year until and including 30 June 2002; shall automatically increase by 15% on July 1 of each year beginning in 2002; and may be increased by a greater amount in the manner provided by Subsection 4.3. The sum of the Fixed Registry-Level Fees and the Variable Registry-Level Fees due to be paid in any year ending on any 30 June during or within one year after the Term of this Agreement by all TLD sponsors and registry operators having sponsorship or registry agreements with ICANN shall not exceed the Total Registry-Level Fee Cap described in the following sentence. The Total Registry-Level Fee Cap shall be US$5,500,000 for the fiscal year ending 30 June 2002; shall increase by 15% each fiscal year thereafter; and may be increased by a greater amount in the manner provided by Subsection 4.3.

3.14.5. Adjustments to Price. The maximum pricing for initial and renewal registrations set forth in Appendix G shall be adjusted at the beginning of each calendar quarter by adding, to the amount specified in that Appendix (after adjustment according to Subsection 4.4) as the applicable annual charge for initial or renewal registration of a domain name, an amount calculated according to the following three sentences. For calendar quarters in which the variable fee is collected at the registrar level, the amount shall be US$0.00. For the first two calendar quarters during the Term of this Agreement in which the variable fee is collected at the registry level, the amount shall be four times the per-name variable accreditation fee charged to registrars for the quarter beginning six months earlier. For subsequent calendar quarters, the amount shall be four times the quarterly Variable Registry-Level Fee reflected in the

invoice to Registry Operator for such a fee for the quarter beginning six months earlier divided by the number of Registered Names that the invoice shows was used to calculate that quarterly Variable Registry-Level Fee.

3.15. Reports Provided to ICANN. Registry Operator shall provide the following periodic written reports to ICANN regarding the following:

3.15.1. Monthly Reports on Registry Operations. Within twenty days after the end of each month during the Term of this Agreement, Registry Operator shall provide ICANN a written report, giving information specified by ICANN, on operation of the registry during the month. The initial specification of information is set forth in Appendix T. Changes to that specification may be made only with the mutual written consent of ICANN and Registry Operator (which neither party shall withhold without reason) or in the manner provided in Subsections 4.3 through 4.6.

3.15.2. Data Related to Proof of Concept. Registry Operator shall, for the purpose of providing data concerning concepts to be proven by establishment of the Registry TLD, provide reports concerning the Registry TLD's operation on a schedule and with content specified in Appendix U.

PROCEDURES FOR ESTABLISHMENT OR REVISION OF SPECIFICATIONS AND POLICIES.

4.1. Registry Operator's Ongoing Obligation to Comply With New or Revised Specifications and Policies. During the Term of this Agreement, Registry Operator shall comply, in its provision of Registry Services, on the schedule provided in Subsection 4.5, with

• 4.1.1. new or revised specifications (including forms of agreement to which Registry Operator is a party) and policies established by ICANN as Consensus Policies in the manner described in Subsection 4.3,

4.1.2. in cases where:

4.1.2.1. this Agreement expressly provides for compliance with revised specifications or policies established in the manner set forth in one or more subsections of this Section 4; or

4.1.2.2. the specification or policy concerns one or more topics described in Subsection 4.2.

4.2. Topics for New and Revised Specifications and Policies. New and revised specifications and policies may be established on the following topics:

4.2.1. issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, technical reliability, and/or operational stability of Registry Services, the DNS, or the Internet;

4.2.2. functional and performance specifications for the provision of Registry Services;

4.2.3. safety and integrity of the Registry Database;

4.2.4. procedures to avoid disruptions of registration due to suspension or termination of operations by a registry operator or a registrar, including procedures for allocation of responsibility for serving Registered Names affected by such a suspension or termination;

4.2.5. resolution of disputes regarding whether particular parties may register or maintain registration of particular domain names;

4.2.6. principles for allocation of Registered Names (e.g., first-come/first-served, timely renewal, holding period after expiration);

4.2.7. prohibitions on warehousing of or speculation in domain names by registries or registrars;

4.2.8. maintenance of and access to accurate and up-to-date contact information for domain-name registrants;

4.2.9. reservation of Registered Names that may not be registered initially or that may not be renewed due to reasons reasonably related to (a) avoidance of confusion among or misleading of users, (b) intellectual property, or (c) the technical management of the DNS or the Internet (e.g., establishment of reservations of names from registration); and

4.2.10. registry policies reasonably necessary to implement Consensus Policies relating to registrars.

4.3. <u>Manner of Establishment of New and Revised Specifications and Policies</u>.

4.3.1. "Consensus Policies" are those specifications or policies established based on a consensus among Internet stakeholders represented in the ICANN process, as demonstrated by (a) action of the ICANN Board of Directors establishing the specification or policy, (b) a recommendation, adopted by at least a two-thirds vote of the council of the ICANN Supporting Organization to which the matter is delegated, that the specification or policy should be established, and (c) a written report and supporting materials (which must include all substantive submissions to the Supporting Organization relating to the proposal) that (i) documents the extent of agreement and disagreement among impacted groups, (ii) documents the outreach process used to seek to achieve adequate representation of the views of groups that are likely to be impacted, and (iii) documents the nature and intensity of reasoned support and opposition to the proposed policy.

4.3.2. In the event that Registry Operator disputes the presence of such a consensus, it shall seek review of that issue from an Independent Review Panel established under ICANN's bylaws. Such review must be sought within fifteen working days of the publication of the Board's action establishing the policy. The decision of the panel shall be based on the report and supporting materials required by Subsection 4.3.1. In the event that Registry Operator seeks review

and the Independent Review Panel sustains the Board's determination that the policy is based on a consensus among Internet stakeholders represented in the ICANN process, then Registry Operator must implement such policy unless it promptly seeks and obtains a stay or injunctive relief under Subsection 5.9.

4.3.3. If, following a decision by the Independent Review Panel convened under Subsection 4.3.2, Registry Operator still disputes the presence of such a consensus, it may seek further review of that issue within fifteen working days of publication of the decision in accordance with the dispute resolution procedures set forth in Subsection 5.9; provided, however, that Registry Operator must continue to implement the policy unless it has obtained a stay or injunctive relief under Subsection 5.9 or a final decision is rendered in accordance with the provisions of Subsection 5.9 that relieves Registry Operator of such obligation. The decision in any such further review shall be based on the report and supporting materials required by Subsection 4.3.1.

4.3.4. A specification or policy established by the ICANN Board of Directors on a temporary basis, without a prior recommendation by the council of an ICANN Supporting Organization, shall also be considered to be a Consensus Policy if adopted by the ICANN Board of Directors by a vote of at least two-thirds of its members, so long as the Board reasonably determines that immediate temporary establishment of a specification or policy on the subject is necessary to maintain the operational stability of Registry Services, the DNS, or the Internet, and that the proposed specification or policy is as narrowly tailored as feasible to achieve those objectives. In establishing any specification or policy under this provision, the ICANN Board of Directors shall state the period of time for which the specification or policy is temporarily adopted and shall immediately refer the matter to the appropriate Supporting Organization for its evaluation and review with a detailed explanation of its reasons for establishing the temporary specification or policy and why the Board believes the policy should receive the consensus support of Internet stakeholders. If the period of time for which the specification or policy is adopted exceeds ninety days, the Board shall reaffirm its temporary establishment every ninety days for a total period not to exceed one year, in order to maintain such specification or policy in effect until such time as it meets the standard set forth in Subsection 4.3.1. If the standard set forth in Subsection 4.3.1 is not met within the temporary period set by the Board, or the council of the Supporting Organization to which it has been referred votes to reject the temporary specification or policy, it will no longer be a "Consensus Policy."

4.3.5. For all purposes under this Agreement, the policies identified in Appendix V shall be treated in the same manner and have the same effect as "Consensus Policies."

4.3.6. In the event that, at the time the ICANN Board of Directors establishes a specification or policy under Subsection 4.3.1 during the Term of this Agreement, ICANN does not have in place an Independent Review Panel established under ICANN's bylaws, the fifteen-working-day period allowed under Subsection 4.3.2 to seek review shall be extended until fifteen working days after ICANN does have such an Independent Review Panel in place and

Registry Operator shall not be obligated to comply ICANN with the specification or policy in the interim.

4.4. <u>Pricing Adjustments Arising from New or Revised Specifications or Policies</u>. The maximum prices stated in Appendix G shall be increased through an amendment to this Agreement as approved by ICANN and Registry Operator, such approval not to be unreasonably withheld, to reflect demonstrated increases in the net costs of providing Registry Services arising from (A) new or revised ICANN specifications or policies adopted after the Effective Date, or (B) legislation specifically applicable to the provision of Registry Services adopted after the Effective Date, to ensure that Registry Operator recovers such costs and a reasonable profit thereon; provided that such increases exceed any reductions in costs arising from (A) or (B) above.

4.5. <u>Time Allowed for Compliance</u>. Registry Operator shall be afforded a reasonable period of time (not to exceed four months unless the nature of the specification or policy established under Subsection 4.3 reasonably requires, as agreed to by ICANN and Registry Operator, a longer period) after receiving notice of the establishment of a specification or policy under Subsection 4.3 in which to comply with that specification or policy, taking into account any urgency involved.

4.6. <u>Indemnification of Registry Operator</u>. ICANN shall indemnify, defend, and hold harmless Registry Operator (including its directors, officers, employees, and agents) from and against any and all claims, damages, liabilities, costs, and expenses, including reasonable legal fees and expenses, arising solely from Registry Operator's compliance as required by this Agreement with an ICANN specification or policy (including, without limitation, a Consensus Policy) established after the Effective Date; except that Registry Operator shall not be indemnified or held harmless hereunder to the extent that the claims, damages or liabilities arise from the particular manner in which Registry Operator has chosen to comply with the specification or policy, where it was possible for Registry Operator to comply in a manner by which the claims, damages, or liabilities would not arise. As an alternative to providing the indemnity stated in this Subsection 4.6, ICANN may, at the time it establishes a specification or policy after the Effective Date giving rise to an indemnity obligation under this Subsection 4.6, state ICANN's election that the Registry Operator shall bear the cost of insuring the claims, damages, liabilities, costs, and expenses that would otherwise be indemnified by ICANN under this Subsection 4.6, in which case the reasonable cost to Registry Operator of such insurance shall be treated under Subsection 4.4 as a cost of providing Registry Services arising from the newly established ICANN specification or policy.

## MISCELLANEOUS PROVISIONS.

5.1. <u>Expiration of this Agreement</u>.

5.1.1. The initial Expiration Date shall be five years after the Commencement-of-Service Date, except that, in the case of a TLD not delegated within the Authoritative Root-Server System on the Effective Date, the initial Expiration Date shall be five years after the end of the Ramp-Up Period. The Expiration Date may be extended as provided in Section 5.1.2.

5.1.2. The initial Expiration Date shall be extended by one year in the event

that, on the date one year before the initial Expiration Date, Registry Operator has under management within the Registry TLD at least 19,827,980 Registered Names.

5.1.3. Registry Operator acknowledges and agrees that upon the earlier of (i) the Expiration Date or (ii) termination of this Agreement by ICANN pursuant to Subsection 5.4, it will cease to be the operator of the Registry TLD unless ICANN and Registry Operator enter a new registry agreement continuing Registry Operator's status as operator of the Registry TLD.

5.1.4. Upon conclusion of its status as operator of the Registry TLD, Registry Operator shall make all commercially reasonable efforts to cooperate with ICANN, and with any party designated by ICANN as successor operator, to facilitate prompt and smooth transition of the operation of the Registry TLD.

5.1.5. Registry Operator acknowledges and agrees that, except as expressly provided by this Agreement, it shall not acquire any right in the Registry TLD by virtue of its operation of the Registry TLD or its provision of Registry Services hereunder.

## 5.2. Procedure for Subsequent Agreement.

5.2.1. Registry Operator may, no later than eighteen months prior to the initial Expiration Date, submit a written proposal to ICANN for the extension of this Agreement for an additional term (the "Renewal Proposal"). The Renewal Proposal shall contain a detailed report of the Registry Operator's operation of the Registry TLD and include a description of any additional Registry Services, proposed improvements to Registry Services, or changes in price or other terms of service. ICANN shall provide an initial response to the Renewal Proposal within thirty days of receiving it and, during a period of at least six months after receiving the Renewal Proposal, ICANN shall consider the Renewal Proposal and meet with Registry Operator to discuss the Renewal Proposal, but the decision whether to accept the Renewal Proposal shall be in ICANN's sole discretion.

5.2.2. Only after the six-month period described in Subsection 5.2.1 may ICANN call for competing proposals from potential successor registry operators for the Registry TLD. Registry Operator shall be eligible, to the same extent as similarly situated entities, to submit a proposal to such a call. To the extent that the Renewal Proposal demonstrates (i) substantial service in the interests of the Internet community, (ii) enhancement of competition for registration services, and (iii) enhancement of the utility of the DNS, such demonstration shall be among the specific factors considered in ICANN's evaluation of any competing proposals, but the choice from among competing proposals shall be in ICANN's sole discretion.

5.2.3. In the event a party other than the Registry Operator is selected as the successor registry operator for the Registry TLD upon the expiration of this Agreement, ICANN shall require the successor registry operator to pay to Registry Operator a Registry Operator Transfer Fee equal to the difference of:

5.2.3.1 the present value, at the Expiration Date (as extended, if applicable), computed using a discount rate equal to the London Inter-Bank Offer Rate ("LIBOR") (based on the term of renewal of the successor registry operator) plus three percent per annum, of the revenue stream that would be achieved by the successor registry operator from renewal fees during the term (not taking into account any extensions) of the successor registry operator's registry agreement for Registered Names on the Expiration Date that have not been continuously under registration during the entire Base Period, assuming that the domain-name registrations are renewed at the time of their expiration for a renewal term and at annual renewal fees and rates described in the next four sentences. The assumed renewal term, fees, and rates shall be based on actual experience within the Registry TLD during a period (the "Benchmark Period") consisting of the eighteen months immediately prior to the Expiration Date. The assumed renewal term shall be the average total term by which registrations of Registered Names scheduled for expiration during the Benchmark Period are extended by renewal during the Benchmark Period. The assumed renewal rate shall be the percentage of names scheduled for expiration during the Benchmark Period that are extended by renewal at least once during the Benchmark Period. The assumed annual renewal fee shall be the lesser of (i) the maximum annual renewal fee that the successor registry operator may charge under its registration agreement and (ii) the average of the annual renewal fees charged by Registry Operator during the Benchmark Period; less

5.2.3.2 the present value, at the Expiration Date, computed using a discount rate equal to the LIBOR (based on the term of renewal of the successor registry operator) plus three percent per annum, of the expense stream that would result during the term (not taking into account any extensions) of the successor registry operator's registry agreement from continued registration of the registrations at the Expiration Date, with the same assumptions regarding renewal rates and terms set forth in Subsection 5.2.3.1 above. For purposes of this calculation, the annual expense of continued registration shall be assumed to be 45% of the assumed annual renewal fee stated in Subsection 5.2.3.1 above.

5.2.3.3 The calculation of present value shall be on a monthly basis with all renewals and expenses occurring in a given month assumed to occur at the end of the month. The Registry Operator Transfer Fee shall be paid, with interest per annum equal to the LIBOR plus three percent, from the Expiration Date, within nine months after the Expiration Date.

.3. Condition to Performance. In the event that ICANN is unable, through use of commercially reasonable efforts, to have the Registry TLD delegated within the authoritative Root-Server System to nameservers designated by Registry Operator within two years after the Effective Date, then this Agreement shall be automatically terminated

without liability of either party to the other party and neither party shall have any further obligation hereunder. Thirty days in advance of such an automatic termination, either party may propose an extension of the time in which delegation must occur, and in that event the other party shall consult in good faith (but without obligation to agree) concerning the proposal. No extension of the time in which delegation must occur shall be effective unless embodied in a written amendment signed by authorized agents of both parties to this Agreement.

5.4. Termination by ICANN. This Agreement may be terminated before its expiration by ICANN in any of the following circumstances:

5.4.1. There was a material misrepresentation, material inaccuracy, or materially misleading statement, made with knowledge of its falsity, inaccuracy, or misleading nature or without reasonable cause to believe it was true, accurate, and not misleading, of then-existing fact or of Registry Operator's intention in its application for the Registry TLD or any written material provided to or disclosed to ICANN by the Registry Operator in connection with the application. The foregoing shall not apply to projections or forward-looking statements (other than statements, not made in good faith, about Registry Operator's intentions) in the application or materials.

5.4.2. Registry Operator:

5.4.2.1. is convicted by a court of competent jurisdiction of a felony or other serious offense related to financial activities, or is the subject of a determination by a court of competent jurisdiction that ICANN reasonably deems as the substantive equivalent of those offenses; or

5.4.2.2. is disciplined by the government of its domicile for conduct involving dishonesty or misuse of funds of others.

5.4.3. Any officer or director of Registry Operator is convicted of a felony or of a misdemeanor related to financial activities, or is judged by a court to have committed fraud or breach of fiduciary duty, or is the subject of a judicial determination that ICANN deems as the substantive equivalent of any of these, and such officer or director is not immediately removed in such circumstances.

5.4.4. Registry Operator fails to cure any material breach of this Agreement (other than a failure to comply with a Consensus Policy adopted by ICANN during the Term of this Agreement as to which Registry Operator has obtained a stay under Subsection 5.9) within fifteen business days (or such longer reasonable period as may be necessary using best efforts to cure such breach) after ICANN gives Registry Operator written notice of the breach.

5.4.5. Registry Operator's action or failure to act has been determined by arbitration under Subsection 5.9 to be in violation of this Agreement and Registry Operator continues to act or fail to act in the manner that was determined to violate this Agreement for a period stated in the arbitration decision, or if no period is stated, fifteen business days.

5.4.6. Registry Operator acts or continues acting in a manner that ICANN has reasonably determined endangers the operational stability of Registry Services, the DNS, or the Internet after receiving three days notice of that determination.

5.4.7. Registry Operator fails to pay to ICANN the final amount of sanctions determined to be appropriate under the sanctions program described in Appendix Y within thirty days after the amount of sanctions is deemed final.

5.4.8. Registry Operator becomes bankrupt or insolvent.

This Agreement may be terminated in the circumstances described in Subsections 5.4.1 through 5.4.7 above only upon thirty calendar days written notice to Registry Operator (in the case of the circumstances described in Subsections 5.4.4, 5.4.5, and 5.4.6 occurring after Registry Operator's failure to cure), with Registry Operator being given an opportunity during that time to initiate arbitration under Subsection 5.9 to determine the appropriateness of termination under this Agreement. In the event Registry Operator initiates arbitration concerning the appropriateness of termination by ICANN, Registry Operator may at the same time request that the arbitration panel stay the termination until the arbitration decision is rendered, and that request shall have the effect of staying the termination until the decision or until the arbitration panel has granted an ICANN request for lifting of the stay. If Registry Operator acts in a manner that ICANN reasonably determines endangers the operational stability of Registry Services, the DNS, or the Internet and upon notice does not immediately cure, ICANN may suspend this Agreement for five calendar days pending ICANN's application for more extended injunctive relief under Subsection 5.9. This Agreement may be terminated immediately upon notice to Registry Operator in the circumstance described in Subsection 5.4.8.

5.5. Representations and Warranties of Registry Operator. Registry Operator represents and warrants to ICANN that:

5.5.1. it is a [insert Registry Operator's type of organization] duly organized, validly existing, and in good standing under the laws of [insert jurisdiction];

5.5.2. it has all requisite organizational power and authority to execute, deliver and perform its obligations under this Agreement;

5.5.3. the execution, performance and delivery of this Agreement has been duly authorized by Registry Operator; and

5.5.4. subject to Subsection 5.3, no further approval, authorization or consent of any governmental or regulatory authority is required to be obtained or made by Registry Operator in order for it to enter into and perform its obligations under this Agreement.

.6. Additional Covenants of Registry Operator. Throughout the Term of the Agreement, Registry Operator shall comply, in all material respects, with the covenants contained in Appendix W.

7. Indemnification of ICANN. Registry Operator shall indemnify, defend, and hold harmless ICANN (including its directors, officers, employees, and agents) from and against

any and all claims, damages, liabilities, costs, and expenses, including reasonable legal fees and expenses, arising out of or relating to: (a) the selection of Registry Operator to operate the Registry TLD; (b) the entry of this Agreement; (c) establishment or operation of the Registry TLD; (d) Registry Services; (e) collection or handling of Personal Data by Registry Operator; (f) any dispute concerning registration of a domain name within the domain of the Registry TLD; and (g) duties and obligations of Registry Operator in operating the Registry TLD; provided that, with respect to items (b) through (g) only, Registry Operator shall not be obligated to indemnify, defend, or hold harmless ICANN to the extent of ICANN's indemnification of Registry Operator under Subsection 4.6 and provided further that, with respect to item (g) only, Registry Operator shall not be obligated to indemnify, defend, or hold harmless ICANN to the extent the claim, damage, liability, cost, or expense arose due to a breach by ICANN of any obligation contained in this Agreement. For avoidance of doubt, nothing in this Subsection 5.7 shall be deemed to require Registry Operator to reimburse or otherwise indemnify ICANN for the costs associated with the negotiation or execution of this Agreement, or with the monitoring or management of the parties' respective obligations under this Agreement.

5.8. Indemnification Procedures. If any third-party claim is commenced that is indemnified under Subsections 4.6 or 5.7, notice thereof shall be given to the indemnifying party as promptly as practicable. If, after such notice, the indemnifying party acknowledges its obligation to indemnify with respect to such claim, then the indemnifying party shall be entitled, if it so elects, in a notice promptly delivered to the indemnified party, to immediately take control of the defense and investigation of such claim and to employ and engage attorneys reasonably acceptable to the indemnified party to handle and defend the same, at the indemnifying party's sole cost and expense, provided that in all events ICANN shall be entitled to control at its sole cost and expense the litigation of issues concerning the validity or interpretation of ICANN policies or conduct. The indemnified party shall cooperate, at the cost of the indemnifying party, in all reasonable respects with the indemnifying party and its attorneys in the investigation, trial, and defense of such claim and any appeal arising therefrom; provided, however, that the indemnified party may, at its own cost and expense, participate, through its attorneys or otherwise, in such investigation, trial and defense of such claim and any appeal arising therefrom. No settlement of a claim that involves a remedy affecting the indemnifying party other than the payment of money in an amount that is indemnified shall be entered into without the consent of the indemnified party. If the indemnifying party does not assume full control over the defense of a claim subject to such defense in accordance with this Subsection, the indemnifying party may participate in such defense, at its sole cost and expense, and the indemnified party shall have the right to defend the claim in such manner as it may deem appropriate, at the cost and expense of the indemnifying party.

5.9. Resolution of Disputes Under This Agreement. Disputes arising under or in connection with this Agreement, including requests for specific performance, shall be resolved through binding arbitration conducted as provided in this Subsection 5.9 pursuant to the rules of the International Court of Arbitration of the International Chamber of Commerce ("ICC"). The arbitration shall be conducted in the English language and shall occur in Los Angeles County, California, USA. There shall be three arbitrators: each party shall choose one arbitrator and, if the two arbitrators are not able to agree on a third arbitrator, the third shall be chosen by the ICC. The parties shall bear the costs of the arbitration in equal shares, subject to the right of the arbitrators to reallocate the costs in their award as provided in the ICC rules. The parties shall bear their own attorneys' fees in connection with the arbitration,

and the arbitrators may not reallocate the attorneys' fees in conjunction with their award. The arbitrators shall render their decision within ninety days of the initiation of arbitration. In all litigation involving ICANN concerning this Agreement (as provided in the remainder of this Subsection), jurisdiction and exclusive venue for such litigation shall be in a court located in Los Angeles, California, USA; however, the parties shall also have the right to enforce a judgment of such a court in any court of competent jurisdiction. For the purpose of aiding the arbitration and/or preserving the rights of the parties during the pendency of an arbitration, the parties shall have the right to seek a temporary stay or injunctive relief from the arbitration panel or a court located in Los Angeles, California, USA, which shall not be a waiver of this arbitration agreement.

5.10. Limitation of Liability. ICANN's aggregate monetary liability for violations of this Agreement shall not exceed the amount of Fixed or Variable Registry-Level Fees paid by Registry Operator to ICANN within the preceding twelve-month period under Subsection 3.14. Registry Operator's aggregate monetary liability to ICANN for violations of this Agreement shall be limited to fees and monetary sanctions due and owing to ICANN under this Agreement. In no event shall either party be liable for special, indirect, incidental, punitive, exemplary, or consequential damages arising out of or in connection with this Agreement or the performance or nonperformance of obligations undertaken in this Agreement. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, REGISTRY OPERATOR DOES NOT MAKE ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES RENDERED BY ITSELF, ITS SERVANTS, OR ITS AGENTS OR THE RESULTS OBTAINED FROM THEIR WORK, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE.

5.11. Assignment. Any assignment of this Agreement shall be effective only upon written agreement by the assignee with the other party to assume the assigning party's obligations under this Agreement. Moreover, neither party may assign this Agreement without the prior written approval of the other party. Notwithstanding the foregoing, a party may assign this Agreement by giving written notice to the other party in the following circumstances: (a) Registry Operator may assign this Agreement as part of the transfer of its registry business if such transfer and assignment are approved in advance by ICANN pursuant to its procedures, and (b) ICANN may assign this Agreement (i) in conjunction with a reorganization or re-incorporation of ICANN, to another non-profit corporation organized for the same or substantially the same purposes as ICANN or (ii) as required by Section 5 of Amendment 1 (dated 10 November 1999) to the 25 November 1998 Memorandum of Understanding between ICANN and the United States Department of Commerce.

5.12. Subcontracting. Registry Operator shall not subcontract portions of the technical operations of the Registry TLD accounting for more than 80% of the value of all Registry TLD operations without ICANN's written consent. When ICANN's consent to subcontracting is requested, ICANN shall respond within fifteen business days, and the consent shall not be unreasonably withheld. In any subcontracting of the technical operations of the Registry TLD, the subcontract shall state that the subcontractor shall not acquire any right in the Registry TLD by virtue of its performance under the subcontract.

5.13. Force Majeure. Neither party shall be liable to the other for any loss or damage resulting from any cause beyond its reasonable control (a "Force Majeure Event") including, but not limited to, insurrection or civil disorder, war or military operations,

national or local emergency, acts or omissions of government or other competent authority, compliance with any statutory obligation or executive order, industrial disputes of any kind (whether or not involving either party's employees), fire, lightning, explosion, flood, subsidence, weather of exceptional severity, and acts or omissions of persons for whom neither party is responsible. Upon occurrence of a Force Majeure Event and to the extent such occurrence interferes with either party's performance of this Agreement, such party shall be excused from performance of its obligations (other than payment obligations) during the first six months of such interference, provided that such party uses best efforts to avoid or remove such causes of nonperformance as soon as possible.

5.14. No Third-Party Beneficiaries. This Agreement shall not be construed to create any obligation by either ICANN or Registry Operator to any non-party to this Agreement, including any registrar or Registered Name holder.

5.15. Notices, Designations, and Specifications. All notices (including determinations, designations, and specifications) to be given under this Agreement shall be given in writing at the address of the appropriate party as set forth below, unless that party has given a notice of change of address in writing. Any notice required by this Agreement shall be deemed to have been properly given when delivered in person, when sent by electronic facsimile, or when scheduled for delivery by an internationally recognized courier service. Designations and specifications by ICANN under this Agreement shall be effective when written notice of them is deemed given to Registry.

If to ICANN, addressed to:

Internet Corporation for Assigned Names and Numbers
4676 Admiralty Way, Suite 330
Marina Del Rey, California 90292
Telephone: 1/310/823-9358
Facsimile: 1/310/823-8649
Attention: Chief Executive Officer

If to Registry Operator, addressed to:

[_____]
Telephone: _____
Facsimile: _____
Attention: _____

5.16. Dates and Times. All dates and times relevant to this Agreement or its performance shall be computed based on the date and time observed in Los Angeles, California, USA.

5.17. Language. All notices, designations, determinations, and specifications made under this Agreement shall be in the English language.

5.18. Amendments and Waivers. No amendment, supplement, or modification of this Agreement or any provision hereof shall be binding unless executed in writing by both parties. No waiver of any provision of this Agreement shall be binding unless evidenced by a writing signed by the party waiving compliance with such provision. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other

provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

5.19. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.20. Entire Agreement. This Agreement (including its Appendices, which form a part of it) constitutes the entire agreement of the parties hereto pertaining to the operation of the Registry TLD and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, between the parties on that subject. In the event of a conflict between the provisions in the body of this Agreement (Section 1 to Subsection 5.20) and any provision in its Appendices, the provisions in the body of the Agreement shall control.

WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate their duly authorized representatives.

TERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS

_____

M. Stuart Lynn
President and CEO

e:

rt name of Registry Operator]

_____

nsert name of official]
nsert title of official]

r drafts:

ril 2001
bruary 2001

---

Comments concerning the layout, construction and functionality of this site
should be sent to webmaster@icann.org.

Page Updated 19-May-2001

(c) 2001 The Internet Corporation for Assigned Names and Numbers. All rights reserved.

C



Search for a  Name
www. [          ] .info **GO**
**Advanced WHOIS Search**

Home > Register a .INFO Domain > Dispute Resolution >

**About .INFO**

**Register a .INFO Domain**

**Find a Registrar**

**Dispute Resolution**

Sunrise Challenge Overview

Afilias Bulk Sunrise Challenges

Notice of Changes to .INFO Sunrise Challenge Policy

Sunrise Challenge Policy (Revised)

Sunrise Challenge Rules (Revised)

Sunrise Challenge Policy (Original)

Sunrise Challenge Rules (Original)

.INFO Rollout Schedule

**WHOIS Search**

**FAQs**

**News and Events**

**Registrars**

**About Afilias**



**Deutsch**
**Français**
**Español**
日本語
한국어

**Contact us**

# Sunrise Challenge Rules (Original)

[Note: a revised version of these rules has been posted, persuant to the Rules (see paragraph 15) and approval by ICANN.]

Administrative proceedings for the resolution of disputes pursuant to the Sunrise Registration Challenge Policy adopted by Afilias shall be governed by these Rules.

## 1. Definitions

In these Rules:

**Center** refers to the World Intellectual Property Organization Arbitration and Mediation Center.

**Challenger** means a party which is challenging a domain name registration under the Sunrise Registration Challenge Policy.

**ICANN** refers to the Internet Corporation for Assigned Names and Numbers.

**Party** means a Challenger or a Respondent.

**Policy** means the Sunrise Registration Challenge Policy that is incorporated by reference and made a part of the Registration Agreement.

**Registrar** means the entity with which the Respondent has registered a domain name that is the subject of a challenge.

**Registration Agreement** means the agreement between a Registrar and a domain name holder.

**Registry** means the registry operator for the <.info> top-level domain.

**Respondent** means the holder of a domain name registration against which a challenge is initiated.

## 2. Communications

(a)    Except as otherwise provided in these Rules, any communication required under these Rules shall be made by electronic mail via the Internet.

(b)    For the purposes of any communications to the Center, the following addresses should be used:

(i) electronic mail: see http://arbiter.wipo.int/domains/

(ii) facsimile transmission: see http://arbiter.wipo.int/domains/

(iii) postal or courier service:

WIPO Arbitration and Mediation Center
34 chemin des Colombettes
1211 Geneva 20

**SUBSCRIBE TO OUR NEWSLETTER GO**
[Your E-Mail]

Land Rush 2 is now complete.

Thinking about buying or transferring an existing .INFO domain name? Some are subject to transfer restrictions and challenges.

A few of the great new .INFO sites being built across the Web:

• New York City's **Metropolitan Transportation Authority**

• **World Trade Center Relief Info**

• **Redsheriff**

Switzerland

(c)   All communications shall be made in the language prescribed in Paragraph 6.

(d)   Either Party may update its contact details by notifying the other Party, the Center, the Registrar and the Registry.

(e)   Except as otherwise provided in these Rules, all communications provided for under these Rules shall be deemed to have been made:

(i)   if via the Internet, on the date that the communication was transmitted, provided that the date of transmission is verifiable; or

(ii)   if by postal or courier service, on the date of mailing marked on the receipt; or

(iii)   if delivered by facsimile transmission, on the date shown on the confirmation of transmission.

(f)   Except as otherwise provided in these Rules, all time periods calculated under these Rules shall commence on the earliest date that the communication is deemed to have been made in accordance with Paragraph 2(e).

(g)   Except as otherwise provided in these Rules, any communication by

> (i)   the Center, following the commencement of an administrative proceeding pursuant to Paragraph 4(c), to any Party shall be copied to the other Party; and

> (ii)   a Party shall be copied to the other Party and the Center.

(h)   It shall be the responsibility of the sender to retain records of the fact and circumstances of sending, which shall be available for inspection by affected parties and for reporting purposes.

(i)   In the event that a Party sending a communication receives notification of non-delivery of the communication, that Party shall promptly notify the Center of the circumstances of the notification.

(j)   When a paper submission is to be made to the Center by a Party, it shall be submitted in three (3) sets, including the original of such submission.

3.   The Challenge

(a)   Any person or entity may initiate an administrative proceeding by submitting a challenge to the Center in accordance with the Policy and Rules.

(b)   The challenge shall be submitted in electronic form via the Internet using the Model Challenge Form made available by the Center.

(c)   The challenge shall:

> (i)   Request that the challenge be submitted for decision in accordance with the Policy and Rules and describe why the domain name registration should be considered subject to the Policy;

> (ii)   Provide the full name, postal and e-mail addresses, and the telephone and telefax numbers of the Challenger and of any representative authorized to act for the Challenger in the administrative proceeding;

> (iii)   Provide complete bank account details of the Challenger for purposes of any reimbursement of fees in accordance with

Paragraph 13;

(iv)    Provide the full name of the Respondent and, if different from the contact details available in the Whois database for the domain name, provide all information known to the Challenger regarding how to contact the Respondent or any representative of the Respondent, including contact information based on pre-challenge dealings;

(v)    Specify the domain name that is the subject of the challenge;

(vi)    Identify the Registrar with whom the domain name is registered at the time the challenge is filed;

(vii)    Describe, in accordance with the Policy, the grounds on which the challenge is made including, in particular, why the domain name that is the subject of the dispute should be considered to have been registered in violation of the sunrise registration conditions set forth in the Registration Agreement with specific reference to Policy, Paragraph 4 (a):

> (1)    at the time of the Respondent's registration of the Domain Name, no current (non-expired) trademark or service mark registration was issued in the Respondent's name; or
>
> (2)    the Domain Name is not identical to the textual or word elements of the trademark or service mark registration on which the registration of the Respondent's Domain Name is based; or
>
> (3)    the trademark or service mark registration on which the registration of the Respondent's Domain Name is based is not of national effect; or
>
> (4)    the trademark or service mark registration on which the registration of the Respondent's Domain Name was based did not issue prior to October 2, 2000.
>
> The above description should not exceed 2000 words;

(viii)    Specify, in accordance with the Policy, the remedies sought, i.e. transfer or cancellation of the Domain Name registration;

(ix)    Identify any other proceedings that have been commenced or terminated in connection with or relating to the domain name that is the subject of the challenge;

(x)    State that a copy of the challenge, together with the coversheet set out in Annex A hereto, has been sent or transmitted to the Respondent, the Registrar and the Registry;

(xi)    Include the following statement:

> "Challenger agrees that its claims and remedies concerning the registration of the domain name, the dispute, or the dispute's resolution shall be solely against the domain name holder and waives all such claims and remedies against (a)

the Center, (b) the Registrar, (c) the Registry, and (d) ICANN, as well as their directors, officers, employees, and agents.

Challenger certifies that the information contained in this challenge is to the best of Challenger's knowledge complete and accurate, that this challenge is not being presented for any improper purpose, such as to harass, and that the assertions in this challenge are warranted under the Sunrise Registration Challenge Policy, the Rules for Sunrise Registration Challenge Policy and under applicable law, as it now exists or as it may be extended by good-faith and reasonable argument."; and

(xii)   Specify the credit card (American Express, Visa or MasterCard), together with the name of the cardholder as it appears on the card, the card number and the card expiration date for purposes of payment of the Challenger's fee in accordance with Paragraph 13 (a).

(d)   The challenge may not relate to more than one domain name.

4.   Notification of Challenge

(a)   The Center shall review the priority challenge for formal compliance with the Policy and the Rules.  If the priority challenge is found to be in compliance with the Policy and the Rules and the Center is satisfied that the Challenger's fee has been paid in accordance with Paragraph 13 (a), the Center shall notify the priority challenge to the Respondent by sending it to the e-mail addresses and telefax numbers of the administrative contact for the domain name, as shown in the Whois database at the time of the notification of the priority challenge by the Center to the Respondent.  In addition, the Center shall notify the priority challenge to the e-mail addresses and telefax numbers of the Respondent, or of any representative of the Respondent, as provided by the Priority Challenger in accordance with Paragraph 3 (c) (iv).

(b)   If the Center finds the priority challenge to be formally deficient, it shall promptly notify the Priority Challenger of the nature of the deficiencies identified. The Priority Challenger shall have ten (10) days after such notification within which to correct any such deficiencies, after which the administrative proceeding will be deemed terminated without prejudice to the submission of another challenge by the Challenger.

(c)   The date of commencement of the administrative proceeding shall be the date the priority challenge is notified by the Center to the Respondent.

(d)   The Center shall notify the Priority Challenger, the Respondent, the Registrar, and the Registry of the date of commencement of the administrative proceeding.

(e)   If the Priority Challenger fails to remedy any deficiencies identified by the Center within the time period provided for in Paragraph 4 (b), the Center shall notify the Priority Challenger, the Respondent, the Registrar and the Registry of the deemed termination of the challenge and the fee of USD 295 paid by the Challenger pursuant to Paragraph 13 (a) of the Rules shall be deemed forfeited.

5.   The Response

(a)   Within ten (10) days of the date of commencement of the administrative proceeding, the Respondent shall specify the credit card (American Express, Visa or MasterCard), together with the name of the cardholder as it appears on the card, the card number and the card expiration date for purposes of

payment of the Respondent's fee in accordance with Paragraph 13 (b).

(b)   Within sixty (60) days of the date of commencement of the administrative proceeding the Respondent shall submit a response to the Center.

(c)   The response shall be submitted in hard copy (with annexes) by postal or courier service (postage pre-paid and return receipt requested) and in electronic form (without annexes) via the Internet using the Model Response Form made available by the Center.

(d)   The response shall:

>   (i)   Annex the originals or certified copies of any trademark or service mark certificates required to be submitted by the Respondent under Paragraph 4(b) of the Policy and respond specifically to the statements and allegations contained in the complaint and include any and all bases for the Respondent to retain registration of the disputed domain name with specific reference to Policy, Paragraph (4) (b).  Such description should not exceed 2000 words;

>   (ii)   Provide the name, postal and e-mail addresses, and the telephone and telefax numbers of the Respondent and of any representative authorized to act for the Respondent in the administrative proceeding;

>   (iii)   Provide complete bank account details of the Respondent for purposes of any reimbursement of fees paid by the Respondent in accordance with Paragraph 13 (c);

>   (vi)   Identify any other proceedings that have been commenced or terminated in connection with or relating to the domain name that is the subject of the challenge;

>   (vii)   Include the following statement:

>>   "Respondent certifies that the trademark or service mark forming the basis for the registration of the domain name was issued prior to October 2, 2000 and was current (non-expired) at the time of the registration of the domain name";

>   (viii)   Include the following statement followed by the signature of the Respondent or its authorized representative:

>>   "Respondent certifies that the information contained in this Response is to the best of Respondent's knowledge complete and accurate, that this Response is not being presented for any improper purpose and that the assertions in this Response are warranted under the Sunrise Registration Challenge Policy, the Rules for Sunrise Registration Challenge Policy and under applicable law, as it now exists or as it may be extended by good-faith and reasonable argument."; and

(e)   At the request of the Respondent, the Center may, in exceptional cases, extend the period of time for the filing of the response.

(f)   If a Respondent does not pay the Respondent's fee in accordance with Paragraph 13 (b) or does not submit a response, the Respondent shall be deemed to have defaulted and the challenge will be granted.

6.    Language of Proceedings

(a)    Unless otherwise agreed by the Center in exceptional circumstances, the language of the administrative proceeding shall be English.

(b)    Any trademark or service mark certificates in a language other than English, submitted by the Respondent in accordance with Paragraph 5 (d) (viii), must be accompanied by a certified translation into English.

7.    Further Statements

Unless otherwise requested or agreed by the Center in exceptional circumstances, no further statements or documents from either of the Parties are to be submitted.

8.    In-Person Hearings

There shall be no in-person hearings.

9.    Default

(a)    In the event that a Respondent does not comply with any of the time periods established by the Rules or the Center, the Center, unless it finds exceptional circumstances apply, shall proceed to a decision on the challenge.

(b)    If a Party, in the absence of exceptional circumstances, does not comply with any provision of, or requirement under, the Rules or any request from the Center, the Center may draw such inferences therefrom and may undertake such procedural steps as it considers appropriate.

10.    Center Decisions

(a)    The Center's determination of whether the response meets the conditions set forth in Paragraph 4(b) of the Policy will be based solely on a prima facie examination of any trademark or service mark certificates submitted by the Respondent. The Center's decision is of an administrative nature and shall be final. The Center shall not be required to state reasons for its decision.

(b)    The Center will use reasonable efforts to decide upon a challenge within twenty (20) days (as observed at the Center's place of business) of the receipt of the response or of the expiry of the deadline for the response, subject to the provisions of Paragraph 13 (b).

(c)    The Center in its sole discretion, may prior to rendering the decision, consult relevant intellectual property offices in the context of reaching its determination.

11.    Communication of Decision

(a)    The Center shall communicate the decision to each Party, the Registrar, and the Registry.

(b)    If a prevailing Challenger seeks the transfer of the domain name subject to the dispute, as stipulated in Paragraph 4 (j) of the Policy, such Challenger shall be provided with an authorization code generated by the Registry which will allow the Challenger to register the Domain Name in its name in accordance with the sunrise registration conditions of the Registration Agreement, at a registrar of its choice, within 10 days of the date on which the notification of the authorization code is sent to the Challenger.

(c)    In case of multiple challenges, the Center will issue the relevant notifications in accordance with Paragraph 4 (k) of the Policy.

12.    Settlement or Other Grounds for Termination

(a)   If the Challenger notifies the Center that the Parties have agreed on a settlement, the Center may suspend or terminate the administrative proceeding.

(b)   If it becomes unnecessary or impossible to continue the administrative proceeding for any other reason, the Center shall terminate the administrative proceeding.

(c)   In case of a termination of the administrative proceeding in accordance with (b), any fees paid by the Parties in accordance with Paragraph 13 shall be deemed forfeited.

13.   Fees

(a)   The filing of a challenge is subject to the payment of a Challenger's fee in the amount of USD 295, comprising of a non-refundable fee of USD 75 and a refundable fee of USD 220.  This fee is to be paid by credit card at the time of the submission of the challenge in accordance with Paragraph 3 (c) (xii).  If the Center is not satisfied that the Challenger's fee has been paid within 15 days of the filing of the challenge, the Center will dismiss the challenge on the basis of the Challenger's failure to pay the Challenger's fee.  In case of multiple challenges, Paragraph 4 (k) of the Policy shall apply and the credit card of a non-priority challenger will be debited only in the amount of the non-refundable fee of USD 75. in which case the full amount of USD 295 will be debited.

(b)   The filing of a response is subject to the payment of a Respondent's fee in the amount of USD 295.  This fee is to be paid by credit card within ten(10) days of the date of commencement of the administrative proceeding in accordance with Paragraph 5 (a).  If the Respondent fails to provide the credit card information for the payment of the Respondent's fee within ten days of the date of commencement of the administrative proceeding, the Center will send a reminder to the Respondent requiring it to submit such payment within ten (10) further days.  If the Center is not satisfied that the Respondent's fee has been paid within this period, the challenge will be granted on the basis of the Respondent's failure to pay its fee.

(c)   If a Respondent pays the Respondent's fee and establishes that the domain name subject to the dispute has been registered in compliance with the sunrise registration conditions set forth in the Registration Agreement, the Center will reimburse the Respondent's fee.

(d)   If a Respondent pays the Respondent's fee but fails to establish that the domain name subject to the dispute has been registered in compliance with the sunrise registration conditions set forth in the Registration Agreement, the Center will reimburse the Challenger's fee, subject to the withholding of the non-refundable fee in the amount of USD 75.

(e)   If a challenge other than a Priority Challenge is dismissed by the Center in accordance with Paragraph 4 (k) (ii) or (vi) of the Policy, the Center shall retain only a non-refundable fee in the amount of USD 75 as referred to in (a).

(f)   Under no other circumstances will a Challenger's fee or a Respondent's fee be reimbursed by the Center.

(g)   The Center will transfer to the Registry a portion in the amount of USD 25 of each Challenger's and Respondent's fee which it has effectively received and which is not to be reimbursed to the Parties in accordance with the preceding provisions of this Paragraph.

(h)   In the event that a Party whose challenge, other than a priority challenge, is dismissed by the Center, subsequently submits a new challenge against the new registrant of the domain name pursuant to Policy, Paragraph 4(j) or 4(k)(iv), the Center shall apply the USD 75 non-refundable fee previously debited and shall debit USD 220 in relation to such new challenge.

14.   Exclusion of Liability

The Center and any intellectual property office consulted by the Center shall not be liable to a Party for any act or omission in connection with any administrative proceeding under the Policy and the Rules.

15.   Amendments

The version of these Rules in effect at the time of the submission of the challenge to the Center shall apply to the administrative proceeding commenced thereby.  The Registry reserves the right to modify the Rules at any time.

Home | .INFO WHOIS | Contact Us | Legal Information
© 2001-2002 Afilias Limited. All rights reserved.
This page last updated: 16-October-2002 19:41 UTC